FILED

2021 Feb-12  AM 10:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| JANE DOE #1, and JANE DOE #2, on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO: |
| MG FREESITES, LTD, d/b/a "PORNHUB", a foreign entity; MG FREESITES II LTD, a foreign entity, MINDGEEK S.A.R.L., a foreign entity; MINDGEEK USA, INCORPORATED, a Delaware corporation; MG CY HOLDINGS LTD, a foreign entity; MINDGEEK CONTENT RT LIMITED, a Foreign entity; 9219-1568 QUEBEC INC. d/b/a MINDGEEK, a foreign entity; MG BILLING LTD, a foreign entity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT**  JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## COMPLAINT

## INTRODUCTION

1.     Plaintiffs and the proposed class are victims and survivors of childhood sex trafficking who had videos and images of their childhood sex trafficking sold and/or distributed on websites owned, operated, managed and controlled by Defendants. Defendants have victimized and exploited this child sex abuse material for profit.

2.     Defendants created, organized, and disseminated images and videos on their websites that depict child sexual abuse, often referred to as child pornography. Each of these images and videos are crime scenes Defendants monetized.

3.     Plaintiffs bring this action against Defendants, who financially benefited from, or otherwise participated in, a sex trafficking venture in which Plaintiffs were victims.  Plaintiffs,

who were under eighteen years of age at the time of filming, were depicted in commercial sex acts and child pornography, which was then made available for viewing on websites owned or operated by the Defendants.   This violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591 and 1595, among other laws.

## JURISDICTION AND VENUE

4.     The Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

5.     The Court may properly exercise personal jurisdiction over all Defendants.  Each of the Defendants maintains minimum contacts with Alabama, such that maintenance of this lawsuit does not offend traditional notions of fair play and substantial justice. Defendants have purposefully availed themselves of this Court's jurisdiction. Each Defendant directs substantial business activity into this jurisdiction. There is a substantial nexus between Jane Doe #1's claims and Defendants' activities.

6.     As set forth in more detail below, each of the Defendants acts as the alter ego of the others.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

## PARTIES

8.     Plaintiff Jane Doe #1 is an individual who is now the age of majority under Alabama law and presently resides in Alabama.  Jane Doe #1 is a victim of child sex trafficking and child pornography, in violation of the TVPRA.

9.     Due to the sensitive, private, and potentially retaliatory nature of Jane Doe #1's

allegations, she requests that this Court permit her to proceed under pseudonym.  Courts recognize

an exception to the general rule that pleadings name all parties when the issues involved are of a

sensitive and highly personal nature.  For good cause, as exists here, the Court may permit Jane

Doe #1 to proceed in pseudonym to protect a party from annoyance, embarrassment, oppression,

or undue burden or expense.  Here, granting pseudonym status is warranted because this litigation

will involve the disclosure of stigmatizing sexual information, including rape.  Jane Doe #1 fears

the stigma from her family, friends, employer, and community if her true identity is revealed in

the public record.

       10.    Defendants will not be prejudiced by Jane Doe #1's use of a pseudonym.  She will

agree to reveal their identity to Defendants for the limited purpose of investigating her claims once

the parties are governed by a protective order.  Jane Doe #1 simply seeks redaction of her personal

identifying information from the public docket and assurances that Defendants will not use or

publish her identity in a manner that will compromise her personal life or future employment

prospects.

       11.    Jane Doe #2 is an individual who is now the age of majority under Alabama law

and presently resides in California. Jane Doe #2 is a victim of sex trafficking and child

pornography, in violation of the TVPRA.

       12.    Due to the sensitive, private, and potentially retaliatory nature of Jane Doe #2's

allegations, she requests that this Court permit her to proceed under pseudonym.  Courts recognize

an exception to the general rule that pleadings name all parties when the issues involved are of a

sensitive and highly personal nature.  For good cause, as exists here, the Court may permit

anonymous pleading to protect a party from annoyance, embarrassment, oppression, or undue

burden or expense.  Here, granting pseudonym status is warranted because this litigation will

involve the disclosure of stigmatizing sexual information, including rape.  Jane Doe #2 fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

13.     Defendants will not be prejudiced by Jane Doe #2's use of a pseudonym.  She will agree to reveal her identity to Defendants for the limited purpose of investigating her claims once the parties are governed by a protective order.  Jane Doe #2 simply seeks redaction of her personal identifying information from the public docket and assurances that Defendants will not use or publish her identity in a manner that will compromise her personal life or future employment prospects.

14.     Defendant MG FREESITES, LTD, d/b/a "PORNHUB" is a foreign entity incorporated in the Republic of Cyprus conducting business throughout the United States, including within the Northern District of Alabama. Upon information and belief, MG FREESITES, LTD is a wholly owned subsidiary of MINDGEEK S.A.R.L., either directly or through intermediary companies that are also under the control of MINDGEEK S.A.R.L. Upon information and belief, MG FREESITES, LTD owns, operates, and/or manages one or several of the websites and is predominantly under the control of and operated by directors, officers and employees working in MindGeek's offices in the United States and Canada, with little business operations being conducted within the Republic of Cyprus, where MG FREESITES, LTD is incorporated.

15.     Defendant MG FREESITES II LTD, is a foreign entity incorporated under the laws of the Republic of Cyprus conducting business throughout the United States, including within the Northern District of Alabama. Upon information and belief, MG FREESITES II LTD owns, operates, and/or manages one or several of the websites.

16.     Defendant MINDGEEK S.A.R.L. is a foreign entity incorporated in Luxembourg conducting business throughout the United States, including within the Northern District of Alabama. Formerly known as ManWin, MINDGEEK S.A.R.L. is the convergence of two large pornography companies, Mansef and InterTube. Over the past decade, MINDGEEK S.A.R.L. acquired competing businesses and now owns and operates over one hundred (100) pornographic websites, production companies, and brands. Upon information and belief, MINDGEEK S.A.R.L. now owns and/or controls the majority of the pornography on the Internet, much of which it distributes for free to any person, regardless of age, who has a web connection. MINDGEEK S.A.R.L.'s principal place of business is Montreal, Canada, with satellite offices in San Diego, Los Angeles, San Francisco, London, Bucharest (Romania), and Nicosia (Cyprus).

17.     Defendant MINDGEEK USA, INCORPORATED, is a corporation incorporated in the State of Delaware conducting business throughout the United States, including within the Northern District of Alabama. Upon information and belief, MINDGEEK USA, INCORPORATED is a wholly owned subsidiary of MINDGEEK S.A.R.L., either directly or through intermediary companies also under the control of MINDGEEK S.A.R.L.

18.     Defendant MG CY HOLDINGS LTD is a foreign entity incorporated under the laws of the Republic of Cyprus conducting business throughout the United States, including within the Northern District of Alabama.

19.     Defendant MINDGEEK CONTENT RT LIMITED is a foreign entity incorporated under the laws of Ireland conducting business throughout the United States, including within the Northern District of Alabama. Upon information and belief, MINDGEEK CONTENT RT LIMITED owns, operates, and/or manages one or several of the websites.

20.     Defendant 9219-1568 QUEBEC INC., d/b/a "MindGeek", is a Montreal-based company conducting business throughout the United States, including within the Northern District of Alabama. Upon information and belief, 9219-1568 QUEBEC INC. employs between 750 and 999 employees with a portfolio of pornographic websites.

21.     Defendant MG BILLING LTD is a foreign entity incorporated under the laws of Ireland conducting business throughout the United States, including within the Northern District of Alabama. Upon information and belief, MG BILLING LTD owns, operates, and/or manages the subscription services for one or several of the pornographic websites.

22.     Defendants may collectively be referred to below as "MindGeek."

23.     Over the years, MindGeek's corporate grouping has included over one hundred subsidiaries and related companies around the world, including the United States.  The complete details of this complex network of related companies is unknown to the Plaintiffs and Class at this time.[1] However, MindGeek operates as a single business enterprise, commingling its funds and other assets to shelter and avoid liabilities and in an effort to hide the identity of all its owners and investors. All Defendants are jointly and severally liable in this action as alter egos of the other.

24.     In particular, Plaintiffs are unaware of any "MindGeek"-related entity that does not act at the direction of the MindGeek enterprise operated by the Defendants.

25.     MindGeek and its subsidiaries have utilized the United States judicial system to enforce their contractual and/or business rights relating to the business they systematically and routinely conduct within the United States, including their pornographic websites.

26.     Defendants conspired, facilitated, and financially benefited, from sex trafficking ventures between Defendants and others.  In these ventures, Jane Doe #1 and Jane Doe #2  and

---

[1] *See* https://opencorporates.com/corporate_groupings/MindGeek.

other minors were trafficked and commercially exploited in a sexual nature, in violation of law, including but not limited to, the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1591, *et seq*.

27.    Sex traffickers and the Defendants worked together to earn a profit from commercial sex acts and child pornography involving the Plaintiffs and Class members.

## **BACKGROUND**

28.    In 2000, Congress passed the Trafficking Victims Protection Act ("TVPA"). The TVPA was the first comprehensive law in the United States to penalize the full range of human trafficking offenses,[2] including sex trafficking of children under the age of 18 or sex trafficking by force, fraud, or coercion.[3]

29.    Congress reauthorized the TVPA in 2003.[4]  In doing so, the Trafficking Victims Protection Reauthorization Act ("TVPRA") created a civil cause of action, codified at 18 U.S.C. § 1595.[5]

30.    The TVPRA permits a party to bring a civil claim against perpetrators and against a person who, although not the actual perpetrator of a violation, knowingly benefits from participating in a venture that it should have known was engaged in a violation, including that an act involving a child 18 years of age or under constitutes a violation.[6]

31.    During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common

---

[2] See Victims of Trafficking and Violence Protection Act of 2000. Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1467(2000), available at https://www.congress.gov/106/plaws/publ386/PLAW-106publ386.pdf.
[3] See 18 U.S.C. § 1591(a) available at https://www.law.cornell.edu/uscode/text/18/1591
[4] See Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (2003), available at https://www.gpo.gov/fdsys/pkg/STATUTE-117/pdf/STATUTE-117-Pg2875.pdf
[5] See 18 U.S.C. § 1595(a) available at https://www.law.cornell.edu/uscode/text/18/1595
[6] Id.

humanity.  It ought to concern every community, because it tears at our social fabric.  It ought to concern every business, because it distorts markets.  It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[7]

32.     Statistics released in 2014 by the International Labor Organization showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[8]

33.     The United States Department of Justice estimates that pornographers have recorded the abuse of more than one million children in the United States.[9] The Internet has radically changed how child pornography is reproduced and disseminated according to the United States Department of Justice. "The expansion of the Internet has led to an explosion in the market for child pornography, making it easier to create, access, and distribute these images of abuse. While 'child pornography' is the term commonly used by lawmakers, prosecutors, investigators and the public to describe this form of sexual exploitation of children, that term largely fails to describe the true horror that is faced by hundreds of thousands of children every year. The child victims are first sexually assaulted in order to produce the vile, and often violent, images. They are then victimized again when these images of their sexual assault are traded over the Internet in massive numbers by like-minded people across the globe."[10]

34.     In the United States, the National Center for Missing and Exploited Children ("NCMEC") serves as the national clearinghouse for child pornography/child sexual abuse

---

[7] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), available at https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.
[8] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, available at https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[9] Roger J.R. Levesque, Sexual Abuse of Children: A Human Rights Perspective, at 66 (Ind. Univ. Press 1999).
[10] https://www.justice.gov/psc/docs/natstrategyreport.pdf

material reports.  NCMEC was created by an Act of Congress and is federally funded.  NCMEC operates the "CyberTipline," which gathers reports of child sexual exploitation (including child pornography, online enticement, and contact offenses). The CyberTipline provides an online mechanism for members of the public and electronic service providers to report incidents of suspected child sex trafficking or child sexual abuse images. In 2019, the CyberTipline processed 16.9 million reports and approximately 21 million reports in 2020. NCMEC also operates the U.S. Child Victim Identification Program and, as of 2019, it had reviewed more than 312 million images and videos of child sexual abuse material.[11]

35.    Through NCMEC's database, more than 13,200 child victims have been identified by law enforcement.

36.    On January 31, 2020, President Trump entered Executive Order #13903, entitled "Combating Human Trafficking and Online Child Exploitation in the United States."[12] The Order stated: "Human trafficking is a form of modern slavery. Throughout the United States and around the world, human trafficking tears apart communities, fuels criminal activity, and threatens the national security of the United States. It is estimated that millions of individuals are trafficked around the world each year—including into and within the United States." It further stated that "Twenty-first century technology and the proliferation of the internet and mobile devices have helped facilitate the crime of child sex trafficking and other forms of child exploitation. Consequently, the number of reports to the National Center for Missing and Exploited Children of online photos and videos of children being sexually abused is at record levels."

---

[11] Child Sexual Abuse Material (CSAM), National Center for Missing & Exploited Children, https://www.missingkids.org/theissues/csam (last visited Feb. 8, 2021).

[12] Exec. Order No. 13903, 85 FR 6721, 6721-6723 (Jan. 31, 2020), available at https://www.federalregister.gov/documents/2020/02/05/2020-02438/combating-human-trafficking-and-online-child-exploitation-in-the-united-states.

## FACTUAL ALLEGATIONS

**A.    COMMERCIAL SEX ACTS INVOLVING MINORS IS SEX TRAFFICKING**

37.    Under 18 U.S.C. § 1591(e)(3) the term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3).

38.    Section 1591(a)(1) and (a)(2) make it a crime to benefit, financially or by receiving anything of value from participation in a venture which knowingly recruit, entice, harbor, transport, provide, obtain, maintain, patronize, or solicit by any means a person to engage in a commercial sex act OR that the person has not attained the age of 18 years old and will be caused to engage in a commercial sex act.  18 U.S.C. § 1591(a)(1).  Section 1591(a)(2) also makes it a crime to knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the acts described in § 1591(a)(1).

39.    The TVPRA, as amended in 2008, improved a victim's ability to hold traffickers accountable, by eliminating the requirement to prove a particular defendant knew a sex trafficking victim was a minor, in cases where the defendant had a reasonable opportunity to observe the minor.  The TVPRA also significantly expanded the civil cause of action and extended liability to those who financially benefit from sex trafficking. The revised civil remedy provision allows sex trafficking survivors to bring suit against anyone who benefits financially or receives anything of value from the violation. The TVPRA's civil remedy provision grants survivors the right to sue the direct perpetrator *as well as anyone else* who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of [the statute.]"  18 U.S.C. § 1595(a) (emphasis added).

40.    In 2018, Congress passed a bill known as Fight Online Sex Trafficking Act ("FOSTA") and Stop Enabling Sex Traffickers Act ("SESTA") (collectively, "FOSTA/SESTA")

to amend 47 U.S.C. § 230, the Communications Decency Act, to clarify that it was never intended to provide immunity or protect the arrangement of illegal commercial sex acts with children or adult victims of human trafficking on websites.[13]  Arguably, FOSTA simply made it clear that the law would now be enforced against internet and web-based companies that advertise and profit from sex trafficking.  The FOSTA/SESTA amendment to Section 230 is retroactive, applying "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after … enactment."[14]

41.     Plaintiffs are victims of sex trafficking within the meaning of 18 U.S.C. §1591 and are therefore entitled to bring a civil action under 18 U.S.C. §1595.

### B.     MINDGEEK FACILITATES SEX TRAFFICKING OF MINORS

42.     Defendants own and operate a large number of websites, including their four most popular websites: www.PornHub.com ("PornHub"), www.YouPorn.com, www.RedTube.com, and www.Tube8.com. MindGeek boasts it has over 115 million daily visitors[15] to its various websites, from which it has consolidated production, distribution, possession, and advertising.[16]

43.     Unlike other video websites like YouTube, MindGeek's websites also include a download button to allow for the transfer of images and videos, including the child sexual abuse material appearing on the Defendant's websites, from their servers to an undisclosed number of child pornographers, child sex traffickers, and pedophiles.

44.     MindGeek proclaims PornHub to be its flagship website.

---

[13] Pub. L. 115–164, §2, Apr. 11, 2018, 132 Stat. 1253
[14] See, 132 Stat. 1253, §4(b); see also Woodhull Freedom Found v. United States, No. 18-5298, 2020 WL 398625 (D.C. Cir., June 24, 2020).
[15] www.mindgeek.com (last visited Feb. 11, 2021)
[16] https://nationalpost.com/news/how-a-canadian-founded-company-youve-never-heard-of-took-control-of-the-porn-industry (last visited Feb. 10, 2021)

45.     In December 2019, MindGeek released its annual PornHub Insights report and revealed that over 6.83 million new videos had been uploaded to PornHub in 2019.[17] "To put this in perspective – if you strung all of 2019's new video content together and started watching them way back in 1850, you'd still be watching them today!"[18] In addition, there were 42 billion visits to PornHub in 2019 and the United States remained by far the country with the highest daily traffic on PornHub, with Alabama users ranking second in the nation in time spent per visit to PornHub.

46.     ModelHub is a MindGeek company that offers the "amateur" pornographer various methods to upload content and create revenue based on views of material uploaded to PornHub, PornHub premium channel, and ModelHub.  When a user goes to the PornHub site, it can select the MindGeek created link for ModelHub as an option.

47.     The process for an "amateur" pornographer to create a ModelHub account is a short form and a picture identification as age verification. The only requirement is that the account holder be at least 18 years old, however, it is unclear how this requirement is verified. Once a ModelHub account is created videos may be uploaded. If a video posted by an amateur pornographer includes other parties or individuals, MindGeek has no effective process to verify age.  Essentially, "moderators" hired by MindGeek eyeball the performers in the video to see if they look young.   If the performer is a child under the age of 12, it may be more likely that a moderator would flag that video or image.  However, if the performer is 15, 16, 17, the moderator may be less likely, and less inclined, to flag that video or image due to the ineffective system

---

[17] https://www.pornhub.com/insights/2019-year-in-review
[18] Id.

PornHub implemented.  Just give just one documented example of the problem: one mother found her missing child was in 58 videos on adult websites, which included ModelHub and PornHub.[19]

48.     MindGeek shapes the content of amateur material when they ask amateurs to fill out an online form stating what type of requests the amateur is willing to take. MindGeek retains 35% of the total revenue. Further, competitions for cash and prizes are promoting riskier behaviors that are encouraged by PornHub based on what users are searching for. ModelHub encourages tips from users and takes a percentage of the tips from the ModelHub performers that receive payment. There is no guarantee or check on whether or how any additional persons in the video are at least 18 years of age, and whether they consented or understood that the video would be uploaded for the profit of the ModelHub member.[20]

49.     PornHub added over 98,000 new members in 2019 to its Modelhub program bringing the total to around 130,000.[21]

50.     With its Modelhub program and other pay, subscription, and premium content, MindGeek profited from images and videos of commercial sex acts, including the sexual abuse and rape of children who were under eighteen years of age. This profit-making activity included the rape of each of the Plaintiffs.

---

[19] Paul, P., 2021. *15-year-old girl missing for a year spotted in 58 videos on adult websites, Periscope and Snapchat by mother*. [online] MEAWW. Available at: <https://meaww.com/missing-teen-adult-video-pornhub-modelhub-snapchat-periscope> [Accessed 11 February 2021].
[20] *See, "How to Make Money On PornHub (Simple Guide to Making Your First $100)"* posted on May 6, 2019. Available at: <https://www.blackandwhite.ninja/blog/how-to-make-money-on-pornhub> [Accessed on February 10, 2021].
[21] *See*, https://www.pornhub.com/insights/2019-year-in-review

51.     The MindGeek company that collects subscriptions from premium users of MindGeek's websites (MG Billing Ltd) generated revenue of $1.3 billion between 2012 and 2018 and revenue for 2018 alone totaled $220.9 million – or a weekly average of $4.2 million.[22]

52.     MindGeek's billions of monthly views allow it to gather massive amounts of consumer data, and to use that data to grow, become more competitive, and help shape new content.[23] MindGeek uses "data-driven creativity" to produce content that is tailor-made for users according to what they have previously enjoyed.[24] According to press reports, MindGeek uses data mining to register what videos users are choosing, as well as more detailed metrics: which moments they pause at, which scenes they skip, and which scenes they rewind to and replay.[25] MindGeek even harvests data on the clothes actors wear and the furniture in the videos.

53.     MindGeek uses its data mining ability to create an infinite amount of satisfying content tailored for a particular user or group of users and to suggest or promote content to a user based on his or her user history.

54.     In addition, MindGeek generates titles and tags for video and image uploads and reviewers at MindGeek also edit titles and tags associated with videos and images on its websites. Tags are keywords to be associated with a video and will be referenced when users search the websites' video collection.[26]  Many of the tags, categories, and search suggestions that have been created or edited by MindGeek facilitate the experience for users turning to MindGeek's websites

---

[22] Gordon Deegan, *Grant Thornton Resigns as Auditor to Firms Owned by PornHub Operator,* Irish Times, (February 9, 2021) https://www.irishtimes.com/business/economy/grant-thornton-resigns-as-auditor-to-firms-owned-by-pornhub-operator-1.4480517#.YCMd5f48f6s.twitter

[23] Kal Raustiala and Christopher Jon Sprigman, *The Second Digital Disruption: Streaming and the Dawn of Data-Driven Creativity,* 94 N.Y.U. L. Rev. 1555, 1583 (2019), https://www.nyulawreview.org/wp-content/uploads/2019/12/NYULawReview-94-6-RaustialaSprigman.pdf.

[24] Sam Harton, *The Porn Industry Leads Streaming Services In User Data Mining (UPDATED)*, My Tech Decisions (January 2, 2019),  https://mytechdecisions.com/compliance/the-porn-industry-leads-streaming-services-in-user-data-mining/.

[25] *Id.*

[26] https://help.pornhub.com/hc/en-us/articles/360044322674-What-are-tags-

for easy access to child pornography, child sex trafficking, or any other form of child sexual abuse material. One such tag MindGeek used to classify pornographic content on its websites was "Teen." Examples of the "Teen" tag or suggested search terms on PornHub have been shared on social media platforms such as Twitter. The suggested terms include "abused teen," "crying teen," and "Middle Schools Girls."[27] In 2018, the word "teen" was the seventh most searched term on all of PornHub.[28] Despite this, MindGeek's chief operating officer told members of the Standing Committee on Access to Information, Privacy and Ethics that "teen" in the "adult world" means "18 to 25, 18 to 27."[29]

55.    In short, MindGeek's suggested search terms and tags make it easier for pedophiles to find the exact content they want: child sexual abuse material, including that of the Plaintiffs.

56.    MindGeek's platform traditionally made it easy for traffickers, rapists, or would-be criminals to go undetected as account holders or managers who would control and recover any associated compensation.

57.    For years, MindGeek has also directly produced content for its various websites and viewers. In 2016, MindGeek boasted that it was producing "over 400 exclusive scenes every month."[30]

58. The content MindGeek creates relies on data gathered from its users' habits to highlight new trends, compare viewing habits of users in different cities or regions, and generally parse the online behavior of its millions of consumers.

---

[27] See https://twitter.com/LailaMickelwait/status/1352166713559662593?s=20; See also https://twitter.com/LailaMickelwait/status/1352706802094227456?s=20
[28] https://www.pornhub.com/insights/2018-year-in-review#searches
[29] https://parlvu.parl.gc.ca/Harmony/en/PowerBrowser/PowerBrowserV2/20210205/-1/34697?Language=English&Stream=Video
[30] Orlando Crowcroft, *PornHub: How 'the YouTube of sex' changed the porn world - and how it may still destroy it*, International Business Times (Apr. 25, 2016), https://www.ibtimes.co.uk/pornhub-how-youtube-sex-changed-porn-world-how-it-may-still-destroy-it-1554844.

59.     MindGeek harnesses the data it compiles and analyzes to write scripts and specify details in those video shoots. The level of detail and overall approach to MindGeek's content production illustrates the impact of MindGeek's analysis of user data on MindGeek's content creation process. MindGeek caters to fetishes and incorporates and highlights elements of the videos on its websites that data suggests are essential to success. MindGeek's leadership has stressed that content choices reflect the data mining of millions of views, which allows MindGeek to determine what variables produce the highest viewership. MindGeek's data analyses are used to instruct future content and the placement of future content, including child sexual abuse material, on its websites.  MindGeek knows that certain dialogue, sex acts, and particular positions and camera angles drew in more viewers than did others.

60.     Very simply, MindGeek uses its billions of monthly views to make decisions about specific features of the content it creates and curates on its various websites. MindGeek suggests to users what other content a particular user might like based on prior viewing and will also categorize all the material on its websites, including the child sexual abuse material, based on data, revealing the terms that are most widely searched for that particular content to know how to drive user engagement.[31] MindGeek leverages its user data to shape the particulars of content.[32]

61.     There have been numerous reports of child sexual abuse material on MindGeek's websites. All of the reported child sexual abuse material was available for streaming and download on MindGeek's websites and in some reports, was left up on the websites by MindGeek even after the child victim requested that MindGeek remove the child sex abuse material from its websites.[33]

---

[31] Raustiala and Sprigman, *supra* note 22, at 1590-1591.

[32] *Id.*

[33] Nicholas Kristof, *The Children of PornHub*, The New York Times, (December 4, 2020) https://www.nytimes.com/2020/12/04/opinion/sunday/pornhub-rape-trafficking.html; Mega Mohan, *I Was Raped at 14, and the Video Ended Up on a Porn Cite,* BBC News, (February 10, 2020) https://www.bbc.com/news/stories-51391981; Minnyvonne Burke, *Florida man arrested after videos of missing teen surface on pornography website,*

62.     MindGeek completely fails to control the torrent of videos available on its sites depicting children being molested, rapes of children and adults, persons who are incapacitated and otherwise unwilling participants.

63.     MindGeek maintains an offshore "moderation team" of reviewers whose job it is to review uploaded videos to identify anything "inappropriate," including, but not limited to, child pornography videos.

64.     Despite the incredible volume of material being posted, MindGeek employs only around ten people on this team at any given time throughout the day.  These people have no prior training, medical or otherwise, to identify whether someone depicted in a pornographic video is a child.

65.     There are essentially three categories of "inappropriate" videos that these individuals are tasked with identifying: (1) underage; (2) slightly underage and (3) non-minor inappropriate videos, such as bestiality videos or videos where someone is being murdered.

66.     Workers at MindGeek report categorizing and tagging sex acts and fetishes, as well as viewing "suspicious" content, "from puppies being kicked to death, to child abuse, rape and incest."[34]

67.     MindGeek's philosophy is that if videos appeared to be "professionally made," moderators were to assume that they were not child pornography and should not be flagged as inappropriate.

---

NBC News, (October 25, 2019) https://www.nbcnews.com/news/crime-courts/florida-man-arrested-after-videos-missing-teen-surface-pornography-website-n1072141

[34] https://www.dailymail.co.uk/news/article-9065059/Ex-PornHub-moderators-reveal-life-inside-explicit-video-site-sued-80m.html

68.     The ten individuals on the "moderation team" were each tasked by MindGeek to review approximately 800-900 pornographic videos per 8-hour shift, or about 100 videos per hour. According to PornHub, there are approximately 18,000 videos uploaded daily, with an average length of approximately 11 minutes per video.[35]   Hence, each moderator is tasked with reviewing approximately 1,100 minutes of video *each hour*.  This is an impossible task, and MindGeek knows that.[36]  To compensate, moderators fast-forward and skip through videos, often with the sound turned down.  The problem is not resources: MindGeek's annual revenues are approximately $500 million and it could certainly hire more moderators.

69.     MindGeek's policies, or lack thereof, incentivize its employees not to remove child pornography and other inappropriate content.  There is a yearly bonus system, based on the number of videos approved. This results in individuals fast-forwarding to the end of videos (or not reviewing them at all) and approving them, even if they depict sexual trafficking of children.

70.     The impossible conditions also result in low morale for the individuals tasked with reviewing videos.  These reviewers watch hours upon hours of demoralizing and disturbing videos, including child pornography.

71.     Worse, not all of the reviewers even have the authority to remove videos.  Even when there was a report that a video contained child pornography, it could only be removed by the "team leader."  There is an approximate backlog of five months between the time a video is reported by a user as "inappropriate" and the time it is reviewed by a "team leader" to determine whether it should be removed.  Thus, for five months, such videos would sit on MindGeek's sites, available for downloading and redistribution.

---

[35] *See*, https://www.pornhub.com/insights/2019-year-in-review
[36] https://parlvu.parl.gc.ca/Harmony/en/PowerBrowser/PowerBrowserV2/20210205/-1/34697?Language=English&Stream=Video at 14:01

72.     MindGeek employees reviewed comments to videos and deleted comments that informed MindGeek that a video constituted child pornography or otherwise should be removed from the system.

73.     It is also known that minor victims of sex trafficking and their representatives have contacted MindGeek to remove videos of them from its websites.  MindGeek has refused to do so. Further, in December 2020, MindGeek suspended "nine to ten million unverified videos" much of which likely contains child abuse.[37]  This is clear evidence that MindGeek is knowingly in possession of child pornography and is allowing distribution, production, advertising, and possession of it for profit.[38]

74.     MindGeek functioned such that a subscriber could use search terms such as "rape," "preteen," "pedophilia", "underage rape," and "extra small teens"  and call up videos depicting the same.[39]

75.     Finally, even where videos have been removed for being child porn -- or carrying illegitimate search terms -- MindGeek has sometimes just retitled these videos and has failed to remove them from being viewed or downloaded.  So even when illicit videos are discovered, MindGeek has sometimes simply looked the other way.[40]

### C.     MINDGEEK MONETIZED CHILD SEX TRAFFICKING, CHILD RAPE, CHILD SEXUAL ABUSE MATERIAL, AND CHILD PORNOGRAPHY

---

[37] *See*, Pornhub removes a majority of its videos after investigation reveals child abuse - CNN

[38] https://www.bbc.com/news/stories-51391981, "I was raped at 14 and the video ended up on a porn site"  Meghan Mohan; *see also*, https://www.ourcommons.ca/webcast/43-2/ETH/19

[39] https://www.nytimes.com/2020/12/04/opinion/sunday/pornhub-rape-trafficking.html?searchResultPosition=1

[40] https://www.nytimes.com/2020/12/04/opinion/sunday/pornhub-rape-trafficking.html

76.     MindGeek actively controls how videos are posted; the discussions/comments surrounding particular videos and images; processes for viewing, posting, and creating accounts; and processes for encouraging and rewarding income and fees for downloaded and viewed content.

77.     MindGeek uses its data-mining machine to steer porn viewers toward content that they seek the most.

78.     Specifically, MindGeek, along with PornHub, use a technique called "data-driven authorship", in which MindGeek produces content that is tailor-made for users related to what they enjoyed viewing, including which moments viewers paused at, which scenes they rewind to, the type of clothes the actors wear and the type of furniture in the videos.  MindGeek uses this data to actively create pages on its sites, drive specific content to specific users, including videos involving non-consensual actors, rape, and child pornography, to create an infinite amount of satisfying content for each user.  This effort by MindGeek is clearly more than a passive host of videos; rather MidGeek is actively and materially creating and contributing to content users view.[41]

79.     TraffickJunky is a web advertising and digital marketing company created by MindGeek for use on its PornHub site.  One of the revenue models for MindGeek is based on being able to sell ads to advertisers.  As noted above, MindGeek hires reviewers who are instructed to label and tag videos and images for the purpose of viewing and categorizing content, and also so that advertisers can reach users quickly.  If users are searching for a term frequently then MindGeek can produce or tag materials based on frequent search terms by the users.  MindGeek is an editor of advertisements placed on its website and TraffickJunky is the department within MindGeek that facilitates "data driven decisions" about advertising content.  These ads frequently highlight terms such as "girls," "boys," "broken teens," and "twink," which are terms that are

---

[41] *See*, https://mytechdecisions.com/compliance/the-porn-industry-leads-streaming-services-in-user-data-mining/

known and encouraged for use by MindGeek and are the same terms that promote the use and creation of child sexual abuse materials.

80.    MindGeek developed ads and affirmatively chose the characteristics and categories of content to determine what users would be targeted and where the ads would be directed.

81.    To draw in new users and maintain market share, MindGeek makes most of its library fully available and free to view, even without creating an account.  In this way, MindGeek will distribute content -- including child pornography -- to anyone.

82.    Users can access as much pornography as they like without creating an account. [42] MindGeek analyzes and optimizes user data to subtly lead viewers to create accounts.[43]   It does this for means of user convenience.  This permits MindGeek to better track and understand what users like.  MindGeek uses the data to facilitate and route viewers to increased engagement with the platform and leads viewers to paid subscriptions offering premium content of the type of pornography enjoyed by the viewer, even if that content involves child rape, pornography, or other rapes.

83.    The videos appear on ModelHub and the video would then be further classified by MindGeek manually or via technology to account for search terms and fetishes.

84.    MindGeek employees and supervisors have the ability to change and edit the titles and tags associated with videos and images to optimize the search features for users.  The collected and organized data encourages user profile preferences and increased engagement by the user with the website.  Further, MindGeek employees decide which videos are to be featured on the

---

[42] *See*, Porn sites collect more user data than Netflix or Hulu. This is what they do with it. (yahoo.com), https://finance.yahoo.com/news/porn-sites-collect-more-user-130045307.html
[43] *Id*.

homepage by requiring that they last at a minimum of 5 minutes, however, "videos 10 minutes or longer will achieve optimal viewing results."[44]

85.     MindGeek employees create content on their PornHub site meant to increase and encourage visits to particular pornographic videos and images by developing an achievement system for milestones related to particular videos and views.  More views and longer views equals more money.

86.     More user engagement means more profit.   MindGeek offers premium subscriptions to users.   MindGeek sells advertising on its sites.  More views means more money.

87.     MindGeek sells videos on a one-off or subscription basis.   Videos may be downloaded for a cost as well.  Under this model, MindGeek makes the sale for a fixed price for download, as well as any applicable subscription fees, then divides that revenue with users who have uploaded videos.  The commission is gauged by the length of time a video is viewed or number of times a video is downloaded.

88.     MindGeek does not have adequate protocols and procedures to identify or remove and report videos with titles or tags that captures words like child rape, incest, or other violent, criminal or inappropriate content.

89.     MindGeek is generating millions of dollars in advertising and membership revenue, applies sophisticated data analytics to multiple dimensions of its videos, down to the camera angles, and yet they do not have an effective system in place to reliably verify the age or consent of those featured in the pornographic content, or most importantly prevent and guard against sex trafficking of the most vulnerable victims whose bodies have been sold for profit without limitation.

---

[44] See, https://help.pornhub.com/hc/en-us/articles/229817247-how-long-should-my-videos-be; and https://www.pornhub.com/content_partner_guide.pdf.

90.     MindGeek took no meaningful initiative to verify whether illegal content existed in a particular video or image, whether the performers in the videos or images were minors, forced participants,  or non-consenting participants because they were asleep, drugged, or otherwise incapacitated, or to sufficiently validate the identity of the account owner such as requiring a two-step verification process (true credit card or bank account matching the photo ID for the account holder); requiring IP addresses and personal information of the owner and operator of the device used to post the video or image; and a detection of performers in a video with a match to IDs uploaded to the site.

91.     Until December 2020, PornHub did not require verification of an account owner unless the account owner was seeking to have the video monetized.   MindGeek's "verification" or "validation" process has been updated but remains woefully inadequate and essentially boils down to reliance on an untrained layperson attempting to match a government ID photo against a pornographic video.

92.     MindGeek also does a poor job verifying the "sellers", account holders and uploaders of videos.  It does not consistently know who is posting or performing in such videos.

93.     MindGeek also makes no effort to verify co-performers in the video at the time of upload, requiring only that a co-performer agreement be kept if there are others in the video in case MindGeek decides to check for the consent of co-performers in the future.  Further, the site, acknowledging that account holders are not required to verify the participants in the video, indicates "if you forget to identify yourself in the upload process" (much less any co-peformer, rape victim, or non-consenting participant) just email them.[45]

---

[45] See, www.pornhub.com/partners/models (last accessed 2/9/2021)

94.     In February 2021, MindGeek wrote to the Canadian Committee on Access to Information, Privacy and Ethics ("Committee") admitting that non-consensual material continues to make its way to the PornHub site.  "Material [on the site] identified as non-consensual (meaning that images depict non-consensual activities or the content was uploaded without consent of the participants)...." will be disabled, fingerprinted so it cannot be uploaded again, and ban the account user who uploaded it.  However, as stated above, without adequate account holder verification measures in place when opening accounts or uploading material, banned users and banned material can and do find its way back onto the site.

95.     Further, even if the user is banned for child pornography or rape and blocked from immediate reentry, the banned account owner or user could be essentially banned for only 90 days. After that, unless the illegal and inappropriate data is actually reported by PornHub and asked to be preserved, the "content and user's details" will be "deleted" after 90 days opening the door to reposting.

96.     MindGeek employees responsible for viewing videos for illegal, banned or inappropriate content formally report very few.  Generally, when the uploader has a history of highly viewed content, the employees are only permitted to send warning letters about illegal or inappropriate content.

97.     PornHub permits and encourages the use of VPN connections (less secure and less traceable connection) to create accounts, browse and process videos, including those containing illegal content, so as to keep the users' location and true identity private and anonymous.

98.     MindGeek is aware that its PornHub site attracts sex traffickers.[46]   Users of PornHub, including sex traffickers, realize quickly that the video they have of a minor or victim

---

[46]  *See,*  A Survivor of Teen Porn Trafficking Speaks Out on PornHub - Exodus Cry, https://exoduscry.com/blog/shiftingculture/a-survivor-of-teen-porn-trafficking-speaks-out-on-pornhub/

under force, fraud or coercion is more likely than not to be permitted on the site with no real risk. The inadequacies of the site, including lack of: (1) meaningful verification of identification, (2) consent from all performers in the video, (3) IP addresses connected to the account, (4) prohibition on accounts having "managers"; or (5) other available safeguard processes, essentially permit sellers (and traffickers) to remain anonymous and risk free.

99.    MindGeek is responsible, in whole or in part, for the development and creation of guidelines which necessarily permit, create and encourag sex trafficking and child pornography on its website, PornHub.  Videos are posted to ModelHub for a fee or otherwise a portion of profits from monetizing the video.  MindGeek facilitates and assists traffickers and purchasers of child pornography through its account creation and data mining efforts.  Through the unique systems established by MindGeek, child pornography and videos of rape, are organized, tagged, and optimized to create optimal opportunity for profits.

### D.    SEX TRAFFICKING OF PLAINTIFF JANE DOE #1 VIA MINDGEEK

100.    In 2018, when Jane Doe #1 was just sixteen years old, she was drugged and raped by a man in Tuscaloosa, Alabama. The child sexual abuse and rape of Jane Doe #1 was filmed. That same man entered into a business agreement or profit sharing relationship with MindGeek under its Modelhub program.  Under the terms of that program, MindGeek and Jane Doe #1's rapist agreed to share profits from views and downloads of Jane Doe #1's victimization on MindGeek's websites.  MindGeek reviewed, categorized, tagged, and disseminated the images and videos depicting the rape and sexual exploitation of sixteen year old Jane Doe #1. One of the videos of Jane Doe #1 had been viewed over 2,400 times since MindGeek added it to its websites in early 2018.

101.    At no time did MindGeek or PornHub attempt to verify Jane Doe #1's identity, age, inquire about her status as a victim of trafficking, or otherwise protect or warn against her traffickers before or while the video of her being drugged and raped was sold, downloaded, viewed and otherwise advertised on PornHub.  Neither Jane Doe #1 nor any parent or legal guardian consented to having a video or image of her appear on PornHub, and neither Jane Doe #1 nor any parent or legal guardian could lawfully consent to the many adults who purchased, downloaded, viewed, or otherwise subscribed to the video of her rape and sexual exploitation.

102.    At least two videos that included Jane Doe #1 have been identified. One had a title that included the word "Lil" which is often used to signify youth.[47]

103.    Videos of an adult engaging in sex acts with Jane Doe #1 while she was a minor were uploaded and disseminated through websites owned, operated and/or controlled by Defendants. Neither PornHub, nor any other website, owned or operated by Defendant MindGeek undertook any measure to verify Jane Doe #1's identity or age. As a result, child sex abuse material depicting Jane Doe #1 was distributed broadly throughout the world on Defendants' websites.

104.    But Jane Doe #1 continues to be traumatized, every single day, by MindGeek, whose platform is being used to permit the continued and repeat dissemination of these horrific videos for sexual gratification and for profit.

105.    Jane Doe #1's experience is not unique to her.  In a recent study conducted by the Canadian Centre for Child Protection, 67% of child sexual abuse survivors said distribution of their images impacts them differently than the hands-on abuse they suffered, because the distribution never ends and the images are permanent.[48]

---

[47] https://www.dictionary.com/e/slang/lil/
[48] Canadian Centre for Child Protection, *Survivors' Survey: Executive Summary 2017*, https://protectchildren.ca/pdfs/C3P_SurvivorsSurveyExecutiveSummary2017_en.pdf

106.    Jane Doe #1 is aware of the scope and extent of the distribution, production, possession and/or advertising of the videos of her, as well as the breadth of the MindGeek network.

107.    Jane Doe #1 knows that because her videos have been downloaded, using the easy-to-find "Download" button that MindGeek placed on them, she is at risk that the video of her rape will be further disseminated -- even uploaded a second time to a MindGeek platform, under a different name or with different tags.

108.    As described above, MindGeek's moderation team is inadequate, and the company has frequently permitted the re-uploading of illicit videos.

109.    Thus Jane Doe #1 is at present risk of further harm if video of her is further disseminated. Because of MindGeek's practices, this is all too likely.

###    E.    SEX TRAFFICKING OF PLAINTIFF JANE DOE #2 VIA MINDGEEK

110.    Jane Doe #2 began being trafficked when she was just fourteen (14) years old.

111.    When she was still a minor, a sex trafficker introduced Jane Doe #2 to individuals who produced sexually explicit videos. The trafficker forced Jane Doe #2 to participate in the creation of sexually explicit videos that included adults engaging in sex acts with her. She was never paid for her participation in the production of these videos.

112.    Videos of adults engaging in sex acts with Jane Doe #2 while she was a minor were uploaded and disseminated through websites owned, operated and/or controlled by Defendants, including, but not limited to PornHub and Redtube.

113.    At least four videos that included Jane Doe #2 being trafficked as a minor have been identified. For Jane Doe #2's privacy and safety, Plaintiffs will be moving for leave to file the names of those videos with the Court under seal.

114.    Neither PornHub, nor any other website owned or operated by MindGeek, undertook any measure to verify Jane Doe #2's identity or age. As a result, child sex abuse material depicting Jane Doe #2 was distributed broadly throughout the world on Defendants' internet platforms.

115.    Jane Doe #2 continues to be traumatized, every single day by MindGeek, whose platform is being used to permit the continued and repeated dissemination of these horrific videos for sexual gratification and for profit.

116.    Jane Doe #2 is aware of the scope and extent of the distribution, production, possession and/or advertising of the videos of her, as well as the breadth of the MindGeek network.

117.    Jane Doe #2 knows that because her videos have been downloaded, using the easy-to-find "Download" button that MindGeek placed on them, she is at risk that the video of her trafficking will be further disseminated -- even uploaded a second time to a MindGeek platform, under a different name or with different tags.

118.    The broad dissemination of child sex abuse material depicting Jane Doe #2 has severely harmed Jane Doe #2, including financial, physical, emotional, and reputational harm.

119.    As described above, MindGeek's moderation team is inadequate, and the company has frequently permitted the re-uploading of illicit videos.

120.    Thus Jane Doe #2 is at present risk of further harm if video of her is further disseminated.  Because of MindGeek's practices, this is all too likely.

**F.    JANE DOES #1 AND 2 AND MEMBERS OF CLASS CONTINUE TO SUFFER IRREPARABLE HARM**

121.    Class members, including Plaintiffs, remain at risk of irreparable harm due to Defendants' failure to enact and enforce appropriate and sufficient policies, procedures, and processes for the prevention of child pornography from being added to Defendants' sites.

122.    On behalf of the Class and themselves, Plaintiffs seek injunctive and equitable relief requiring the Defendants to identify and remove child pornography and implement corporate-wide policies and practices to prevent continued dissemination of child pornography or child sex trafficking.

123.    Because of the insidious nature of child sex trafficking and child pornography, all of this relief is necessary to protect the present and future interests of Plaintiffs and Class members.

## CAUSES OF ACTION

### COUNT I:
**BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591 AND 1595**
**(Plaintiffs and the Class Against All Defendants)**

124.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

125.    Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1) and 1595(a), occurring within the territorial jurisdiction of the United States.

126.    Defendants' conduct was in, or affected, interstate and/or foreign commerce. Defendants knowingly benefited from participation in what they knew or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a).

127.    Defendants monetize content on their platforms through advertisements and data collection as well as direct fees from production/uploading agreements with child traffickers via their Modelhub program and otherwise.

128.    Defendants knowingly benefited from, and/or received something of value for their participation in the venture, in which Defendants knew, should have known, or were in reckless

disregard of the fact that the Plaintiffs and other Class members were engaged in commercial sexual acts while under the age of eighteen.

129.    Defendants' employees and agents had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of minor children.

130.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595.  Specifically, Defendants had a statutory obligation not to benefit in any way from a venture they knew, or should have known, to engage in violations of 18 U.S.C. §1591(a).  At all relevant times, Defendants breached this duty by causing a person under the age of 18 to engage in a commercial sex act.

131.    Defendants' conduct has caused class members including Plaintiffs serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**COUNT II:**
**RECEIPT, DISTRIBUTION, AND POSSESSION OF CHILD PORNOGRAPHY, 18**
**U.S.C. § 2252 and 2252A**
**(Plaintiffs and the Class Against All Defendants)**

132.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

133.    Defendants committed violations of 18 U.S.C. § 2252.

134.    Plaintiffs and Class members were minors, and victims of these violations of Sections 1591, 2252, and 2252A and suffered personal injury as a result of such violations and are eligible to sue and recover damages and other forms of relief under 18 U.S.C. § 2255.

135.    Defendants knowingly received, possessed, and distributed child pornography depicting Class members including Plaintiffs.

136.    Defendants' receipt, distribution, advertising, and possession of child pornography occurred in or affected interstate or foreign commerce.

137.    As a proximate result of Defendants' violation of 18 U.S.C. § 2252A, Class members, including Plaintiffs, suffered serious harm, including physical, psychological, financial, and reputational harm.

138.    Defendants' conduct was malicious, oppressive, or in reckless disregard of Plaintiffs' rights and Class members' rights.  They are entitled to injunctive relief, compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

## CLASS ACTION ALLEGATIONS

139.    Plaintiffs Jane Does Nos. #1 and #2 bring this action under to Federal Rules of Civil Procedure 23(b)(2), (b)(3), and 23(c)(4), on behalf of themselves and the following "Class":

> All persons, who were under eighteen years of age at the time they were depicted in any video or image, (1) in any commercial sex act as defined under 18 U.S.C. §§ 1591 and 1595, or (2) in any child pornography as defined under 18 U.S.C. § 2252A, that has been made available for viewing on any website owned or operated by the Defendants.

140.    Plaintiffs reserve the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

141.    Numerosity: The Class consists of thousands of people, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members of the Class cannot be known.  However, based on the statistics showing that millions of reports of abuse have been made to NCMEC, and Defendants' status as the largest distributor of pornography in the United States, the numerosity requirement can be established.

142.    Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class that they seek to represent. The claims of the Plaintiffs and the other members of the Class are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' sex trafficking.  Plaintiffs, like all members of the Class, were victimized by

Defendants profiting from videos depicting Plaintiffs in commercial sex acts or child pornography which Defendants knew, or should have known, were filmed while they were minors.

143.    <u>Commonality</u>: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect only individual members of the Class, within the meaning of Fed. R. Civ. P. 23(a)(2).   Additionally, class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.   Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

a.   Whether videos depicting minors in commercial sex acts or child pornography appear on Defendants' platforms;

b.   Whether Defendants profited from videos depicting minors in commercial sex acts or child pornography appearing on Defendants' platforms;

c.   Whether Defendants' internal controls were adequate to stop videos depicting minors in commercial sex acts or child pornography from appearing on Defendants' platforms;

d.   Whether Defendants knew or should have known that videos depicting minors in commercial sex acts or child pornography appear on Defendants' platforms;

e.   Whether Defendants' conduct constitutes sex trafficking, dissemination of videos depicting minors in commercial sex acts or child pornography, or child exploitation in violation of 18 U.S.C. §§ 1591, 1595, and 2252A; and

f.   The scope of the injunctive relief and damages to which the Plaintiffs and members of the Class are entitled.

144.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests and the interests of all other members of the Class are identical, and Plaintiffs are cognizant of their duty and responsibility to the Class. Accordingly, Plaintiffs can fairly and adequately represent the interests of the Class. Moreover, Plaintiffs' counsel are competent and have a wealth of experience litigating claims regarding sex trafficking and exploitation of minors, complex commercial litigation, and class actions. Plaintiffs and counsel intend to vigorously

prosecute this case and will fairly and adequately protect the Class' interests. Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class.

145.    <u>Equitable relief</u>: Class certification is appropriate under Rule 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is appropriate with respect to the Class as a whole.  The nature of the relief sought is described in this Complaint.

146.    Absent a class action, most of the members of the Class would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. Class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.  Finally, Class treatment would minimize the trauma that Class members would experience as a result of litigating their claims on an individual basis, and further promotes the remedial purposes of the federal statutes under which the claims are brought.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter a judgment on their behalf and against Defendants, and further grant the following relief:

A.    Certify the proposed Class pursuant to the Federal Rules of Civil Procedure Rule 23(a), (b)(2), (b)(3), and (c)(4);

B.    Designate Plaintiffs as representatives of the proposed Class and Plaintiffs' counsel as counsel for the Class;

C.    Award injunctive or any other equitable relief, to Plaintiffs and the Class, requiring the Defendants to identify and remove child pornography and implement corporate-wide

policies and practices to prevent continued dissemination of child pornography or child sex trafficking, including:

a. Content uploaders' accounts should be opened only with bank or credit card information, so that they can be identified.

b. Government-issued photo identification should be required for each person in a video, and it should be required that each person is at least eighteen years old.

c. Defendants should use facial recognition technology to verify that each performer in a video or image upload is legal.

d. Defendants should remove all images and videos of Plaintiffs and Class members from their platforms and archive them for use in this litigation.

e. Defendants should timely respond to all reports of child pornography and proactively disable the streaming or downloading of reported videos without a human moderator.

f. Defendants should disable the "Download" button on videos so that it is not as easy for sex traffickers to disseminate videos of Plaintiffs, causing future harm.

g. Defendants should send all government IDs that have been associated with any video or account to the databases maintained by States and the United States, including the FBI and the National Center for Missing and Exploited Children, so that sex offenders can be identified and sex-crime victims can be protected.

h. Defendants should use "video fingerprinting" technology to prevent the repeat upload of videos of Plaintiffs' and Class members' rapes.

i.  Defendants should use human moderators to screen each video and image for child pornography or trafficking of minors before this material is made available to the public.

j.  Defendants should adequately train individuals tasked with screening videos and images on identifying potential child pornography or trafficking.

k.  Defendants should employ neutral standards for screening for child pornography.

l.  Defendants should promptly terminate any employees who have failed to fairly moderate material.

m.  Defendants should adequately staff their moderation teams tasked with screening videos and images so that all videos are screened in their entirety.

n.  Defendants should end the employee bonus program that is based on the raw number of videos approved per year.

o.  Defendants should ban individuals who have uploaded child pornography or trafficking videos or images from having the ability to upload anything to a website owned, controlled, or operated by Defendants ever again.

p.  Defendants should limit the number of hours moderators or employees can review videos and images on a daily basis, so as to reduce the incidence of "employee burnout" or turnover relating to the traumatic nature of the work.

q.  Defendants should refuse to publish videos and images that have been flagged or are suspected of containing child pornography or trafficking.

r.  Defendants should immediately send all videos and images with suspected or confirmed child pornography or trafficking to NCMEC's clearinghouse, along with all information available to identify perpetrators or victims.

D.      Award all available damages, including but not limited to compensatory and

punitive damages, in favor of Plaintiffs and the Class; and

E.      Award Plaintiffs and the Class prejudgment interest, costs and attorneys' fees;

F.      Require restitution and disgorgement of all profits and unjust enrichment obtained

as a result of Defendants' unlawful conduct; and

G.      Retain jurisdiction of this matter to ensure all forms of relief it deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by struck jury.

Respectfully submitted,

*/s/ Gregory Zarzaur            .*
Gregory Zarzaur (ASB-0759-E45Z)
THE ZARZAUR LAW FIRM
2332 Second Avenue North
Birmingham, Alabama 35203
T: (205) 983-7985
E: gregory@zarzaur.com

/s/ *Joshua P. Hayes                    .*
Joshua P. Hayes (ASB-4868-H68H)
PRINCE GLOVER HAYES
701 Rice Mine Road
Tuscaloosa, Alabama 35406
T: (205) 345-1234
E: jhayes@princelaw.net

Kimberly Lambert Adams*
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
T: (850) 435-7056
E: kadams@levinlaw.com
*pro hac vice application forthcoming*

Brian Kent*
Gaetano D. Andrea*
Jill P. Roth*
M. Stewart Ryan*

Alexandria MacMaster
LAFFEY, BUCCI & KENT, LLP
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
T: (215) 399-9255
E: bkent@lbk-law.com
    gdandrea@lbk-law.com
    jroth@lbk-law.com
    sryan@lbk-law.com
    amacmaster@lbk-law.com
*pro hac vice application forthcoming

Benjamin W. Bull*
Peter A. Gentala*
Dani Bianculli Pinter*
Christen M. Price*
NATIONAL CENTER ON SEXUAL EXPLOITATION
1201 F Street NW, Suite 200
Washington, D.C. 20004
T: (202) 393-7245
E: lawcenter@ncose.com
*pro hac vice application forthcoming

Kevin Dooley Kent*
Mark B. Schoeller*
Joseph W. Jesiolowski*
CONRAD O'BRIEN PC
Centre Square West Tower
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
T: (215) 864-9600
E: kkent@conradobrien.com
    mschoeller@conradobrein.com
    jjesiolowski@conradobrien.com
*pro hac vice application forthcoming

Of Counsel:
Louis C. Bechtle*
CONRAD O'BRIEN PC
Centre Square West Tower
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
T: (215) 864-9600
E: lbechtle@conradobrien.com
*pro hac vice application forthcoming

*Counsel for the Plaintiffs*