FILED
2023 Nov-06 PM 03:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| JANE DOE #1, and JANE DOE #2, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | CIVIL ACTION NO: 7:21-cv-00220-LSC |
| v. | |
| MG FREESITES, LTD, d/b/a "PORNHUB"; MG FREESITES II LTD; MINDGEEK S.A.R.L.; MINDGEEK USA INCORPORATED; MG CY HOLDINGS LTD; MINDGEEK CONTENT RT LIMITED; 9219-1568 QUEBEC, INC., d/b/a MINDGEEK; MG BILLING LTD, | Honorable L. Scott Coogler |
| Defendants. | |

**PLAINTIFF'S REPLY IN SUPPORT OF THE
<u>MOTION FOR CLASS CERTIFICATION</u>**

Gregory Zarzaur (ASB-0759-E45Z)
Kelsie Overton (ASB-1791-F80L)
THE ZARZAUR LAW FIRM
2332 Second Avenue North
Birmingham, Alabama 35203
T: (205) 983-7985
E: gregory@zarzaur.com
  kelsie@zarzaur.com

Joshua P. Hayes
PRINCE GLOVER HAYES
701 Rice Mine Road
Tuscaloosa, Alabama 35406
T: (205) 345-1234
E: jhayes@princelaw.net

Kimberly Lambert Adams*
Kathryn L. Avila*
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
T: (850) 435-7056
E: kadams@levinlaw.com
  kavila@levinlaw.com

Brian Kent*
Gaetano D'Andrea*
Jill P. Roth*
M. Stewart Ryan*
Alexandria MacMaster*
LAFFEY, BUCCI & KENT, LLP
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
T: (215) 399-9255
E: bkent@laffeybuccikent.com
  gdandrea@laffeybuccikent.com
  jroth@laffeybuccikent.com
  sryan@laffeybuccikent.com
  amacmaster@laffeybuccikent.com

*(attorneys continue on next page)*

Benjamin W. Bull*
Dani Bianculli Pinter*
Christen M. Price*
Peter A. Gentala*
NATIONAL CENTER ON
SEXUAL EXPLOITATION
1201 F Street NW, Suite 200
Washington, D.C. 20004
T: (202) 393-7245
E: lawcenter@ncose.com

Kevin Dooley Kent*
Mark B. Schoeller*
Vanessa L. Huber*
CLARK HILL PLC
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
T: (215) 640-8500
E: kkent@clarkhill.com
    mschoeller@clarkhill.com
    vhuber@clarkhill.com

*pro hac vice

*Counsel for Plaintiff Jane Doe #1*

## **TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................1

ARGUMENT ...................................................................................................4

I.    MindGeek's Arguments Regarding Common Questions and
      Predominance Ignore the Evidence (Including the Impact of
      its Own Records) and Misapplies the Law ..................................4

      A.    Common Questions Exist and Predominate in This Case....................4

      B.    Establishing Minority is *Not* an Individual Issue that Predominates....8

      C.    The Sex Trafficking Claims Do *Not* Raise Individualized Issues ......12

            1.    Direct Sex Trafficking ..................................................12

                  a.    Common evidence proves that the persons who created
                        and uploaded the CSAM *and* MindGeek itself *both*
                        "provided," "obtained," and "maintained" persons
                        pursuant to the TVPRA. ............................................12

                  b.    The TVPRA does *not* require that Plaintiff prove
                        MindGeek's knowledge or awareness of the victims'
                        ages. ..............................................................14

                  c.    Plaintiff does *not* have to prove that each uploader had
                        the intent to monetize the CSAM videos................................19

            2.    Beneficiary Liability for Sex Trafficking ....................................22

      D.    Plaintiff's Child Pornography Claim Can Be Proven on a
            Classwide Basis with Common Evidence............................................34

      E.    Statutory Damages Are Inherently a Common Issue and Other
            Available Forms of Damages Do *Not* Defeat Class Certification ......37

II.   MindGeek's Arguments Regarding the Adequacy of Representation
      and Typicality Requirements in Rule 23(a) Are Wrong............................42

      A.    Plaintiff's Pursuit of Both Statutory Damages and Additional
            Damages Proves That She is an Adequate Class Representative .......42

B.    Plaintiff's Life Experiences Do *Not* Change the Fact that Her
Claims are Typical of the Class Members' Claims............................44

III.   MindGeek's Arguments Regarding Certification of a Rule 23(b)(2)
Injunctive Relief Class Misconstrue the Law and Ignore that CSAM
Will Continue to Appear on Its Sites Unless Its Moderation Practices
Are Dramatically Overhauled ......................................................................47

IV.   Plaintiff's Proposed Class is Ascertainable and Can Be Modified by
the Court if Needed ........................................................................................54

V.    A Class Action is a Superior Method for Adjudicating Plaintiff's
Claims ...............................................................................................................58

VI.   A Rule 23(c)(4) Issues Class is an Appropriate Alternative......................60

CONCLUSION..........................................................................................................64

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*,
321 F.R.D. 688 (S.D. Fla. 2017) ............................................................................57

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*,
938 F.3d 1170 (11th Cir. 2019) .................................................................... 49, 54

*Action Marine, Inc. v. Cont'l Carbon Inc.*,
481 F.3d 1302 (11th Cir. 2007) .............................................................................41

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
2020 WL 4368214 (N.D. Cal. July 30, 2020) ......................................................23

*Babineau v. Federal Express Corp.*,
576 F.3d 1183 (11th Cir. 2009) ..............................................................................7

*Baker v. State Farm Mut. Auto. Ins. Co.*,
2022 WL 3452469 (11th Cir. Aug. 18, 2022) ....................................................7, 8

*Bridges v. Poe*,
2022 WL 1598437 (N.D. Ala. May 19, 2022)............................................... 33, 34

*Brown v. Electrolux Home Prod., Inc.*,
817 F.3d 1225 (11th Cir. 2016) ....................................................... 38, 42, 46

*Bryant v. Southland Tube*,
294 F.R.D. 633 (N.D. Ala. 2013) ............................................................... 44, 45

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ..................................................................... 39, 61

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ...............................................................................4

*Casa Orlando Apartments, Ltd. v. Fed Nat'l Mortg. Assoc.*,
624 F.3d 185 (5th Cir. 2010) ...............................................................................54

*Cherry v. Dometic Corp.*,
   986 F.3d 1296 (11th Cir. 2021) ...........................................................55

*Church v. City of Huntsville*,
   30 F.3d 1332 (11th Cir. 1994)...............................................................48

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ..........................................................................38

*Davis v. Mar-Jac Poultry*,
   2021 WL 2556012 (N.D. Ala. Mar. 30, 2021) .....................................24

*Doe #1 v. MG Freesites, LTD*,
   2022 WL 407147 (N.D. Ala. Feb. 9, 2022)................................... 35, 36

*Doe #1 v. Red Roof Inns, Inc.*,
   21 F.4th 714 (11th Cir. 2021) ........................................... 23, 28, 30, 31

*Doe 1 v. JPMorgan Chase Bank, N.A.*,
   2023 WL 3945773 (S.D.N.Y. June 12, 2023) .......................................27

*Doe v. Boland*,
   698 F.3d 877 (6th Cir. 2012) ................................................................46

*Does 1–4 v. Red Roof Inns, Inc.*,
   2023 WL 5444261 (N.D. Ga. Aug. 10, 2023) ................................ 31, 32

*Eufaula Drugs, Inc. v. TDI Managed Care Servs.*,
   250 F.R.D. 670 (M.D. Ala. 2008).........................................................45

*Fleites v. MindGeek S.A.R.L.*,
   2022 WL 1314035 (C.D. Cal. Feb. 10, 2022) ................................. 28, 29, 30, 58

*Green v. Fed. Exp. Corp.*,
   614 F. App'x 905 (9th Cir. 2015) .........................................................14

*Grimes v. Rave Motion Pictures Birmingham, L.L.C.*,
   264 F.R.D. 659 (N.D. Ala. 2010) .........................................................60

*Herman v. Seaworld Parks & Ent., Inc.*,
  320 F.R.D. 271 (M.D. Fla. 2017) ........................................................................54

*Hoever v. Marks*,
  993 F.3d 1353 (11th Cir. 2021) ..........................................................................41

*In re Amerifirst Sec. Litig.*,
  139 F.R.D. 423 (S.D. Fla. 1991) ..........................................................................45

*In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*,
  321 F.R.D. 430 (N.D. Ga. 2017) .................................................................. 62, 63

*In re Checking Account Overdraft Litig.*,
  2022 WL 472057 (11th Cir. Feb. 16, 2022) ........................................................46

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) .................................................................. 38, 39, 43

*In re Fibreboard Corp.*,
  893 F.2d 706 (5th Cir. 1990) ..............................................................................10

*In re Monumental Life Ins. Co.*,
  365 F.3d 408 (5th Cir. 2004) ..............................................................................57

*In re Photochromic Lens Antitrust Litig.*,
  2014 WL 1338605 (M.D. Fla. Apr. 3, 2014)........................................................57

*In re Takata Airbag Prod. Liab. Litig.*,
  --- F. Supp. 3d ----, 2023 WL 4925368 (S.D. Fla. June 20, 2023) ............. *passim*

*J.G. v. Northbrook Indus., Inc.*,
  2022 WL 4482735 (N.D. Ga. Aug. 2, 2022) ............................................ 6, 27, 28

*Jacob v. Duane Reade, Inc.*,
  293 F.R.D. 578 (S.D.N.Y. 2013) .............................................................. 39, 61

*Jane Doe No. 1 et al v. Daniel S. Fitzgerald*,
  2022 WL 425016 (C.D. Cal. Jan. 6, 2022) ........................................................56

*Medine v. Washington Mut., FA,*
    185 F.R.D. 366 (S.D. Fla. 1998) ...........................................................................46

*Menocal v. GEO Grp., Inc.,*
    882 F.3d 905 (10th Cir. 2018) ................................................................. 7, 8, 27

*Moody v. Circle K Stores, Inc.,*
    2023 WL 404018 (N.D. Ala. Jan. 25, 2023).............................................. 56, 58

*Morris v. Walmart Inc.,*
    2022 WL 1590474 (N.D. Ala. Mar. 23, 2022) ...................................................55

*Morrison v. Nat'l Australia Bank Ltd.,*
    130 S. Ct. 2869 (2010) ......................................................................................58

*Mulvania v. Sheriff of Rock Island Cnty.,*
    850 F.3d 849 (7th Cir. 2017) ..................................................................... 39, 61

*New York v. Ferber,*
    458 U.S. 747 (1982).........................................................................................46

*Nozzi v. Hous. Auth. of the City of Los Angeles,*
    2016 WL 2647677 (C.D. Cal. May 6, 2016)....................................................52

*Ocwen Loan Servicing, LLC v. Belcher,*
    2018 WL 3198552 (11th Cir. June 29, 2018)...................................................58

*Opperman v. Path, Inc.,*
    2016 WL 3844326 (N.D. Cal. July 15, 2016) ............................................ 41, 42

*Palmer v. Cognizant Tech. Sols. Corp.,*
    2022 WL 18214014 (C.D. Cal. Oct. 27, 2022)..................................................41

*Palmer v. Combined Ins. Co. of America,*
    217 F.R.D. 430 (N.D. Ill. 2003)........................................................................41

*Pichler v. UNITE,*
    646 F. Supp. 2d 759 (E.D. Pa. 2009) ................................................................40

*Reid v. Lockheed Martin Aeronautics Co.*,
    205 F.R.D. 655 (N.D. Ga. 2001) .................................................................. 40, 41

*Richardson v. Byrd*,
    709 F.2d 1016 (5th Cir. 1983) ...........................................................................57

*RJR Nabisco, Inc. v. European Community*,
    136 S. Ct. 2090 (2016).......................................................................................58

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)................................................................... 38, 39, 42

*Rollins v. Alabama Community College System*,
    2010 WL 4269133 (M.D. Ala. Oct. 25, 2010) ....................................................43

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
    211 F.3d 1228 (11th Cir. 2000) .............................................................. 7, 40, 54

*Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Servs. Inc.*,
    601 F.3d 1159 (11th Cir. 2010) ................................................................. 10, 24

*St. Louis v. Perlitz*,
    176 F. Supp. 3d 97 (D. Conn. 2016)..................................................................46

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)..........................................................................................40

*Tershakovec v. Ford Motor Co., Inc.*,
    79 F.4th 1299 (11th Cir. 2023) ..........................................................................59

*Thorpe v. Walter Inv. Mgmt., Corp.*,
    2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)....................................................57

*Tilton v. Playboy Entertainment Group, Inc.*,
    554 F.3d 1371 (11th Cir. 2009) ............................................................ 23, 36, 37

*Ulysse v. Waste Mgmt. Inc.*,
    2013 WL 11327137 (S.D. Fla. Sept. 13, 2013) ........................................... 40, 60

*United States v. Cook*,
   782 F.3d 983 (8th Cir. 2015) ........................................................ 20, 56

*United States v. Haymond*,
   672 F.3d 948 (10th Cir. 2012) .............................................................36

*United States v. Lewis*,
   2017 WL 1652587 (S.D. Ga. Apr. 28, 2017)................................ 16, 18

*United States v. Marchand*,
   308 F. Supp. 2d 498 (D.N.J. 2004) ......................................................36

*United States v. Pabon-Cruz*,
   255 F. Supp. 2d 200 (S.D.N.Y. 2003) ..................................................36

*United States v. Parks*,
   849 F. App'x 400 (4th Cir. 2021) .........................................................15

*United States v. Pratt*,
   821 F. App'x 200 (4th Cir. 2020) .................................................. 15, 24

*United States v. Sparks*,
   --- F. Supp.3d ---, 2023 WL 2366607 (N.D. Cal. Mar. 6, 2023)...... 16, 17, 18, 24

*United States v. Valdez*,
   2021 WL 3478402 (11th Cir. Aug. 9, 2021) .........................................15

*United States v. Whyte*,
   928 F.3d 1317 (11th Cir. 2019) ..................................... 15, 16, 18, 24

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) ..................................................... 14, 24

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)......................................................................4, 53

*WesternGeco v. ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018).........................................................................58

*Williams v. Mohawk Industries, Inc.*,
   568 F.3d 1350 (11th Cir. 2009)...............................................................52

*Williams v. Reckitt Benckiser LLC*,
   65 F.4th 1243 (11th Cir. 2023)....................................................... 48, 49

*Wright v. Dep't of Alabama Veterans of Foreign Wars*,
   2010 WL 11569414 (N.D. Ala. Mar. 24, 2010) ...................................59

**Statutes**

18 U.S.C. § 1591 ............................................................... *passim*

18 U.S.C. § 1595 ........................................................ 5, 8, 25, 30

18 U.S.C. § 2252 ...............................................................34

18 U.S.C. § 2252A ........................................................ 8, 23, 34

18 U.S.C. § 2256.................................................................6

22 U.S.C. § 7101 ...............................................................58

**Rules**

Fed. R. Civ. P. 23 ............................................................. *passim*

**Treatises**

2 Newberg and Rubenstein on Class Actions § 4:38 (6th ed.)...................... 53, 60, 62

**Other Authorities**

146 Cong. Rec. S7781 (daily ed. Jul. 27, 2000) .....................................58

*Classifying Evil: Lessons from Hunting Human Traffickers*
   *| SANS Threat Hunting & IR Summit*,
   https://www.youtube.com/watch?v=mLQHaQnG8D4 (Oct. 3, 2019)................14

*Li'l*, Dictionary.com,
    https://www.dictionary.com/e/slang/lil/ (last visited Oct. 26, 2023)...................26

*Pornhub Exec: Rapists, Traffickers Using Pornhub "Loophole" to
    "Make a Lot of Money"*, Sound Investigations,
    https://soundinvestigations.com/pornhub-loophole/ (Sept. 13, 2023).................50

S. Caltagirone, *The Human Trafficking Kill Chain, A Guide to Systematic
    Disruption*, Global Emancipation Network,
    https://www.globalemancipation.ngo/wp-content/uploads/2021/11/Human-
    Trafficking-Kill-Chain-2.pdf (Dec. 2017) ..........................................................14

# INTRODUCTION

In their opposition to Plaintiff's Motion for Class Certification, Defendants (hereinafter collectively "MindGeek") want the Court to conclude that this case is primarily about the actions and circumstances of thousands of victims and underlying sex traffickers, and not really about anything that MindGeek itself has done or how it has profited from the sexual exploitation of thousands of children. However, MindGeek's opposition is just an exercise in misdirection and distraction.

When the curtain is pulled back on MindGeek's rhetoric, the reality is that there is only one reason CSAM of Plaintiff (and every other class member) has been disseminated to the world on MindGeek's websites—MindGeek operates its pornography business using monetization and content moderation policies and practices that encourage and allow CSAM to appear on its websites. Neither Plaintiff, the class members, nor any of the underlying sex traffickers put this CSAM on MindGeek's sites for the world to see. Only one party decided and took the necessary actions for this CSAM to appear on these websites—MindGeek. While MindGeek vainly protests to the contrary, the overwhelming and predominant issue here is the failure of MindGeek and its business practices to prevent CSAM from appearing on its websites and thereby victimize every minor depicted in that CSAM. *This issue affected Plaintiff and every class member in the same exact way and it is*

*common to the entire class, based on MindGeek's own business records, and clearly predominates over every other issue or combination of issues in this case.*

As discussed more fully below, this Court will not need to delve into the individual actions and circumstances of every class member or every underlying sex trafficker in order to resolve the question of MindGeek's liability on Plaintiff's sex trafficking or child pornography claims on a classwide basis. The focus of Plaintiff's claims is what *MindGeek* did with all of the class members' CSAM, and that can be proven from MindGeek's own business documents regardless of the fine details surrounding the creation of each individual piece of CSAM. These claims present common questions that have common answers, and this case cries out for the resolution of the common claims of the proposed class of MindGeek's thousands of children victims in the most efficient, economical, consistent, and timely way possible. Accordingly, this case should be allowed to proceed as a class action.

Also, to the extent the Court were to be troubled by any of MindGeek's carping at the propriety of class certification (which it should not), there are many procedural tools the Court can use to advance the twin goals of class actions of promoting judicial economy and efficiently resolving disputes without denying the present Motion (including the certification of an injunctive relief class and deferring consideration of a damages class until liability is established, the bifurcation of liability and damages, the certification of a Rule 23(c)(4) issues class, redefining the

class, providing victims notice and the opportunity to opt-out and to pursue their own claims, and the use of a special master or the claims administration process to establish each victim's qualifications for class membership and right to share in any monetary relief).

In short, this case satisfies every requirement for class certification of a Rule 23(b)(2) injunctive relief class and/or a Rule 23(b)(3) damages class. As MindGeek's corporate designee on the monetization of content on its websites recently admitted, ██████████████████████████████████████████████ ██████████████████████,[1] and requiring MindGeek to do just that is at the heart of this case. Without a Rule 23(b)(2) class and significant injunctive relief, MindGeek will be able to continue its faulty practices that have repeatedly victimized minors and failed to keep CSAM off of PornHub and MindGeek's other websites. And without a Rule 23(b)(3) class and the prospect of a damages award, Plaintiff, and MindGeek's thousands of other victims, will not be compensated for the significant harm that MindGeek's CSAM has caused already.

For all of the reasons set forth in this Reply and in Plaintiff's Memorandum of Law in Support of the Motion for Class Certification (cited herein as "MOL"), this Court should grant Plaintiff's Motion for Class Certification and certify a class under Rule 23(b)(2) and/or a Rule 23(b)(3).

---

[1]  *See* Reply Exhibit 1, ██████ 30(b)(6) Dep. at 79:22–80:7.

# ARGUMENT

## I. MindGeek's Arguments Regarding Common Questions and Predominance Ignore the Evidence (Including the Impact of its Own Records) and Misapply the Law

On pages 13-29 of its Opposition, MindGeek gloms together a hodge-podge of arguments relating to various requirements for class certification under Rule 23(b)(2) ("commonality") and Rule 23(b)(3) ("predominance" and "manageability").

### A. Common Questions Exist and Predominate in This Case

It is well-established that the existence of just one common question of law or fact suffices to satisfy Rule 23(a)(2). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("for purposes of Rule 23(a)(2) even a single common question will do"); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016). Nonetheless, MindGeek's threadbare argument regarding the alleged lack of common questions, *see* Opp. at 13-14, fails even to discuss—let alone challenge— the majority of the points that Plaintiff identified as "questions of law or fact common to the class" as required by Rule 23(a)(2).

Specifically, while MindGeek generally acknowledges that Plaintiff has identified at least *eight* common questions of law or fact in her Motion, *see* MOL at 13, MindGeek only addresses and attempts to critique *two* of them specifically,[2] *see*

---

[2]    While Plaintiff did not specifically identify "whether MindGeek 'received or distributed CSAM'" as one of the eight common questions in her Motion as MindGeek implies in its

Opp. at 13-14, tacitly conceding that at least some of the common questions can be answered with common evidence. *See id.* at 13 (arguing only that "most" of the eight questions cannot be answered with common evidence).

First, MindGeek argues that "whether MindGeek 'participated in sex trafficking ventures'" is an abstraction[3] and not susceptible of a classwide answer. *Id.* at 14. As a threshold point, MindGeek misstates the phrasing of this common question in Plaintiff's Motion. *See* MOL at 13 (emphasis added) (common questions include "[w]hether Defendant knowingly benefitted from *and/or* participated in sex trafficking ventures"). Here, MindGeek does not challenge Plaintiff's assertion that "[w]hether Defendant knowingly benefitted from . . . sex trafficking ventures" is a common question that satisfies Rule 23(a)(2). While MindGeek argues that "human trafficking crimes are highly unique in their circumstances," *see* Opp. at 14, that argument relates to more traditional trafficking like child prostitution rings, and not to a pornography website operator vetting content and allowing CSAM to be disseminated on its websites to the public. Those facts are not "highly unique" but rather relate to the website's general practices and business operations. Accordingly,

---

Opposition, *see* Opp. at 14; MOL at 13, that likely is a *ninth* common question of law or fact in this case which is susceptible of classwide proof and answers a question common to the entire class. For example, MindGeek's own records show that ███████████████████████████████████████████████ . *See* MOL Ex. 2.

[3]    "Participation in a venture" is an element of beneficiary liability under 18 U.S.C. § 1595. Curiously, MindGeek calls this an "abstraction" and not a common question, *see* Opp. at 14, but then argues that the identification of common questions "begins, of course, with the elements of the underlying cause of action." *Id.* at 15 (citation omitted).

the "participation in a venture" element of beneficiary liability can be proven through common evidence. *See* MOL at 25 (detailing MindGeek's own records that allows one to "'connect the dots' between the plaintiff's particular experience as a victim of trafficking and the specific defendant in the case" as discussed in *J.G. v. Northbrook Indus., Inc.*, 2022 WL 4482735, at *4 (N.D. Ga. Aug. 2, 2022)).

Second, MindGeek does *not* dispute that "[w]hether CSAM has appeared on MindGeek's websites" is a common question but only argues that it is not "necessary" nor "sufficient to establish a trafficking claim." Opp. at 14.   That argument is non-sensical.   This entire case involves the presence of CSAM on MindGeek's websites.   If MindGeek had no CSAM on its sites, there would be no case.   Through the common evidence from MindGeek's own records demonstrating

█████████████████████████████████████████████████████████████████

█████████████,[4] Plaintiff (and the class) establish one of the predicates of the sex trafficking and child pornography claims—namely a "commercial sex act" under 18 U.S.C. § 1591(e)(3) and "child pornography" and "sexually explicit conduct" under 18 U.S.C. § 2256(2)(A) & (8).   The question of whether CSAM has been on MindGeek's sites is a fundamental and common question in this class action.

In addition to its critique of only two of the eight common questions here, MindGeek argues that evidence of a defendant's "practices and policies" does not

---

[4]   *See* Reply Ex. 1, ██████ 30(b)(6) Dep. at 381:8-17.

satisfy the commonality requirement.  *See* Opp. at 15-16.  That is not a blanket rule applicable to all cases, and courts have recognized that the commonality requirement is satisfied where "all members of the TVPA class based their claims on the [same] Policy"[5] of a defendant—which is exactly the situation in this case.  Plaintiff's and the class's claims are based on MindGeek's practices and policies for vetting, monetizing, and allowing content on its sites that has resulted in Plaintiff's and the class member's CSAM being distributed to public in violation of federal sex trafficking and child pornography laws.[6]

---

[5]  *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 916–17 (10th Cir. 2018).

[6]  The cases cited by MindGeek are inapposite.  *Rutstein v. Avis Rent-A-Car Sys., Inc.*—which concerned the Rule 23(b)(3) predominance requirement and not the Rule 23(a)(2) commonality requirement—involved federal civil rights claims for damages alleging that Avis had a policy of discriminating against Jewish people and Jewish-owned businesses in denying applications for corporate accounts. 211 F.3d 1228, 1230-33 (11th Cir. 2000).  Because the intent element of non-employment discrimination cases involves individual issues that often predominate over common questions (which is not the legal claim or situation in this case), and the existence of such a policy could not establish Avis's discrimination in all cases due the inability to identify Jewish people and businesses accurately from accents or names, the court found that Avis's alleged policy was not enough to conclude that common questions predominated "given the substantive elements of the underlying cause of action." *Id.* at 1235, 1240-41.  Unlike *Rutstein*, and as discussed more fully *infra*, MindGeek's knowledge can be established through common classwide proof and its policies did harm all class members similarly. *Babineau v. Federal Express Corp.* involved breach of contract and unjust enrichment claims arising from the defendant's alleged failure to compensate employees for all the time they worked, including times defined as "off the clock" both before and after scheduled work hours. 576 F.3d 1183, 1186-87 (11th Cir. 2009).  The court rejected the argument that proving that the defendant's work efficiency standards (which allegedly caused employees to work "off the clock" to meet those benchmarks) was a general policy that "would establish breach of contract liability on a class-wide basis" because "it is clear from the record that other employees did so voluntarily and for purely personal reasons. The record also indicate[d] that employees could request permission to work outside their shift (and be paid for doing so) if they needed extra time to complete their duties." *Id.* at 1193. *Babineau* (like *Menocal*, *supra*) simply stands for the concept that proof that a defendant has a policy does not satisfy the commonality requirement if all class members' claims are not based on that policy (*e.g.*, work efficiency standards in *Babineau* had no bearing on claims of employees who worked "off the clock" for other reasons). *Baker v. State Farm Mut. Auto. Ins. Co.* involved breach of contract claims alleging that State Farm undervalues vehicles under its insurance policies by using the so-called "17(c) formula."  2022 WL 3452469, at *1 (11th Cir. Aug. 18, 2022).  However, the evidence showed that application of that formula sometimes, but not "always[,] resulted in the

**B.    Establishing Minority is *Not* an Individual Issue that Predominates**

MindGeek's arguments regarding proving the minority of its victims are both misleading and wrong. *See* Opp. at 16-17. Specifically, MindGeek argues: "Plaintiff and each of the absent class members must establish that they were a minor at the time content depicting them was created. 18 U.S.C. §§ 1591(a), 1595, & 2252A. This question presents a highly individualized inquiry and, in most cases, cannot be done through the inspection of a photo or video."[7] *Id.* at 16. While Plaintiff has never argued that the relevant ages of the class members can be proven from their images alone, MindGeek nonetheless tries to elevate this *non-sequitur* to an impediment to class certification of constitutional proportions. *See id.* at 17

---

underassessment of diminished value claims" for all putative class members. *Id.* at *4. Unlike *Rutstein*, *Babineau*, and *Baker* (where the cited policies did not explain or result in the same outcome for all putative class members), the only explanation in this case for how the class members' CSAM came to appear on MindGeek's websites was MindGeek's failure to have adequate content vetting and moderation practices to prevent CSAM from being publicly available on its websites. *Accord Menocal*, 882 F.3d 905, 916–17 (class claim that the defendant's "sanitation policy" that required all inmates to clean facilities without pay violated the TVPA satisfied commonality requirement because policy applied uniformly to, and had same effect, on all class members, thus "all members of the TVPA class based their claims on the [same] Policy").

[7]    Making a large leap from former FBI agent Joseph Fonseca's statement that it is difficult ██████ Fonseca Decl. ¶ 35, MindGeek argues that determining whether a video contains CSAM cannot be done without an individualized investigation. *See* Opp. at 17. Of course, Mr. Fonseca's observation about ████████████████████████████ has no relevance to ████████████████████ ████████████ *See* Reply Exhibit 2, Fonseca Dep. at 185:2-7 (██████████████████████ ███████████████). His observations also are inconsistent with MindGeek's own experience in identifying CSAM without conducting "field investigations" or "victim interviews" as evidenced by ███████████████████████. *See* MOL Ex. 1 at 9; MOL Ex. 2; MOL Ex. 22; *see also* Reply Ex. 2, Fonseca Dep. at 137:6–138:2 (███████████████████████████).

("MindGeek has an inviolate due process right to hold Plaintiff and each of the absent class members to their proofs . . . including minority at the time of filming.").

As a threshold matter, Plaintiff has ample undisputed evidence that she was a minor when her CSAM was created. Her birth date is ██████████. *See* MOL Ex. 18 ¶ 1. Plaintiff has confirmed that the videos at issue were recorded in early 2018 and either late 2018 or early 2019, while she was a minor. *See id.* ¶¶ 4-5. One of the two videos was uploaded to MindGeek (and, therefore, obviously already had been created) on February 27, 2018, while Plaintiff still was a minor. *See* MOL Ex. 1 at 13-14; MOL Ex. 20 at 1. Plaintiff can establish that she was a minor at the relevant times her CSAM was created without relying on an inspection of the videos themselves to determine her age.

MindGeek's constitutional bluster ignores that a class action is a well-established form of representative litigation that does not require that Plaintiff present evidence to establish every element of every claim for every class member, such as the ages of thousands of absent class members. Such a process does not violate any of MindGeek's rights, constitutional or otherwise, as "both Supreme Court and Eleventh Circuit precedent confirm that class actions and the use of class-wide or representative evidence to establish common elements of a claim do not 'abridge, enlarge, or modify' any substantive rights." *In re Takata Airbag Prod. Liab. Litig.*, --- F. Supp. 3d ----, 2023 WL 4925368, at *12 (S.D. Fla. June 20, 2023),

*modified*, 2023 WL 5625652 (S.D. Fla. Aug. 24, 2023) (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010), *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–57 (2016), *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1337 (11th Cir. 2015), and *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155–56 (9th Cir. 2016)).  "The use of the class action procedure and class-wide evidence does not violate the due process clause of the Fourteenth Amendment, as there is no 'authority stating that a party in a class action has a due process right to call every class member to testify at trial.'" *Id.* (quoting *Vasquez v. Leprino Foods Co.*, 2023 WL 1868973, at *11 (E.D. Cal. Feb. 9, 2023)).  "Indeed, 'such a right would obliterate the use of representative evidence and defy the class action device's purpose to save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23.'"  *Id.* (quoting *Vasquez*, 2023 WL 1868973, at *11).[8]

---

[8]   The two cases cited by MindGeek in this regard, *see* Opp. at 17, do not hold that due process requires direct evidence establishing every element of every claim for each class member be presented in a class action.  Rather, those cases simply stand for the proposition that there must be common issues of law or fact in a given case before a plaintiff is allowed to present its own representative evidence and common evidence to prove claims on behalf of absent class members and against the defendant.  *See Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Servs. Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) (class certification in breach of contract action was inappropriate because there were no common questions given the 33 different "variants" in the operative language of the putative class members' contracts); *In re Fibreboard Corp.*, 893 F.2d 706, 711-12 (5th Cir. 1990) (because each plaintiff had unique circumstances regarding their exposure and injuries from asbestos, it was improper to consolidate 3,031 individual asbestos cases and hold class trial presenting full evidence of liability and damages for the 11 lead plaintiffs, presenting evidence for the 30 other plaintiffs selected by the plaintiffs' and defendants' counsel, and then extrapolating damages for the absent 2,990 plaintiffs based on expert testimony comparing each absent plaintiff to the 41 pilot plaintiffs).

This does not mean that absent class members will never have to establish that they qualify as members of the class (*e.g.*, absent class members may have to establish that they were minors at the time their CSAM was created, as part of the claims administration process, in order to participate in any class monetary relief). *See id.* (quotations omitted) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015)) ("[S]o long as the defendant is given a fair opportunity to challenge the claim to class membership and to contest the amount owed each claimant during the claims administration process, its due process rights have been protected."). Like Plaintiff herself, absent class members would be able to demonstrate at the class administration stage that they were minors when their CSAM was created through their own direct evidence and/or MindGeek's records of when the CSAM was uploaded.

In short, Plaintiff can establish through direct evidence that she was a minor when her CSAM was created; the fact that determining a person's age from an image may or may not be difficult is irrelevant to establishing liability on a classwide basis in this case and does not preclude class certification; there is no requirement that a class representative present direct evidence proving every element of every claim of every class member individually in a class action; and the class action management procedures that would apply in this case will fully protect MindGeek's (and all parties') rights.

**C.      The Sex Trafficking Claims Do *Not* Raise Individualized Issues**

**1.      Direct Sex Trafficking**

MindGeek makes three points to argue that "[t]here are no common answers to the questions" raised by the elements of 18 U.S.C. § 1591(a).  *See* Opp. at 17-20. MindGeek is wrong on all three.

> **a.      Common evidence proves that the persons who created and uploaded the CSAM *and* MindGeek itself *both* "provided," "obtained," and "maintained" persons pursuant to the TVPRA.**

MindGeek argues that "determining whether a plaintiff was recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited [as stated in 18 U.S.C. § 1591(a)] requires a highly individualized analysis." Opp. at 18.    MindGeek's interpretation of the TVPRA is unduly narrow, its arguments misconstrue Plaintiff's claims, and it mistakenly implies that this case should be analyzed as if it were a child prostitution case.

MindGeek myopically focuses only on whether the person who uploaded the CSAM to MindGeek's websites or committed the sexual abuse of the victims shown in the CSAM was the direct sex trafficker under § 1591(a).  *See* Opp. at 18.  While video creators and uploaders did all "provide," "obtain," and "maintain" the victims as MindGeek's records show, *MindGeek itself also directly violated § 1591(a) and trafficked the victims by "obtaining," "maintaining," and "providing" the victims engaging in "commercial sex acts" to the public on its websites*.  In other words,

MindGeek's own actions (and its own business records) demonstrate that MindGeek itself has directly violated the "recruit"/"entice"/ "provide"/"obtain"/"maintain" element of § 1591(a) as to all victims whose CSAM has appeared on its websites.

MindGeek ignores the fact that itself violated § 1591 and argues only that determining "[w]hether an individual was 'recruited' or 'enticed' for purposes of a sex-trafficking claim requires investigation and cannot be detected with the information available to MindGeek . . . ." Opp. at 18. MindGeek also notes how Plaintiff ████████████████████████████████████████████████████████ ████████████████████████████████████████ *id.*, presumably implying that she was "recruited" or "enticed" only in one of the two relevant videos. This argument, however, ignores that § 1591(a) includes not only "recruiting" and "enticing," but *also* "providing," "obtaining," and "maintaining." 18 U.S.C. § 1591(a). The very fact that Plaintiff's CSAM and thousands of other CSAM videos and other identifying factors from serial CSAM uploaders, including Plaintiff's trafficker, identified in MindGeek's own records appeared on MindGeek's sites, *see* MOL Ex. 2, demonstrates that the people who uploaded the videos to MindGeek (and MindGeek itself) "obtained," "maintained," and "provided" minors for "commercial sex acts" within the meaning of § 1591(a).[9]

---

[9]    MindGeek's expert Sherrie Caltagirone has acknowledged that ████████████████████ ████████████████████████████████████████████████. *See* Reply Exhibit 3, Caltagirone Dep. at 45:14–46:8, 48:16-20, 49:16-24; S. Caltagirone, *The Human Trafficking Kill Chain, A Guide to Systematic Disruption*, Global Emancipation Network, at 17,

**b.    The TVPRA does *not* require that Plaintiff prove MindGeek's knowledge or awareness of the victims' ages.**

MindGeek asserts that proving whether a person "knew or recklessly disregarded" the age of a person is an individualized inquiry that is not susceptible to "common method of proof."[10]   Opp. at 19.   MindGeek's argument completely disregards the plain language of the TVPRA and must be rejected outright.

**i.    MindGeek had a reasonable opportunity to observe the CSAM victims, so proof of its knowledge of their ages is *not* required.**

Section 1591(a) provides that any person who engages in the predicate conduct discussed above (*i.e.*, "recruit"/"entice"/"provide"/"obtain"/"maintain" a person) "*knowing, or . . . in reckless disregard of the fact . . .* that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act" has committed the crime of sex trafficking.   § 1591(a) (emphasis added).   In turn, § 1591(c) provides:

> In a prosecution under subsection (a)(1) in which the defendant had a
> reasonable opportunity to observe the person so recruited, enticed,

---

https://www.globalemancipation.ngo/wp-content/uploads/2021/11/Human-Trafficking-Kill-Chain-2.pdf (Dec. 2017); *Classifying Evil: Lessons from Hunting Human Traffickers | SANS Threat   Hunting   &   IR   Summit*,   at   10:30-11:48, https://www.youtube.com/watch?v=mLQHaQnG8D4 (Oct. 3, 2019).

[10]    The two cases cited by MindGeek, *see* Opp. at 19, do not involve the TVPRA or the issue of one person's knowledge regarding another person's age and, as such, they have no relevance to how a minor victim of sex trafficking can prove that a person knew or recklessly disregarded their age under § 1591.   *See Green v. Fed. Exp. Corp.*, 614 F. App'x 905, 906-07 (9th Cir. 2015) (putative class action alleging employer did not fully compensate employees for all "on the clock" work and "working meal breaks"); *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256, 1260-62 (11th Cir. 2009) (putative class action for breach of contract and unjust enrichment alleging employer did not pay full commissions to sales employees).

harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

§ 1591(c).  As the Eleventh Circuit has explained, "§ 1591(c) removes the requirement that the government prove the defendant's knowledge or reckless disregard of the minor's age if 'the defendant had a reasonable opportunity to observe the [minor].'" *United States v. Valdez*, 2021 WL 3478402, at *2 (11th Cir. Aug. 9, 2021); *see also United States v. Whyte*, 928 F.3d 1317, 1328 (11th Cir. 2019) ("[S]ubsection (c) provides an exception" to the requirement in § 1591(a) that there must be proof a defendant "knew" or "recklessly disregarded" a minor's age).

As a result, "[s]ubsection (c) 'supplies an *alternative* to proving any *mens rea* with regard to the defendant's awareness of the victim's age.'"  *Whyte*, 928 F.3d at 1328 (emphasis in original) (quoting *United States v. Robinson*, 702 F.3d 22, 32 (2d Cir. 2012)).  "[S]ection 1591(c) unambiguously creates an independent basis of liability when . . . a defendant had a reasonable opportunity to observe the victim" and "relieves the [plaintiff] of [their] burden of proving that the defendant either knew or recklessly disregarded the victim's age." *Id.* at 1330; *see also United States v. Parks*, 849 F. App'x 400, 403 (4th Cir. 2021).  Accordingly, "§ 1591(c) imposes strict liability with regard to the defendant's awareness of the victim's age" when the defendant had "a reasonable opportunity to observe" the victim.  *United States v. Pratt*, 821 F. App'x 200, 201 (4th Cir. 2020) (citing *Robinson*, 702 F.3d at 39);

15

*see also Whyte*, 928 F.3d at 1330 ("[I]n section 1591(c), Congress clearly 'impose[d] strict liability with regard to the defendant's awareness of the victim's age'").

Having the opportunity to see the victim "via pictures" constitutes a "reasonable opportunity to observe" under § 1591(c). *United States v. Lewis*, 2017 WL 1652587, at \*3 (S.D. Ga. Apr. 28, 2017); *United States v. Sparks*, --- F. Supp.3d ---, 2023 WL 2366607, at \*3 n.1 (N.D. Cal. Mar. 6, 2023) ("[A]n in-person, face-to-face interaction isn't required" to show that the defendant had a "reasonable opportunity to observe" the victim under Section 1591(c)).

Also, § 1591(c) only requires that the defendant had an "*opportunity* to observe" the victim, not that the defendant actually did observe the victim. *See Sparks*, 2023 WL 2366607, at \*3 (defendant can have a "reasonable opportunity to observe" a victim under Section 1591(c) "even if he never takes advantage of that opportunity").[11]

---

[11]   As the court in *Sparks* aptly explained:

> [T]he meaning of the phrase ["reasonable opportunity to observe" does not come]
> down to whether the defendant had an in-person, face-to-face interaction with the
> victim. Based on the plain text of the statute, a defendant had a "reasonable
> opportunity to observe" the victim if the defendant could have—with reasonable
> effort—observed them, even if the defendant did not actually do so. To give an
> example: imagine a defendant transports a van of people, knowing that they will be
> caused to engage in commercial sex work. So long as he could open the van and
> observe the victims, he has a "reasonable opportunity to observe" them—even if he
> never takes advantage of that opportunity. In contrast, that defendant might not
> have a reasonable opportunity to observe the victims if the van is padlocked, and it
> is impossible for him to obtain a key. This interpretation comes from the statute's
> use of the word "opportunity." *An opportunity is a chance to do something (here,
> a chance to observe the victim); an opportunity does not need to be seized.*

2023 WL 2366607, at \*3 (emphasis added).

Furthermore, a defendant can commit sex trafficking of a minor based on their having a "reasonable opportunity to observe" the victim under § 1591(c) *even if they could not determine the victim's age when observing the victim. See id.* at *3. In *Sparks*, the court rejected the defendant's argument "that an 'opportunity to observe' is only reasonable if, based on one's observations, a reasonable person would be able to figure out that the person was under eighteen":

> The defendant is wrong that a victim's appearance, mannerisms and behavior are relevant [to whether he had a "reasonable opportunity to observe" the victim under § 1591(c)]. It might be different if the statute said a "reasonable opportunity to ascertain the victim's age." In that case, one could perhaps argue that the opportunity would not be reasonable if the victim's appearance, mannerisms, and behavior were such that it would be impossible to figure out that they were under eighteen. But that's not what the statute says. Section 1591(c) draws from the common law standard for sex offenses, and at common law a defendant could be liable for a sex offense even if they reasonably believed that the victim was of age. *X-Citement Video*, 513 U.S. at 72 n.2, 115 S.Ct. 464; *see also United States v. Brooks*, 841 F.2d 268, 269–70 (9th Cir. 1988) (per curiam). That is to say, a defendant could be liable even if the victim's appearance, mannerisms, and behavior would lead a reasonable person to believe that the victim was over the age of consent. The same is true here: a defendant can have a "reasonable opportunity to observe" a victim even if, based on those observations, no reasonable person would be able to tell that the victim was a minor.

*Id.* (emphasis added). Accordingly, Mr. Fonseca's statements, *see* Fonseca Decl. ¶ 35, and MindGeek's arguments, *see* Opp. at 19, that it is difficult to determine whether someone is a minor from a picture without individual proof of age is not relevant to whether MindGeek can be held liable for sex trafficking under § 1591.

17

In this case, to the extent MindGeek is directly liable for sex trafficking, MindGeek's own business records show that it had a "reasonable opportunity to observe" Plaintiff and all class members within the meaning of § 1591(c) and, therefore, that Plaintiff (and the class) are not required to establish that MindGeek "knew" or "recklessly disregarded" their ages to prove the sex trafficking claims in this case. Specifically, ████████████████████████████████████ ████████████████████████████████████████ *see* MOL Ex. 2—that evidence alone is enough to demonstrate that MindGeek had a reasonable opportunity to observe the entire class. *See Whyte*, 928 F.3d at 1328-30; *Sparks*, 2023 WL 2366607, at *3 ("reasonable opportunity" if the defendant "with reasonable effort" could observe victim); *Lewis*, 2017 WL 1652587, at *3. Considering that MindGeek's Opposition also cites to its policies showing that █ ████████████████████████████████████, *see* Opp. Ex. 12, MindGeek clearly had the "opportunity to observe" the class and actually took advantage of that opportunity.

Alternatively, to the extent MindGeek is liable under the beneficiary theory of liability under the TVPRA, each person who created and/or uploaded the CSAM that appeared on MindGeek's sites clearly had access to content depicting the victims (and possibly to the victims' persons as well)—which establishes that they had a "reasonable opportunity to observe" the victims under § 1591(c) as well and,

therefore, violated § 1591(a) without direct evidence that they "knew" or "recklessly disregarded" the victims' ages.

> ii. **Common evidence shows that MindGeek "recklessly disregarded" the CSAM victims' ages.**

Alternatively, with regard to its own direct liability for sex trafficking, common evidence from MindGeek's own business records establishes that MindGeek "recklessly disregarded" that the victims were minors under § 1591(a), including the evidence that ████████████████████████████, *see* MOL Ex. 2, that MindGeek ████████████████████████, *see* MOL Ex. 2, MOL Ex. 6, that MindGeek ████████████████████████ ████████████████, *see* MOL Ex. 17, Reply Ex. 1, ████ 30(b)(6) Dep. at 322:14–323:19, and that MindGeek knows about CSAM on its sites but has not done all that is possible to identify and eliminate it, *see* MOL Ex. 15 ¶ 5. At a minimum, this evidence creates a genuine issue of material fact with a common answer that must be resolved by the jury at trial.

> c. **Plaintiff does *not* have to prove that each uploader had the intent to monetize the CSAM videos.**

MindGeek argues that "each plaintiff will need to prove that the uploader 'had the intent to monetize the videos at the time they were made.'"[12] Opp. at 19.

---

[12]   MindGeek takes this quote from the similar class action pending in California. *See* Opp. at 19 (quoting *Doe v. MindGeek USA Inc.*, 558 F. Supp. 3d 828, 840 (C.D. Cal. 2021)). With due respect for the court in that case, § 1591 simply does not require that the person who uploaded the

However, § 1591(a) does *not* require evidence of such intent but only requires that the sex trafficker have "knowledge" or "reckless disregard of the fact" that the victim "will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). "The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person." § 1591(e)(3). In this way, and contrary to MindGeek's unsupportable suggestion that the sex trafficker alone is the party who must "monetize" or benefit from the videos, a "commercial sex act" occurs whenever anyone—the sex trafficker OR someone else—gives or receives "anything of value." *Id.*

CSAM and child pornography is a commodity and a "thing of value" under the TVPRA. *See United States v. Cook*, 782 F.3d 983, 989 (8th Cir. 2015) (child pornography "photographs and videos" are "things of value" within the meaning of "commercial sex act" under Section 1591); *see also* Reply Ex. 1, ████ 30(b)(6) Dep. at 33:4-22, 381:8-17. MindGeek's business records show that ████

████████████████████████████████████████████████████████████

---

CSAM have an "intent" to make money from the "sex trafficking." While the uploaders did traffic the victims here, MindGeek itself also has direct liability for its own sex trafficking in violation of § 1591, so the California court's focus solely on the uploader's state of mind (which may be the only focus of the California case) does not fully cover the scope of Plaintiff's sex trafficking claims in this case. And, as discussed more fully *infra*, § 1591 only requires that the sex trafficker "knows" or "recklessly disregards the fact" that the victim was caused "to engage in a commercial sex act" (*i.e.*, that "any person"—not limited to the sex trafficker or uploader here—gave or received "anything of value"—not necessarily money—relating to the relevant sex act). § 1591(a) & (e)(3).



████████. *See* Reply Ex. 1, ██████ 30(b)(6) Dep. at 199:21–201:14.

Since MindGeek clearly has knowledge of its own business practices and uploaders must sign MindGeek's terms of service which outline what MindGeek will do with the content and how both MindGeek and content providers can benefit from uploads (which shows their "knowledge" or "reckless disregard" of how content is used and monetized), the fact that MindGeek obtained CSAM from uploaders *and* placed CSAM on its websites demonstrates *on a classwide basis* that a "thing of value" (the CSAM) was—

      (a)   "given to . . . any person" (the uploaders gave the CSAM to MindGeek *and* MindGeek gave the CSAM to the public); and

---

[13] ████████. *See* Reply Ex. 1, ██████ 30(b)(6) Dep. at 33:4-22, 199:21–218:25. Under the terms of service between MindGeek and its uploaders, ████████ *Id.* at 199:21–201:14. ████████ *See id.* at 202:6-15. ████████ *See id.* at 205:16-20, 206:11-20, 218:15-25. In this way, the person who uploaded Plaintiff's CSAM to MindGeek (who was convicted in Alabama for crimes relating to the sexual abuse of Plaintiff and CSAM) ████████ *See id.* at 202:21–207:13. ████████ *See id.* at 212:11-23. As a result, ████. ████████. *See id.* at 217:23–218:25.

(b) "received by any person" (MindGeek received the CSAM from uploaders *and* the public received the CSAM from MindGeek).

Accordingly, under a direct liability claim against MindGeek for its own sex trafficking, or under a beneficiary liability claim against MindGeek, MindGeek's own business records establish for the entire class that a person had "knowledge" or "reckless disregard of the fact" that class members were "caused to engage in a commercial sex act" under § 1591(a).

## 2. Beneficiary Liability for Sex Trafficking

MindGeek advances two arguments regarding Plaintiff's beneficiary liability claim under the TVPRA. Both arguments are meritless.

*First,* MindGeek incorrectly argues that "Knowledge of Each Plaintiff's Circumstances Is Necessarily An Individualized Inquiry." Opp. at 20. MindGeek again limits this argument to its prior assertion that Plaintiff must prove "MindGeek knew or recklessly disregarded the fact that Plaintiff was underage at the time the content of her was made." *Id.* However, as discussed in Section I.C.1.b, *supra*, Plaintiff does not have to prove that MindGeek knew or recklessly disregarded the fact that Plaintiff was underage because common evidence establishes that the uploaders (and MindGeek) had CSAM of Plaintiff and class members and, therefore, had a "reasonable opportunity to observe" Plaintiff and class members. § 1591(c).

In this regard, the cases cited by MindGeek are inapposite.  For example, *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021) and *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214 (N.D. Cal. July 30, 2020) were TVPRA hotel cases where plaintiffs had alleged hotel brands (the franchisors) participated in sex-trafficking ventures as opposed to a different type of venture under Section 1595. Neither the Eleventh Circuit nor the Northern District of California found the plaintiffs' facts sufficient to support their allegations against the brands.

Whatever the merits of the cases involving hotel brands—and the cases are split—the facts of those cases are completely different than the situation here.  In this case, there is no question that MindGeek actually reviewed, observed, promoted, altered,[14] and distributed each and every child victim through their sex trafficking content—the CSAM—to the public on its websites to generate traffic and maximize profits.

*Tilton v. Playboy Entertainment Group, Inc.*, 554 F.3d 1371 (11th Cir. 2009) was a child pornography case involving the *mens rea* requirement in 18 U.S.C. § 2252A and *not* a sex trafficking case under § 1591 in which the defendant's awareness of the victim's age (or ability to determine the victim's age from his/her appearance) is not relevant if the defendant—like MindGeek here—had a

---

[14]    *See* note 21, *infra*.

"reasonable opportunity to observe" the victim.[15]  Similarly, *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256 (11th Cir. 2009), *Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Servs. Inc*, 601 F.3d 1159 (11th Cir. 2010), and *Davis v. Mar-Jac Poultry*, 2021 WL 2556012 (N.D. Ala. Mar. 30, 2021) were *not* TVPRA or sex trafficking cases, and none of them involved the issue of determining the age of minors or identifying victims of sex trafficking.[16]

MindGeek's assertion that "Plaintiff does not proffer any realistic trial plan for how she could show MindGeek's knowledge that each class member was a victim of child sex trafficking at the hands of the uploader" Opp. at 22, is equally unfounded.  As discussed twice above, Plaintiff and the class do not need to prove that MindGeek (or the uploaders) had "knowledge" or awareness of the victims' ages because MindGeek's own business records establish that MindGeek (and the uploaders) had a "reasonable opportunity to observe" Plaintiff and the other class

---

[15]    *See Whyte*, 928 F.3d at 1330; *Pratt*, 821 F. App'x at 201; *Sparks*, 2023 WL 2366607, at *3.

[16]    *Vega* involved breach of contract and unjust enrichment claims alleging that an employer failed to properly pay sales commissions, but the employer asserted that some sales employees knew the employer's commission structure and knew that the employer had paid them exactly as required, therefore the court found that the employer's defense presented individual issues that predominated.  564 F.3d at 1273-74.  *Sacred Heart* involved claims that an HMO systematically underpaid hospitals for medical services provided to veterans in breach of its individual network provider agreements with each hospital.  601 F.3d at 1178.  Under contract law of six different states, the HMO raised the defenses of contract ratification and waiver against some (but not all) of the class member hospitals, and court ruled that the HMO's defenses raised individual issues that predominated.  *See id*.  *Davis* was an employment discrimination case in which this Court explained that "disparate treatment" claims raise individual issues including whether the employer had "a legitimate, nondiscriminatory reason for not hiring the plaintiff[.]"  2021 WL 2556012, at *11 (N.D. Ala. Mar. 30, 2021).  Not one of these cases involved the substantive law or subject matter at issue in this case.

members pursuant to § 1591(c).  Likewise, it is irrelevant whether "viewing a video does [or does] not imbue knowledge of the subject's age or circumstances of the subject's participation" Opp. at 22, because awareness of the subject's age is not required under § 1591(a) & (c) <u>and</u> the only relevant circumstances are whether the victim was "provide[d]," "obtain[ed]," or "maintain[ed]" to "to engage in a commercial sex act" as defined in § 1591(e)(3)—which MindGeek's own business records clearly establish as discussed in Section I.C.1.a, *supra*.

Furthermore, Plaintiff can and will present additional evidence that MindGeek is directly liable for sex trafficking <u>and</u> has beneficiary liability for sex trafficking of others under §§ 1591 & 1595.  Evidence that MindGeek "recklessly disregarded" (under § 1591(a)) or that MindGeek "know or should have known" (under § 1595) that the victims were minors include the evidence that ███████████████████████ ██████████████, *see* MOL Ex. 2; Ex. 15 ¶ 4(c); Ex. 16, ████████████████ ████████████████████████████,[17] *see* MOL Ex. 6, and that MindGeek knows about CSAM on its sites but has not done all that is possible to identify and

---

[17]    Although MindGeek and Mr. Fonseca argue that tags such as ███████████████ linked to content are not indicia of CSAM, as Plaintiff's expert Timothy Weaver has stated, *see* Fonseca Decl. ¶ 30, ████████████████████████████████████ ███████████████████████████████████████ *See* MOL Ex. 2.  Regardless of what position MindGeek may advocate in its legal papers or what Mr. Fonseca's experience was in the FBI, *the simple fact is that MindGeek's own business records and experience demonstrate that these types of tags are evidence of CSAM.  See also* Reply Ex. 2, Fonseca Dep. at 186:11-18 (████████████ ██████).

eliminate it, *see id.* Ex. 15 ¶¶ 4-7. Such evidence of MindGeek's own actions has probative value on the merits of Plaintiff's sex trafficking claims and creates a genuine issue of fact based on common evidence that should be resolved by the jury at trial. In short, MindGeek's attempt to minimize the evidentiary weight of this common evidence does not mean that Plaintiff will be unable to prove her claims and establish liability on her sex trafficking claims based on common evidence applicable to the entire class.

MindGeek's recitation of Plaintiff's personal circumstances in this regard, *see* Opp. at 22-23, is inconsequential and inaccurate. For example, regardless of whether or how Plaintiff was associated with the term "lil" which appeared in the title of one of her two CSAM videos on PornHub, "lil" is "an abbreviation of the word little. It's often used in names or titles to emphasize youth or physical size." *Li'l*, Dictionary.com, https://www.dictionary.com/e/slang/lil/ (last visited Nov. 3, 2023). Based on this accepted definition of the word, tagging or titling Plaintiff's CSAM with "lil" clearly was suggestive that the video contained CSAM. *See* MOL Ex. 15 ¶ 4. Likewise, the fact that the public "never flagged" Plaintiff's videos for "underage content" has no significance on the present Motion for Class Certification. And the fact that Plaintiff ███████████████████████████████████ ███████████████ Opp. at 23, is irrelevant because MindGeek had an opportunity to observe Plaintiff, as discussed *supra*. Finally, while it also is irrelevant,

MindGeek claims Plaintiff has admitted "there is nothing in the two videos themselves that suggests they contain underage content." Opp. at 23 (citing Plaintiff's Deposition).  But Plaintiff specifically stated that she had a more childlike voice at the time the videos were made and that her young voice can be heard on one of the videos.  *See* Reply Exhibit 4, Jane Doe Dep. at 263:3-8, 264:6-22.

**Second,** MindGeek incorrectly argues that "Participation In A Trafficking Venture Likewise Turns On Each Plaintiff's Circumstances."  Opp. at 23.  In making this argument, MindGeek tellingly does *not* attempt to distinguish the cases cited in Plaintiff's Motion regarding the "participation in a venture" element of beneficiary liability for sex trafficking.[18]  *See* MOL at 26-28.  Even more remarkably, MindGeek does *not* even mention—let alone dispute the significance of—the evidence reviewed by Plaintiff in the Motion, which demonstrates that "[t]he 'participation in a venture' element can be proven through common evidence in this case."  *Id.* at 27-28; *see* Opp. at 23-25.

In particular, MindGeek does *not* try to distinguish the holding in *J.G. v. Northbrook Indus., Inc.* that "[o]ne way to connect the dots" between the victim's

---

[18]    In regard to the "participation in a venture" element, MindGeek states that "[t]his case stands in stark contrast to the cases on which Plaintiff relies—unlike here, each involved a single trafficking venture with a standardized *modus operandi*" and then attempts to distinguish *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018) and *Doe 1 v. JPMorgan Chase Bank, N.A.*, 2023 WL 3945773 (S.D.N.Y. June 12, 2023).  Opp. at 24.  Curiously, however, Plaintiff only cites *Menocal* and *JPMorgan Chase* for other principles in her Motion; she does not cite or mention either case for the "participation in a venture" element as MindGeek states.  *See* MOL at 15-16, 28, 40.

particular experience and a specific defendant, thereby proving the "participation in a venture" element, "is to allege a 'direct association' between the beneficiary and the plaintiff's trafficker" or "show a 'continuous business relationship' between a defendant [] and a sex trafficker where the defendants . . . knew or should have known [the traffickers] were engaged in sex trafficking." 2022 WL 4482735, at *4; *see also* MOL at 26. Of course, common evidence showing that all uploaders submit content to MindGeek pursuant to the same terms and conditions is the very type of evidence of "direct association" and "continuous business relationships" that "connects the dots" and proves "participation in a venture" under the TVPRA. *See J.G.*, 2022 WL 4482735, at *4. MindGeek's failure to address this precedent (or the common evidence from its own business records that shows these facts) is striking.

Rather than directly counter Plaintiff's arguments regarding how the "participation in a venture" element of beneficiary liability for sex trafficking can be proven with evidence common to the class, MindGeek relies on one case which does not address TVPRA beneficiary liability at all (*Fleites v. MindGeek S.A.R.L.*, 2022 WL 1314035 (C.D. Cal. Feb. 10, 2022)) and another case with a much different factual setting (*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021) ("*Red Roof Inns I*")). *See* Opp. at 23-24. Both cases are easily distinguishable.

While *Fleites* did involve TVPRA claims against MindGeek and bears some facial similarity to this case, the parties, allegations, legal claims, and procedural

stance of *Fleites* were vastly different. For example, *Fleites* was not a class action but it was a single case brought by 34 individual plaintiffs, including both minors ***and*** adults.[19] 2022 WL 1314035, at *2-3. Further, *Fleites* involved sprawling allegations of criminal activity "just like the Sopranos" and 18 different legal claims under various federal laws, including RICO, and numerous state laws brought against several "MindGeek Defendants" and other independent defendants, including Visa, Inc., a New York financier, and his private investment company.[20] *See id.* at *1, 6, 8 & 1 n.2 (highlighting the "sheer number of claims and issues presented"). Also, there is no discussion of the "participation in a venture" element of TVPRA beneficiary liability in *Fleites*—which is the very context for which MindGeek cites *Fleites* here. *See* Opp. at 23.

Unlike *Fleites*, Plaintiff seeks certification of a class for two federal claims based on MindGeek's inadequate content moderation policies that uniformly affected all of its CSAM victims in the same way. This class action does not raise the judicial economy concerns that troubled the court in *Fleites* decision. *See Fleites*,

---

[19] The *Fleites* decision reviews factual allegations for eight of the 34 individual plaintiffs, some of whom were minors when the videos were created (therefore, obviating the need to prove force or coercion) and others who were adults alleging lack of consent or coercion, including forcible rape, forced prostitution, and drugging. 2022 WL 1314035, at *2-3.

[20] "Beyond the individual allegations of the Plaintiffs, the Complaint [in *Fleites*] alleges that all Defendants named in this action [including MindGeek, Visa and the independent financier defendants] are engaged in racketeering activity, including sex trafficking, possession and distribution of child pornography, use of the mails and wires in furtherance of a scheme, money laundering, criminal copyright piracy, internet hacking, bank and creditor fraud, tax evasion, blackmail, extortion, harassment, defamation, and hacking." 2022 WL 1314035, at *3.

2022 WL 1314035, at *7-8. The *Fleites* court noted that joinder of all 34 plaintiffs in one trial would raise choice-of-law issues, introduce witnesses across national and international jurisdictions, and confuse the issues at trial given that multiple plaintiffs would testify about their specific claims. *See id.* Those are exactly the types of concerns that a class action ameliorates. Put simply, in concluding that the case involved highly individualized issues, the court in *Fleites* was handling a case in a different procedural posture with a much broader, more disparate, and more complex set of factual allegations, legal claims, and parties than this case.

*Red Roof Inns I* also is distinguishable from this case. In *Red Roof Inns I*, four plaintiffs "alleged that they were trafficked in Atlanta-area hotels" and brought TVPRA claims against several defendants. 21 F.4th at 719. Significantly, *Red Roof Inns I* only involved the plaintiff's TVPRA claims against the "three hotel franchisors" and *not* the plaintiff's TVPRA claims against "the hotel operators, employees, owners, [and] franchisees" who were on the ground at the Atlanta hotels where the sex trafficking had occurred. *Id.* The issue in *Red Roof Inns I* was whether a franchisor-hotel company that received revenue from franchisee-hotels in its chain can be held liable for a TVPRA beneficiary liability claim under § 1595(a) where the *only* allegations regarding their "participation in a sex trafficking venture" were that they had sent inspectors to the franchisee-hotels who "would have seen signs of sex trafficking" and that they had "received [online] reviews mentioning sex work

occurring at the hotels." *Id.* at 727.  Based on those very limited allegations and plaintiff's alleging that the franchisor's venture was a "sex trafficking venture" itself, the *Red Roof Inns I* Court stated that "observing something is not the same as participating in it." *Id.*  As discussed below, MindGeek did much more in this case than simply "observe something," unlike the franchisor-hotel companies in *Red Roof Inns I*.

In fact, another hotel case involving Red Roof Inns confirms that sex trafficking victims can bring viable claims for TVPRA beneficiary liability against hotel franchisees (who owned and operated the local hotels at issue) based on the hotel franchisee's direct "ongoing business relationship with known pimps and prostitutes in which they rented rooms to be used for commercial sex." *Does 1–4 v. Red Roof Inns, Inc.*, 2023 WL 5444261, at *3 (N.D. Ga. Aug. 10, 2023) ("*Red Roof Inns II*").  In light of that direct relationship between the hotel franchisee and the traffickers who rented its rooms, evidence that the hotel franchisee regularly observed the traffickers and the victims (including some who appeared "young or underage"), had received complaints about prostitution, and booked the traffickers into remote rooms that were less visible to others presented genuine issues of material fact regarding whether the hotel franchisee "knowingly participated in a sex trafficking venture." *Id.* (denying hotel franchisee's summary judgment motion).

Similarly, MindGeek permitted traffickers space on its platform, was able to regularly observe both the traffickers and victims through the upload and review process, and also participated in and facilitated the trafficking by ████████ ████████████████████████████████████████████████████ ████████. Regardless of the appropriate standard for evaluating hotel franchisor liability, MindGeek's position is much more analogous to the hotel franchisees, against whom plaintiffs have alleged a sex trafficking venture. *See Red Roof Inns II*, 2023 WL 5444261, at *3 (hotel franchisee's direct relationship with traffickers, awareness of trafficking activity, and placing traffickers in certain rooms is evidence of "knowingly participating in a sex trafficking venture").

MindGeek's role in the trafficking here is even more direct than that of the hotel industry. The business of pornography websites is distributing pornography on the Internet. In the circumstances in this case, the operator of the pornography website (and not the uploader) is the party who determines what is published and appears on its website. Accordingly, while a sex trafficker may upload CSAM to a pornography website, it is the website operator (*not* the sex trafficker) that puts the CSAM on the website for the public to view. A pornography website operator like MindGeek—who obtains CSAM through its direct association and contractual relationships with sex traffickers, actively reviews all content before it appears on

32

the website, ███████████████████████,[21] determines what uploaded content

will and will not appear on the website, puts CSAM on its site, *and* knows that

CSAM regularly has appeared on its website—clearly has much more direct

interaction and involvement with the sex traffickers than a hotel franchisor that

knows generally that its franchised hotels are being used by sex traffickers.

Accordingly, *Red Roof Inns I* is distinguishable from the present case.  MindGeek

has done much more than those franchisors (or franchisees)—it has knowingly and

actively created policy, procedures, and a platform to use CSAM that it obtained

from traffickers (as well as CSAM that MindGeek itself created from that content)

to its benefit, thereby "knowingly participating in a venture" under the TVPRA.

Finally, in support of her Motion, Plaintiff cited *Bridges v. Poe* for the

proposition that a defendant's "knowing failure to act in accordance with an

affirmative duty . . . may rise to level of participation in venture" under the TVPRA.

MOL at 26-27 (citing *Bridges v. Poe*, 2022 WL 1598437, at *20 (N.D. Ala. May 19,

2022) (Coogler, J.)).  In its Opposition, MindGeek disregards Plaintiff's actual

argument regarding *Bridges* and simply asserts that the "TVPRA does not impose

---

[21] ████████████████████████████████████████████████████
███████████████████████ *See* Reply Ex. 1, █████ 30(b)(6) Dep. at 225:19–227:11. ██████████
████████████████████████ *see* Reply Ex. 3, Caltagirone Dep. at 81:21–82:14, that can constitute
illegal CSAM themselves. *See* 18 U.S.C. § 2256(8) (emphasis added) ("'[C]hild pornography'
means *any visual depiction, including any photograph, film, video, picture, or computer or
computer-generated image or picture, whether made or produced by electronic, mechanical, or
other means*, of sexually explicit conduct[.]").  This is evidence not only of MindGeek's active
"participation in a venture" but also further evidence of its own "providing, obtaining, and
maintaining" minors and its own direct trafficking of them as well.

an affirmative duty to police and prevent sex trafficking," Opp. at 25—even though Plaintiff has never argued that it did.  Rather, MindGeek "has an affirmative legal duty under U.S. law to not distribute CSAM on its websites, *see* 18 U.S.C. §§ 2252 & 2252A," MOL at 25, and, therefore, MindGeek's failure to keep CSAM it obtained from sex traffickers off of its websites "may rise to level of participation in venture" under the TVPRA as this Court discussed in *Bridges*.  *See Bridges*, 2022 WL 1598437, at *20.

### D.  Plaintiff's Child Pornography Claim Can Be Proven on a Classwide Basis with Common Evidence

MindGeek asserts that Plaintiff's child pornography claim "cannot be resolved through common evidence" because whether each class member "w[as] a minor when depicted in content that appeared on MindGeek's websites," and whether "MindGeek actually knew they were underage at the time it received, possessed or distributed their videos. . . . present plaintiff specific individual inquiries[.]"  Opp. at 26.  But as explained in the Motion, these elements *can* be proven with common evidence. *See* MOL at 34-36 (citing MOL Exs. 17, 31-33).  As for proof of the child pornography on MindGeek's websites, ███████████ ███████████████████████████████████████████████████.[22]

---

[22]    The same evidence shows that ███████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ █████████████████ *See* MOL. Ex. 2 (██████████████████████████████████████ █████████████████████████████████).

*See* MOL Ex. 2.  The fact that ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████ is itself circumstantial

evidence that MindGeek knew the videos contained minors when the videos were

distributed on its websites and is also common evidence for all class members.  Put

another way, MindGeek's categorization of material as CSAM is based on common

proof as ███████████████████████████████████████████████████████

████.  *See* MOL Ex. 7; Opp. Ex. 12.  MindGeek's corporate representative and

Director of Content Moderation testified ███████████████████████████████

███████  Reply Exhibit 5, ██████ 30(b)(6) Dep. at 107:14–109:13, 128:8–129:13.

        And while each class member may have to demonstrate that they qualify to

participate in any class monetary judgment at the claims administration stage (*e.g.*,

by confirming their age when their CSAM was created), *see In re Takata*, 2023 WL

4925368, at *12, this is not an individual issue, let alone one that predominates over

the many issues common to the class.

        As to MindGeek's knowledge that the content constituted child pornography,

MindGeek challenges *this Court's own conclusion in this case* that proof of actual

knowledge is not required.  *See* MOL at 36 (quoting *Doe #1 v. MG Freesites, LTD*,

2022 WL 407147, at *21 (N.D. Ala. Feb. 9, 2022)) ("[I]t is 'not necessary . . . to

prove that the defendant had actual knowledge' that the specific media constituted

child pornography for the statutes to be violated."). As this Court and several other courts have explained, the knowledge element can be proven with circumstantial evidence. *See, e.g.*, *MG Freesites*, 2022 WL 407147, at *21-22 (explaining that circumstantial evidence sufficed to prove knowledge in *United States v. Dixon* and *United States v. Alfaro-Moncada* and finding that, in this case, MindGeek's "actions exceed the conduct that was sufficient to meet the knowledge requirement in *Dixon* and *Alfaro-Moncada*"); *United States v. Haymond*, 672 F.3d 948, 957 (10th Cir. 2012) (quoting *United States v. Borg*, 501 F.2d 1341, 1343 (10th Cir. 1974)) (explaining that, for knowledge of an individuals' age under § 2252A, "a showing of *means*[sic] *rea* 'may and often is inferred from circumstantial evidence[.]'"); *United States v. Marchand*, 308 F. Supp. 2d 498, 506 (D.N.J. 2004) ("The knowledge element [of § 2252A] can be proven through direct and/or circumstantial evidence"); *United States v. Pabon-Cruz*, 255 F. Supp. 2d 200, 206 (S.D.N.Y. 2003) (explaining that proof of knowledge under § 2252A "may be made out by circumstantial evidence" since "direct access to the contents of a person's mind is rarely available").[23]

---

[23]    *Tilton v. Playboy Ent. Grp., Inc.* is not to the contrary. In that case, the defendant was a videographer who filmed the plaintiff and others participating in "sexually themed" activities at a hotel in Florida during spring break. 554 F.3d 1371, 1374 (11th Cir. 2009). The only evidence regarding *mens rea* were the images of the victim, who was 17 years and 10 months old when the images were taken. *See id.* at 1378. Unlike this case, in *Tilton* there was no other circumstantial evidence that the defendant had other experience with CSAM, that he had rules or guidelines to identify CSAM, that he reviewed the images specifically to determine if they contained CSAM before posting them on his website, or that he actually identified the videos as CSAM himself at some point. On that basis, the court in *Tilton* affirmed the district court's summary judgment

Consistent with these precedents, there is abundant circumstantial evidence—common to all class members—from MindGeek's own records ███████████ ████████████████████████████████████████ to prove that MindGeek had the requisite knowledge of the victims' ages to support Plaintiff's child pornography claim.  At a minimum, this presents an issue common to the entire class that should be resolved by the jury at the trial of this matter.

### E.    Statutory Damages are Inherently a Common Issue and Other Available Forms of Damages Do *Not* Defeat Class Certification

The section of MindGeek's Opposition that addresses damages is entitled "Plaintiff's Demand for Compensatory, Punitive, and Statutory Damages Defeats Predominance and Makes Class Treatment Unmanageable," Opp. at 29, but the section itself does ***not*** address or even mention statutory damages once—most likely because, as MindGeek acknowledges in a different section of its Opposition, statutory damages obviate the need for class members to each present evidence of injury or actual damages.  *See* Opp. at 34 n.7; *see also* MOL at 39-40 & n.8 (citing *Doe v. Boland*, 698 F.3d 877, 880–83 (6th Cir. 2012); *Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117, 130 (S.D.N.Y. 2011); *Zaklit v. Nationstar Mortgage LLC*, 2017 WL 3174901, at *9 (C.D. Cal. Jul. 24, 2017); *In re Toys R Us-Delaware*, 300 F.R.D. 347,

---

ruling that the evidence of the images alone did not create a genuine issue of material fact regarding whether the defendant knew that the plaintiff was a minor when the images were created. *See id.*

377 (C.D. Cal. 2013); *Authors Guild v. Google, Inc.*, 282 F.R.D. 384, 395 (S.D.N.Y. 2012)).

In regard to other damages that class members may elect to pursue in lieu of statutory damages, Plaintiff is not required to "provid[e] the Court with a methodology that accurately calculates damages across the entire class[,]" as MindGeek suggests.  Opp. at 29 (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013)).  "*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury; *but the Court did **not** hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance*."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (emphasis added) (citing *Comcast*, 133 S. Ct. at 1433); *see also Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) (emphasis added) ("[T]he Supreme Court [in *Comcast*] did ***not*** hold that individual damages necessarily defeat predominance ***or that a plaintiff seeking class certification must present an expert damages model***."); *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) (interpreting *Comcast* as holding "that certification under Rule 23(b)(3) requires a reliable, common methodology for measuring classwide damages" is "a significant distortion of *Comcast*, and has already been considered and rejected by the Seventh

Circuit, the Sixth Circuit, and the Ninth Circuit in the months since *Comcast* was decided.").

Simply put, "[t]he Supreme Court did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations." *Roach*, 778 F.3d at 408. And in any event, "*Comcast* is largely irrelevant '[w]here determinations on liability and damages have been bifurcated' in accordance with Rule 23(c)(4) and the district court has 'reserved all issues concerning damages for individual determination.'" *In re Deepwater Horizon*, 739 F.3d at 817 (quoting *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013)); *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."); *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 581–82 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) (citing *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 666-67 (D. Kan. 2013)) (explaining that courts can "employ Rule 23(c)(4) and maintain class certification as to liability only, leaving damages for a separate, individualized determination"); *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017) (internal quotations and citation omitted)

(explaining that in class actions "where damages must be assessed individually, district courts may bifurcate the case into a liability phase and a damages phase.").

Finally, in regard to punitive damages, the cases on which MindGeek relies are wholly inapposite as they involved claims of discrimination.[24]  *See Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000) (non-workplace discrimination under 42 U.S.C. § 1981); *Ulysse v. Waste Mgmt. Inc.*, 2013 WL 11327137, at *1 (S.D. Fla. Sept. 13, 2013) (hostile work environment under Title VII); *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 657-58 (N.D. Ga. 2001) (race-based employment discrimination claims under § 1981 and Title VII). Discrimination claims "generally 'require distinctly case-specific inquiries into the facts surrounding each alleged incident of discrimination' such that the predominance prong of Rule 23(b)(3) generally cannot be satisfied." *Ulysse*, 2013 WL 11327137, at *3 (quoting *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997)).  They "depend heavily on the specific circumstances and

---

[24]    Mindgeek also cites *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) to assert that "any award of punitive damages must bear a sufficient nexus to the actual and potential harm to the individual plaintiff."  Opp. at 31.  This is a misinterpretation of *Campbell*—*Campbell* assessed the reasonableness of the amounts of punitive damage awards; it did ***not*** assess circumstances in which punitive damages could not be awarded at all.  *See Pichler v. UNITE*, 646 F. Supp. 2d 759, 763 (E.D. Pa. 2009), *as amended* (Aug. 12, 2009) (emphasis in original) (*Campbell* "create[d] protections as to the amount of a punitive damages award, but *not* against the imposition of such an award.").  Because punitive damages are available for the TVPRA and child pornography claims in this case, *see* MOL at 43-44, Plaintiff and the class members are entitled to request punitive damages.  *See Pichler*, 646 F. Supp. 2d at 763 (explaining that, in the context of summary judgment, "[i]f the law permits a punitive damages recovery, and a genuine question of material fact exists as to the culpability of a defendant's conduct, then nothing in [] *Campbell* . . . permits a court to take the issue of punitive damages from a jury's hands.").

conditions in which the victim finds himself or herself. An individual's qualifications, experience, and background for a particular job or contract must be considered in any case where discrimination is alleged." *Reid*, 205 F.R.D. at 684.

Unlike discrimination-based class actions, the TVPRA and child pornography claims in the present case largely concern common evidence of *MindGeek's* business practices and policies, and MindGeek's own actions are the main focus of punitive damages here. *See* MOL at 43; *see also Hoever v. Marks*, 993 F.3d 1353, 1359 (11th Cir. 2021) ("focus [of punitive damages] is on the character of the [defendant's] conduct"); *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1318 (11th Cir. 2007) ("[T]he reprehensibility of a defendant's conduct is the most relevant" evidence to assessing the reasonableness of a punitive damage award); *Palmer v. Combined Ins. Co. of America*, 217 F.R.D. 430, 440 (N.D. Ill. 2003) ("Because the focus of punitive damages is on the defendant's conduct, not the class members, it is possible to fashion a punitive damages award that would punish [the defendant] for past wrongdoing, if such wrongdoing was proved, and not require individualized inquiry."); *Opperman v. Path, Inc.*, 2016 WL 3844326, at *16 (N.D. Cal. July 15, 2016) (punitive damages can be decided classwide because "any claim for such damages hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole"); *Palmer v. Cognizant Tech. Sols. Corp.*, 2022 WL 18214014, at *31 (C.D. Cal. Oct. 27, 2022) ("[I]ndividualized issues will not

predominate over common questions with regard to the availability of punitive damages[.]").  And to the extent individualized determinations of the amount of punitive damages that each class member is entitled to becomes necessary, that issue can be decided at a later stage.  *See Opperman*, 2016 WL 3844326, at *17.

## II.    MindGeek's Arguments Regarding the Adequacy of Representation and Typicality Requirements in Rule 23(a) Are Wrong

### A.    Plaintiff's Pursuit of Both Statutory Damages and Additional Damages Proves That She is an Adequate Class Representative

Immediately after addressing Plaintiff's pursuit of compensatory and punitive damages in regard to predominance, MindGeek argues that Plaintiff is *only* pursuing statutory damages, has "constructively abandoned" pursuit of compensatory damages, and is therefore an inadequate class representative.  *See* Opp. at 32-34. The Court should not be led astray by this disingenuous argument.

The Motion for Class Certification clearly details Plaintiff's pursuit of statutory, compensatory, and punitive damages on behalf of the entire class.  *See* MOL at 38-44.  And Plaintiff has not "constructively abandoned" her pursuit of compensatory damages by not presenting "how [] compensatory damages can be addressed on a classwide basis"[25] because, as noted above, there is *no* requirement that Plaintiff present a classwide damage model in order to obtain class certification. *See Brown*, 817 F.3d at 1239; *Roach*, 778 F.3d at 407; *In re Deepwater Horizon*,

---

[25]    Opp. at 32.

739 F.3d at 817.  MindGeek even misstates the facts of *Rollins v. Alabama Community College System*, 2010 WL 4269133 (M.D. Ala. Oct. 25, 2010) to support its erroneous assertion, claiming that the *Rollins* plaintiffs "had no plan for addressing compensatory damages on a classwide basis and simply disavowed them on behalf of the absent class members." Opp. at 33 (citing *Rollins*, 2010 WL 4269133, at *10).  But the *Rollins* plaintiffs never sought compensatory damages for the putative class; in fact, they "vehemently denied that their Fourth Amended Complaint should be interpreted to bring claims for damages on behalf of the class[,]" making clear they were "only seeking compensatory damages on behalf of the named Plaintiffs."  *Rollins*, 2010 WL 4269133, at *10.  Because "[t]he unnamed class members would not have an opportunity to prove the humiliation and suffering the Plaintiffs state that they experienced, *because of the election of their named representatives*[,]" the court found the adequacy requirement was not satisfied.  *Id.* at *11 (emphasis added).

*Rollins* is thus wholly distinguishable from this case, in which Plaintiff is pursuing all forms of damages for the class.  *See* MOL at 38-44.  MindGeek is correct that "[t]he decision to elect actual or statutory damages is an individual's personal choice," Opp. at 34, *which is precisely why Plaintiff is pursuing all forms of damages in this case.  See* MOL at 40 ("Plaintiff and class members [can] pursue their actual damages claims under the TVPRA and/or the child pornography statute pursuant to

18 U.S.C. §§ 1595 and 2255(a), rather than just pursuing the alternative $150,000 liquidated damages[.]").  Accordingly, Plaintiff is an adequate class representative as her approach to damages protects each class member's right to elect their desired form of damages.

### B.    Plaintiff's Life Experiences Do *Not* Change the Fact that Her Claims are Typical of the Class Members' Claims

Once again, MindGeek relies upon a wholly inapposite employment discrimination case to assert that Plaintiff's claims are not typical of the class members' claims because she is purportedly "subject to unique defenses that could be central to the litigation."  Opp. at 35 (quoting *Bryant v. Southland Tube*, 294 F.R.D. 633, 648 (N.D. Ala. 2013)).  In *Bryant*, the court found the plaintiffs did not satisfy the typicality requirement because each named plaintiff had vastly different factual circumstances underlying their employment—some "were employed in different positions and they desired different promotions and training. Some . . . asked . . . for training and promotions; some testified they did not ask for a promotion or training because defendant did not post such opportunities. Some [] had issues with job performance and/or attendance that made them unlikely candidates for promotions or merit raises. Others were promoted numerous times." *Bryant*, 294 F.R.D. at 648.  The defendant also "ha[d] stated that its reasons for selecting, or not selecting, certain individuals for promotion, training, and/or merit raises are specific to the individual and not based on a policy of race discrimination." *Id.*  This case

bears no similarity to *Bryant* (or any discrimination case for that matter) because, as noted, the claims at issue here all primarily concern *MindGeek's* business practices and policies.

Moreover, while the court in *Bryant* did not find the typicality requirement satisfied, it nevertheless acknowledged that "[t]he typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories." *Id.* (quoting *Williams v. Mohawk Industries, Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009)). Indeed, "[a]ll putative class members are ***not*** required to have identical claims, and *factual differences among the claims of the putative class members do **not** defeat certification.*" *Eufaula Drugs, Inc. v. TDI Managed Care Servs.*, 250 F.R.D. 670, 675 (M.D. Ala. 2008) (emphasis added) (citing *Cooper v. S. Co.*, 390 F.3d 695, 734–35 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006)). "As long as Plaintiff[] assert[s], as [she] do[es] here, that [MindGeek] committed the same wrongful acts in the same manner against all members of the class, [she] establish[es] the necessary typicality." *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991); *see* MOL at 33 ("CSAM videos make their way onto MindGeek's websites through the same failures in MindGeek's own practices. . . . the focus of this action is on MindGeek and its behavior."). MindGeek does not even attempt to dispute this in regard to typicality.

Finally, that MindGeek claims Plaintiff may be subject to "unique defenses" is irrelevant because "typicality is ***not*** voided by the presence of specific defenses."[26] *Medine v. Washington Mut., FA*, 185 F.R.D. 366, 370 (S.D. Fla. 1998) (emphasis added); *see also In re Checking Account Overdraft Litig.*, 2022 WL 472057, at *5 (11th Cir. Feb. 16, 2022) (rejecting the argument that the named plaintiff "lacks the typicality needed for Rule 23(a)(3) because he has a unique defense" and noting that even if the "defense would be dispositive as to most class members if they attempted

---

[26] Here, MindGeek's argument that Plaintiff is susceptible to "unique defenses" relating to "the determination of what injury is attributable to the uploading of content to PornHub," Opp. at 35, is based on a faulty understanding of the law and the type of injury involved in this case. A victim of child pornography suffers a "personal injury" due to the very existence of their child pornography as a matter of law, regardless of whether that injury manifests in emotional distress and/or physical symptoms. *See Boland*, 698 F.3d at 880-81 (citations omitted) ("'Like a defamatory statement,' pornography injures a child's 'reputation and emotional well-being,' . . . violates 'the individual interest in avoiding disclosure of personal matters,' . . . And like defamation, those harms are 'personal injuries.'"); *New York v. Ferber*, 458 U.S. 747, 758-59 (1982) (emphasis added) ("[T]he use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. . . . *and the harm to the child is exacerbated by their circulation*."); *St. Louis v. Perlitz*, 176 F. Supp. 3d 97, 99 (D. Conn. 2016) ("Congress has recognized that distribution of child pornography on the Internet inflicts an injury on the minor victims depicted in the pornographic material."). As a result, Plaintiff and every other minor whose child pornography appeared on MindGeek's websites suffered the *same identical injury*—which "is attributable to the uploading of content to PornHub" to use MindGeek's own words—as a matter of law. MindGeek's reliance on Dr. Janine Shelby—who "did not conduct an examination of [Plaintiff]" and "did not draw diagnostic conclusions about her mental status, diagnoses, and/or psychological functioning," Shelby Decl. ¶ 6—to argue that Plaintiff's life circumstances make it hard to determine "what injury is attributable to the uploading of content to Pornhub as opposed to other events," Opp. at 35, is not a "defense" but rather a commonplace argument regarding the amount of damages that is not relevant on the present Motion. Any differences in the severity of emotional distress experienced by each class member as a result of their common injuries from child pornography do not defeat class certification and can easily be resolved in a separate stage addressing individual victims who opt for actual damages, the claims administration process in this case, or even in separate actions brought by class members who opt out of this class action to pursue their own individual damages claims. *See* MOL at 40 (quoting *Brown*, 817 F.3d at 1239) ("[T]he 'presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.'").

to sue individually, there is still a 'sufficient nexus' . . . between [the plaintiff's] claims and the class's claims to render [the plaintiff] typical under Rule 23(a)(3).").

### III. MindGeek's Arguments Regarding Certification of a Rule 23(b)(2) Injunctive Relief Class Misconstrue the Law and Ignore that CSAM Will Continue to Appear on Its Sites Unless Its Moderation Practices Are Dramatically Overhauled

MindGeek should be enjoined from allowing sexually explicit content on its websites without putting the content through a comprehensive and sufficient array of moderation practices to identify and remove any content that contains depictions of minors.  This is fundamental to the present case.  Certification of a Rule 23(b)(2) injunctive relief class would remedy, on a classwide basis, injuries that MindGeek's continued receipt and distribution of CSAM would cause class members in the future.  *See* MOL at 18-21.  MindGeek's argument against certifying an injunctive relief class is based on three mistaken premises: (1) that Plaintiff lacks standing, (2) that no injunction can provide relief to the class, and (3) that Plaintiff cannot be granted certification of a Rule 23(b)(2) injunctive relief class because she also is seeking damages separately in a Rule 23(b)(3) class.

***First***, Plaintiff has standing to represent the Rule 23(b)(2) class because her videos appeared on MindGeek's websites.  As a result, like every other class member, Plaintiff has a justifiable fear that her CSAM lives forever on the Internet and can reappear at any moment on MindGeek's websites.  *See* Reply Ex. 4, Jane Doe Dep. at 257:5-14.  MindGeek argues that Plaintiff lacks standing because she faces no future

risk of harm since ███████████████████████████████████████

███████████████. Opp. at 36.  However, once content is posted to public websites

like PornHub, where it can be copied or recorded, there is no way to ensure it will

never reappear again.  In particular, the effectiveness of "fingerprinting" or "hash

valuing" can easily be defeated by the slightest alteration of a video or image.  *See*

MOL Ex. 15 ¶ 8; Reply Exhibit 6, May 24, 2023 CSAM Hearing Tr. at 8:22–9:22.

Unlike the product liability case cited by MindGeek where victims of past harms alone

who had no intention to purchase the product in the future did not have standing as

class representatives for a 23(b)(2) injunctive relief class, Plaintiff herself has no

control over whether her CSAM reappears on MindGeek's sites.  *See Williams v.*

*Reckitt Benckiser LLC*, 65 F.4th 1243, 1255 (11th Cir. 2023) (finding plaintiffs had no

standing where only "remote and attenuated risk of future harm  . . . because none of

the Named Plaintiffs have even alleged that they intend to buy the Neuriva Products

again" and "the operative complaint provides every reason to doubt that the Named

Plaintiffs will ever purchase the Neuriva Products again"); *see generally Church v.*

*City of Huntsville*, 30 F.3d 1332, 1338 (11th Cir. 1994) (person has standing for

injunctive relief based on evidence of past injury caused by defendant's practice

when "for reasons beyond the plaintiff's control, he or she is unable to avoid repeating

the conduct that led to the original injury at the hands of the defendant" and it was

"probable" that defendant would apply same practice if confronted with plaintiff again

in the future). If MindGeek does not change its content moderation practices dramatically, there is a significant risk that Plaintiff's (and each class members') CSAM can reappear on MindGeek's sites because, once again, MindGeek's faulty moderation practices do not prevent CSAM from being made publicly available.[27] Requiring MindGeek to implement the comprehensive changes Plaintiff suggests will greatly reduce the likelihood of future harm to Plaintiff and all class members.[28]

---

[27] Despite MindGeek's claim that "[i]f the content is determined to depict even potential CSAM," human content moderators disable it "so it cannot be searched or viewed." Opp. at 7, MindGeek's own business records suggest the exact opposite— ██████████████████████████████████████████ ██████████████████████ *See, e.g.*, MOL Ex. 2 (███████████████████ ██████ █ MOL Ex. 5 (█████████████████████████████████████████████ ████████ ); MOL Ex. 12 (█████████████████████████████████████ ████████ ); Reply Exhibit 7, MindGeek_NDAL_00001927 (█████████████ ████████████████████████████████████████████████████████████ ); Reply Exhibit 8, MindGeek_NDAL_00059654 at 4 (██████████████████████████████ ████████████████████████████████████████████ ██ ); ███████████████████████████████████████████████ *See, e.g.*, MOL Ex. 13 at 2-3 (██ ████████████████████████████████████████████████████████████ █████████████████████ ); Reply Exhibit 9, MindGeek_NDAL_00100888 at 1-2 (█████████████████████████████████████████████████████████████ ██████████████████████████████ ).

[28] By contrast, in MindGeek's cases, either there was no evidence the challenged activities were likely to recur, or the plaintiffs were not really seeking injunctive relief at all. *See Williams*, 65 F.4th at 1255 (no threat of future harm to warrant injunctive relief where there was no likelihood that the named plaintiffs would purchase subject products again in future); *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1176 (11th Cir. 2019) (no threat of future injury to support 23(b)(2) certification because the plaintiff was seeking primarily monetary relief—and had withdrawn request for 23(b)(3) certification—where "[t]he requested relief . . . looks backward to an injury already suffered" to address the "desire to have [certain PIP] claims reprocessed" and have the court "[r]einstat[e] the full amount of PIP coverage, in the amount of $10,000, which should have been available under the affected policies").

**Second**, Plaintiff has identified a comprehensive array of 18 substantive changes to MindGeek's content moderation practices that would reduce and eliminate CSAM on MindGeek's websites. *See* MOL Ex. 15 ¶ 8(a)-(r). Each of these steps addresses a known deficiency in MindGeek's moderation practices, so an injunction implementing these steps collectively will close gaps and laxness that has resulted in CSAM continually being present on MindGeek's websites.[29] To the extent that there is no one measure that may be able to eliminate all CSAM entirely as MindGeek itself has argued, it simply makes sense for an injunction to require MindGeek to take a multi-pronged approach to catch and eliminate CSAM. While facially disparaging Plaintiff's proposed injunction as a "hodgepodge of steps," Opp. at 37, MindGeek does not even try to substantively refute that the *collective* implementation of these steps would reduce and eliminate CSAM on its sites. Instead, MindGeek only argues that three of Plaintiff's proposed moderation changes would not be "cure-alls" or useful for

---

[29]    For example, both Plaintiff's expert, Timothy Weaver, and MindGeek's expert, Mr. Fonseca, agree that the inability to see the faces of all performers in all content presents a problem for determining if the performers are minors. *See* MOL Ex. 15 ¶ 7(b); Fonseca Decl. ¶¶ 36, 42; *see also* Reply Ex. 3, Caltagirone Dep. at 255:17–256:8 (███████████████████ ███████████). One MindGeek content moderation employee admitted in a candid interview that the lack of faces in videos is a "well known loophole" within MindGeek that allows CSAM to appear on its sites. *See Pornhub Exec: Rapists, Traffickers Using Pornhub "Loophole" to "Make a Lot of Money"*, Sound Investigations, https://soundinvestigations.com/pornhub-loophole/ (Sept. 13, 2023). In order to address this loophole and known deficiency in MindGeek's moderation practices, one of Plaintiff's suggested steps for reducing and eliminating CSAM on MindGeek's websites includes requiring the faces of all performers to appear in all videos. *See* MOL Ex. 15 ¶ 8(e). In light of his opinion that the lack of faces in videos frustrates the ability to identify minors, it speaks volumes that ██████████████████████████████████████████████ ████████████████████████████████████. *See* Reply Ex. 2, Fonseca Dep. at 99:11– 100:1, 112:6-13. Nonetheless, requiring faces of all performers to be visible is a discrete, substantive change that could be made to MindGeek's moderation practices that will close this known deficiency and help identify and keep CSAM off of MindGeek's sites.

eliminating CSAM if each was implemented *individually*[30] without the other 17

changes as well.  Opp. at 6; Fonseca Decl. ¶¶ 41, 43.  Also, that MindGeek's present

moderation practices are allegedly "reasonable" or "best" in the pornography website

industry (which they are not) is irrelevant[31]—such assertions comparing MindGeek's

---

[30]    Mr. Fonseca admits that ███████████████████████████████
████████████████████████████████████████████████  *See* Reply Ex.
2, Fonseca Dep. at 97:8–98:10, 112:6-13, 125:2–127:10.  Nonetheless, Mr. Fonseca states that
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████.  Fonseca Decl. ¶¶ 41-42; Reply Ex. 2,
Fonseca Dep. at 231:1–232:20; *see also* Caltagirone Decl. ¶ 43 (████████████████
██████████████████).  Mr. Fonseca also states that █████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████████.  *See* Reply Ex. 2, Fonseca Dep. at 207:3–211:16, 219:11-
22, 227:4-22; *see also* Caltagirone Decl. ¶ 41 (██████████████████████████████
████████████████).  Lastly, Mr. Fonseca states that ████████████████████████
██████████████████████.  Fonseca Decl. ¶¶ 19, 30, although he admits that ████████
██████████  *see* Reply Ex. 2, Fonseca Dep. at 179:7-19, 186:11-18, and ████████████
█████████████████████.  *See* MOL Ex. 2.  MindGeek's other expert, Ms. Caltagirone, has testified that ████
███████████████████████████████████████████████████████████████████
████████████████████████  Reply Ex. 3, Caltagirone Dep. at 200:4-9.  MindGeek's criticisms of these three
suggested changes to its moderation practices defy the evidence (including its own experts) and
logic, and their lack of weight will be borne out with evidence common to the class at trial.

[31]    While Ms. Caltagirone suggests that █████████████████████████████████
███████████████████████████████████████████████████████████████████
Caltagirone Decl. ¶ 3, she also admits that ██████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████.  Reply Ex. 3, Caltagirone Dep. at 145:14–147:23.  While both Ms.
Caltagirone and Mr. Fonseca criticize some of Plaintiff's 18 suggested changes to MindGeek's
content moderation practices, neither of them offer an opinion regarding the cumulative impact of
implementing all 18 changes together.  *See* Caltagirone Decl. ¶ 42 (████████████████████
███████████████████████); *id.* ¶ 43 (████████████████████████████); Reply
Ex. 3, Caltagirone Dep. at 138:1-23, 145:14–147:23 (███████████████████████████
████████████████████████████████████████████████████████████████████████);
Reply Ex. 2, Fonseca Dep. at 112:6-13 (█████████████████████████████████████

practices relative to the practices of other websites demonstrate nothing regarding whether MindGeek's practices are sufficient and effective to catch CSAM, or whether MindGeek can do more than it is presently doing to eliminate CSAM on its sites.  In contrast, MindGeek's own corporate designee on how MindGeek monetizes content has freely admitted that ███████████████████████████████████████████ ████████ Reply Ex. 1, █████ 30(b)(6) Dep. at 79:22–80:12.  An injunction that requires MindGeek to "do better" by implementing the comprehensive steps suggested by Plaintiff will reduce and eliminate CSAM on MindGeek's sites and greatly reduce the risk that Plaintiff's (and all class members') CSAM will be missed again by MindGeek and redistributed on MindGeek's websites to the entire world in the future.

*Third,* Plaintiff's request to certify both a Rule 23(b)(2) injunctive relief class and a separate Rule 23(b)(3) damages class is common and appropriate.  *See, e.g.*, *Williams*, 568 F.3d at 1360 ("'[H]ybrid class action' may be certified" where "a class under subsection (b)(2) with respect to the [plaintiff's] claim for equitable relief and "a class for damages under subsection (b)(3)" are both certified in same case); *Nozzi v. Hous. Auth. of the City of Los Angeles*, 2016 WL 2647677, at *5 (C.D. Cal. May 6, 2016) (holding that "it is appropriate for the Court to certify one class for injunctive relief under Rule 23(b)(2) and a separate class for other remedies under Rule

---

████████); *id.* at 242:15–243:18 (█████████████████████████████████████
████████████████████████████████████████████████████████████████████).

23(b)(3)"); 2 Newberg and Rubenstein on Class Actions § 4:38 (6th ed.). *Wal-Mart Stores, Inc. v. Dukes* did not change that; it held that "individualized monetary claims belong in Rule 23(b)(3)," not in Rule 23(b)(2). 564 U.S. at 360-62. Misapplying *Wal-Mart*, MindGeek argues that Plaintiff's proposed Rule 23(b)(2) class cannot be certified because she is seeking damages in this case. *See* Opp. at 38. That is wrong because *Wal-Mart* holds only that a class cannot be certified under (b)(2) ***alone*** when plaintiff seeks damages that are more than just "incidental" to her request for injunctive. *See Wal-Mart*, 564 U.S. at 360. *Wal-Mart* did not address and does not bar requests, like Plaintiff's here, for certification of ***both*** a (b)(2) injunctive relief class ***and*** a separate (b)(3) damages class. *See* 2 Newberg and Rubenstein on Class Actions § 4:38 (this approach "insulates the (b)(2) class piece from the money damage portion of the case, hence complying with *Wal-Mart's* admonition against adjudicating individual damage claims in a (b)(2) class action").

Likewise, Plaintiff's request for injunctive relief implementing 18 changes to MindGeek's content moderation practices is robust, highly specific, and incredibly substantive. MindGeek's suggestion that this relief is "insignificant" or a "sham request" being made just for the purposes of Plaintiff recovering damages, *see* Opp.

at 38,[32] is ridiculous (and, as discussed above, Plaintiff is pursuing damages independently under (b)(3), and not under (b)(2)).

## IV. Plaintiff's Proposed Class is Ascertainable and Can Be Modified by the Court if Needed

MindGeek asserts that the class is not ascertainable because "it is defined through 'vague or subjective criteria'" and is "fatally overbroad." Opp. at 39, 42. The rationale underlying these two assertions is not only flawed, but it also suggests that strict adherence to the current class definition is fatal to class certification. Not so—"[t]o the extent that the class definitions should be refined to more clearly cover the class of individuals affected by [Mindgeek's] alleged conduct, the Court has discretion to redefine the class to provide the necessary precision." *Herman v. Seaworld Parks & Ent., Inc.*, 320 F.R.D. 271, 285 (M.D. Fla. 2017) (citing *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 300 (S.D. Ala. 2006) and 5 Moore's Federal Practice § 23.24[7] (3d ed. 2007)).

In regard to its "vague or subjective criteria" argument, MindGeek erroneously claims that the class is not ascertainable because it will be "difficult, if not impossible" to identify class members "with objective criteria" from their

---

[32] The cases in which MindGeek relies in this regard are, once again, inapposite. *Rutstein* was a (b)(3) class certification case, ***not*** a (b)(2) certification case as MindGeek states. *See Rutstein*, 211 F.3d at 1230. In *AA Suncoast*, the plaintiffs were seeking monetary reimbursement and not actually any injunctive relief. 938 F.3d at 1176. In *Casa Orlando Apartments*, only 40% of the class would have benefitted from injunctive relief and the court denied certification of a damages class under (b)(3) on other grounds as well. *See Casa Orlando Apartments, Ltd. v. Fed Nat'l Mortg. Assoc.*, 624 F.3d 185, 196, 201 (5th Cir. 2010).

images.  *See* Opp. at 40.[33]  This argument confuses administrative feasibility (*i.e.,* the ability to identify the individual class members' identities) with ascertainability; but administrative feasibility is ***not*** a prerequisite to class certification and is ***not*** a part of the ascertainability analysis.  *See* MOL at 12 n.2 (citing *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021)).  As the Eleventh Circuit has made clear, "[a] class is 'clearly ascertainable' if we are certain that its membership is 'capable of being' determined.  But membership can be capable of determination without being capable of *convenient* determination."  *Cherry*, 727 F.3d at 1303 (citation omitted) (emphasis in original); *see also Morris v. Walmart Inc.*, 2022 WL 1590474, at *6 (N.D. Ala. Mar. 23, 2022) (finding ascertainability and explaining that a fact "may complicate the identification of class members and even necessitate some self-identification, but it does not make identification impossible.").  In this case, "the age of class members at a specific point in time; the type of media

---

[33]    More specifically, MindGeek argues that Plaintiff "does not explain how one could objectively determine for all putative class members whether they were even in any content depicted on a MindGeek Tube Site. . . . Plaintiff also does not explain how one can determine for all class members whether they were underage when depicted in a commercial sex act or any CSAM." Opp. at 40.  This argument is factually and legally wrong.  Factually, the CSAM content documented in MindGeek's own records shows who the class members are—they are the people in those CSAM images which, by definition, are depictions of minors in sexually explicit situations—and that is all that the Eleventh Circuit requires for ascertainability.  That identifying the identities of those class members may be difficult is not an ascertainability defect in this class. Legally, as discussed below, these are arguments regarding the feasibility of identifying individual class members which are not part of ascertainability in the Eleventh Circuit, *see Cherry*, 986 F.3d at 1303, do not defeat class certification based on how the class is defined, and can await a later stage in the proceeding if and when there is a monetary judgment to be shared by the class.  *See In re Takata*, 2023 WL 4925368, at *12 (case management tools like claims administration process can ensure that individuals qualify as class members before sharing in any classwide monetary relief).

depicting the class members; the specific acts or circumstances in which the class members are depicted; and the availability of the videos or images on specific websites" are all *objective* criteria—they are not subject to opinion or interpretation—through which class members can be identified.  MOL at 12.[34]

MindGeek's claim that the class definition constitutes a "fail-safe" class is not fatal to ascertainability.  Opp. at 41-42.  While such classes may be disfavored, they are ***not*** prohibited.  *See Moody v. Circle K Stores, Inc.*, 2023 WL 404018, at *4 (N.D. Ala. Jan. 25, 2023) (citing *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019)) (noting that fail-safe classes "are disfavored (but not explicitly prohibited) by the Eleventh Circuit").  And in the event the Court is concerned that the proposed class is a "fail-safe" class, the Court has complete discretion to "revise the class on its own, or permit [P]laintiff to cure the flawed definition."[35]  *Id.* (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) and

---

[34]    As discussed above, "[a]s to whether someone was engaged in a commercial sex act" under § 1591, MindGeek's assertion that "there would [] need to be a subjective determination as to whether there was a sex act on account of which 'anything of value' is given to or received by any person," Opp. at 40-41 is patently false—the class members' CSAM are the "things of value" that MindGeek received and gave to others.  *See United States v. Cook*, 782 F.3d 983, 990 (8th Cir. 2015) (finding that "sexual acts, videos, and photographs" constitute "things of value" under § 1591); *Jane Doe No. 1 et al v. Daniel S. Fitzgerald*, 2022 WL 425016, at *6 (C.D. Cal. Jan. 6, 2022) (citing *Cook*, 782 F.3d at 989) (finding that "sexual gratification alone" did not constitute a "thing of value" under § 1591 and explaining that "the situation in *Cook* is easily distinguishable" because "the 'thing of value' in *Cook* was not simply sexual gratification but rather 'sexual acts, photographs, and videos [the defendant] received.'").

[35]    For example, an alternative definition of the class in this case may be:

   All persons who were under the age of 18 when they appeared in a video or image that has been made available for viewing on any website owned or operated by MindGeek anytime from February 12, 2011 through the present.

*Cox v. Community Loans of America, Inc.*, 2014 WL 1216511, at *14 (M.D. Ga. Mar. 24, 2014)).  The same is true regarding MindGeek's assertion that the class definition is "fatally overbroad," *see* Opp. at 42—"the Court is empowered to amend an over-inclusive class definition." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 321 F.R.D. 688, 696 (S.D. Fla. 2017) (citing *Messner*, 669 F.3d at 825).

Simply put, "[d]efining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science" that "should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Id.* (internal quotations and citation omitted) (citing *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("[H]olding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition"), *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts."), *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *5 (S.D. Fla. Mar. 16, 2016) (redefining the proposed class definition to those persons who "purchased" the securities at issue rather than to those who "acquired" them), and *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *15 (M.D. Fla. Apr. 3, 2014) ("And courts are authorized to amend class definitions, even if the amendment

is made subsequent to the initial certification pleadings")); *see also Ocwen Loan Servicing, LLC v. Belcher*, 2018 WL 3198552, at \*5 (11th Cir. June 29, 2018) (citing Fed. R. Civ. P. 23(c)(1)(C)) ("[T]he district court can refine the class as it deems appropriate through the course of litigation.").[36]

## V.    A Class Action is a Superior Method for Adjudicating Plaintiff's Claims

As noted in the Motion, "Rule 23(b)(3) provides a non-exhaustive list of four factors that are pertinent to the finding of superiority[.]"  MOL at 45-46 (quoting Fed. R. Civ. P. 23(b)(3)(A)-(D)).  MindGeek does not address Plaintiff's arguments regarding the class members' interests in individually controlling the prosecution of their own separate actions against MindGeek, the extent and nature of other litigation

---

[36]    MindGeek also makes the throw away argument that the class is not adequately defined because it has no geographic limitation. *See* Opp. at 42-43.  First, as noted, the Court can redefine the class as it sees fit, *see Moody*, 2023 WL 404018, at \*4, and can add a geographic limitation if necessary.  Second, MindGeek is wrong when it suggests that the TVPRA does not apply to claims of non-U.S. persons.  *See* Opp. at 42.  None of the cited cases hold that.  Also, even a federal statute that arguably is not extraterritorial can be applied to foreign parties when "the case involves a domestic application of the statute, and [courts determine] this by looking to the statute's 'focus.'" *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2101 (2016); *see also Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2883-84 (2010). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad[.]" *RJR Nabisco*, 136 S. Ct. at 2101. "The focus of a statute is 'the objec[t] of [its] solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to 'protec[t]' or vindicate." *WesternGeco v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) (alterations in original) (quoting *Morrison*, 130 S. Ct. at 2884).  The "focus" of the TVPRA is the protection and assistance of sex trafficking victims, the prevention and deterrence of future sex trafficking, and the prosecution and punishment of traffickers.  *See* 22 U.S.C. § 7101(a); 146 Cong. Rec. S7781 (daily ed. Jul. 27, 2000).  Accordingly, to the extent that MindGeek disseminated Plaintiff's and the class members' CSAM throughout the United States, which is MindGeek's largest market by far, such actions occurred within the United States and this case presents a permissible domestic application of the TVPRA regardless of the national residence of any class members or defendants.  *Fleites* actually assumed that there was subject matter jurisdiction—and no extraterritoriality problem—in the federal district court over claims involving both the domestic and foreign plaintiffs but simply noted that the presence of parties from multiple states and countries would complicate resolution of all 34 plaintiffs' claims in a single trial.  *See Fleites*, 2022 WL 1314035, at \*6-7.

concerning the controversy already begun by class members, or the desirability of concentrating the litigation of the claims in this forum. *See id.* at 46-47. Rather, MindGeek only challenges Plaintiff's position with respect to the last factor, claiming that "class certification is 'improper for classes that require individualized proof' of each plaintiff's claim and to the extent each plaintiff would be required to present proof of individualized damages." Opp. at 45 (quoting *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1316 (11th Cir. 2023)). Because MindGeek essentially repeats the same arguments it asserts in opposition to the predominance and damages sections of Plaintiff's Motion, which Plaintiff has replied to at length in Section I, *supra*, the same arguments need not be repeated here.[37]

MindGeek asserts one additional reason for why it thinks a class action is not superior—"[t]he statutes under which Plaintiff seeks class relief allow recovery of substantial statutory and punitive damages as well as attorneys' fees for a successful litigant." Opp. at 44. This argument is unfounded. First, class actions under Rule 23 are not limited to just claims for *de minimis* damages. *See generally* 2 Newberg

---

[37]    It is only worth noting that the cases on which MindGeek relies in this section are, once again, distinguishable. In *Tershakovec v. Ford Motor Co., Inc.*, the Eleventh Circuit remanded for the district court to reassess superiority because it was concerned with how the district court would manage various subclasses for each different state law fraud claims. 79 F.4th 1299, 1316 (11th Cir. 2023). In *Wright v. Dep't of Alabama Veterans of Foreign Wars*, the plaintiff asserted claims under an Alabama gambling statute and moved to certify a damages class under Rule 23(b)(3). 2010 WL 11569414, at *1 (N.D. Ala. Mar. 24, 2010). The court did not find the superiority or predominance requirements satisfied because recovery under the state statute would "require individual testimony" due to the "little, if any, evidence available to establish objectively who has played the video-gaming machines owned or leased by the defendants or when those persons might have played the machines" and the "little documentation, if any, to establish the amount of the players' claimed losses[.]" *Id.* at *7.

and Rubenstein on Class Actions § 4:81 (6th ed.) ("a rule that would exempt a defendant from liability in a class action merely because damages are large or detrimental would invite defendants to violate the law on a grand scale" and "a class action is an available procedural mechanism in all suits in federal court [regardless of the type of claims or amount of damages] except where Congress has explicitly ruled otherwise").  Also, none of the cases MindGeek cites involve facts that are remotely similar to the highly personal and sensitive subject matter involved here, which makes these kinds of claims particularly well suited for representative litigation where one or more class representative bears the intrusive burdens of discovery and trial.  *See Ulysse*, 2013 WL 11327127, at *1 (employment discrimination); *Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 661 (N.D. Ala. 2010) (Fair Credit Reporting Act violations).  The ultimate rationale underlying this argument is that MindGeek thinks class members will use class certification to "blackmail" it into a settlement.  *See* Opp. at 44.  MindGeek— a multi-million dollar corporate family that dominates the Internet pornography market—wants the Court to think *it* is the victim here.

## VI.    A Rule 23(c)(4) Issues Class is an Appropriate Alternative

Lastly, MindGeek claims that certification of a Rule 23(c)(4) issues class is not appropriate because, in its view, "none of the elements of either of Plaintiff's claims can be resolved via common proof."  Opp. at 46.  Once again, MindGeek

would like the Court to believe that the presence of *any* individual issue whatsoever renders class certification—even certification of an issues class under Rule 23(c)(4)—inappropriate.  But Plaintiff need only prove that common issues exist (and that the other requirements of Rule 23(a) and *either* Rule 23(b)(2) *or* Rule 23(b)(3)), *see* MOL at 22-23, and certification of an issues class under 23(c)(4) is appropriate for issues that can be resolved on a classwide basis.  *See id.* at 49-50; *see also* Section I.E, *supra* (citing *Butler*, 727 F.3d at 800 ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."); *Jacob*, 293 F.R.D. at 581–82; *Mulvania*, 850 F.3d at 859).

As an alternative to certifying classes under Rule 23(b)(2) and (b)(3), the use of Rule 23(c)(4) issues classes is another example of a hybrid class action and a well-recognized method for managing a class action in which a plaintiff is seeking both injunctive relief and damages.  When confronted with such cases (as the Court is here)—

> [T]wo primary approaches have emerged:
>
> (1) Some courts separately certify both a (b)(2) class for the portion of the case concerning injunctive and declaratory relief and a (b)(3) class for the portion of the case requesting monetary damages.
>
> (2) Other courts bifurcate the litigation into liability and damage phases and then typically begin by determining the defendant's liability;

*in so doing, courts may certify a (b)(2) class for the liability phase or determine liability using issue certification under Rule 23(c)(4).* If the defendant is found liable, courts adopting this approach will then decide whether to certify a (b)(3) class for money damages purposes and/or an additional (b)(2) class for final injunctive relief.

2 Newberg and Rubenstein on Class Actions § 4:38 (emphasis added).  In this way, Rule 23(c)(4) issues classes give courts the ability to resolve classwide issues—especially regarding liability based on a defendant's actions and policies that affected all class members—thereby achieving the judicial economy and efficiency goals of representative litigation while also protecting the defendant's rights to defend itself from any truly individualized issues in a case.[38]  To the extent the Court concludes that certification of this entire case under Rule 23(b)(2) and/or (b)(3) is not possible, the Court should certify an issues class under Rule 23(c)(4) to determine MindGeek's liability on Plaintiff's claims (and the Plaintiff's and the class's entitlement as least to injunctive relief and statutory damages) and then address the issues of actual damages thereafter.

MindGeek's reliance on *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.* is not persuasive because, in that case, "the [p]laintiff ask[ed] the [c]ourt to certify a Rule 23(c)(4) class consisting of four common questions: '(1) whether the shingles suffer[ed] from a common manufacturing defect; (2) whether the defect

---

[38]    "Certification of a hybrid action is often thought to be the best of both worlds, achieving the judicial economies associated with group litigation while also respecting the due process rights of individuals with monetary claims should the defendant be found liable during the first phase of the trials."  2 Newberg and Rubenstein on Class Actions § 4:38 (6th ed.).

breache[d] any express or implied warranties; (3) whether the defect necessitate[d] replacement of all roofs containing the shingles; and (4) whether Atlas fraudulently concealed the defect.'" 321 F.R.D. 430, 447 (N.D. Ga. 2017). As MindGeek noted, the court found certification of 23(c)(4) issues classes inappropriate because "each class member's claim will still need to be separately tried to determine issues like causation, notice, and statute of limitations." *Id.* However, these elements required individualized proof because of the "numerous reasons a roof may fail, including commonplace events and ordinary wear and tear. . . . [the] numerous reasons a shingle may blister, crack, or suffer from granule loss[,]" and the fact that each class member would have to "prove that the alleged defect caused their roof to prematurely fail[,]" which would be "an especially fact-intensive inquiry." *Id.* at 442-43.

Here, unlike in *In re Atlas*, certification of issues classes to determine "whether MindGeek knowingly benefitted from sex trafficking ventures in violation of the TVPRA and whether MindGeek received and distributed child pornography in violation of 18 U.S.C. § 2252A" only looks to *MindGeek's* conduct and does not require individualized inquiries of every class member. MOL at 49. This is especially true considering that ███████████████████████████████████ ███████████████████████████. *See id.* at 4-6 (citing MOL Exs. 15-17). Accordingly, certification of an issues class under Rule 23(c)(4) is appropriate in the

event the Court concludes that this case may not be certified in its entirety under Rule 23(b)(2) and/or (b)(3).

## CONCLUSION

Accordingly, Plaintiff respectfully requests that the Court grant her Motion for Class Certification and certify the class pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3), or, alternatively, certify an issues class pursuant to Rule 23(c)(4).  Additionally, Plaintiff respectfully requests that the Court appoint Plaintiff's counsel as Class Counsel pursuant to Rule 23(g).

Respectfully submitted this 6th day of November 2023,

/s/ *Gregory Zarzaur*
Gregory Zarzaur (ASB-0759-E45Z)
Kelsie Overton (ASB-1791-F80L)
THE ZARZAUR LAW FIRM
2332 Second Avenue North
Birmingham, Alabama 35203
T: (205) 983-7985
E: gregory@zarzaur.com
    kelsie@zarzaur.com

Joshua P. Hayes
PRINCE GLOVER HAYES
701 Rice Mine Road
Tuscaloosa, Alabama 35406
T: (205) 345-1234
E: jhayes@princelaw.net

Kimberly Lambert Adams*
Kathryn L. Avila*
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
T: (850) 435-7056
E: kadams@levinlaw.com

kavila@levinlaw.com
*pro hac vice*

Brian Kent*
Gaetano D'Andrea*
Jill P. Roth*
M. Stewart Ryan*
Alexandria MacMaster*
LAFFEY, BUCCI & KENT, LLP
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
T: (215) 399-9255
E: bkent@laffeybuccikent.com
   gdandrea@laffeybuccikent.com
   jroth@laffeybuccikent.com
   sryan@laffeybuccikent.com
   amacmaster@laffeybuccikent.com
*pro hac vice*

Benjamin W. Bull*
Dani Bianculli Pinter*
Christen M. Price*
Peter A. Gentala*
NATIONAL CENTER ON SEXUAL
EXPLOITATION
1201 F Street NW, Suite 200
Washington, D.C. 20004
T: (202) 393-7245
E: lawcenter@ncose.com
*pro hac vice*

Kevin Dooley Kent*
Mark B. Schoeller*
Vanessa L. Huber*
CLARK HILL PLC
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
T: (215) 640-8500
E: kkent@clarkhill.com
   mschoeller@clarkhill.com
   vhuber@clarkhill.com
*pro hac vice*

*Counsel for Plaintiff Jane Doe #1*

65

**CERTIFICATE OF SERVICE**

I hereby certify on this 6th day of November 2023, this document was filed conventionally with the Clerk of the United States District Court for the Northern District of Alabama and will be served electronically by the Plaintiff to all participants of record along with copies of the sealed documents.


*/s/ Gregory Zarzaur*
Gregory Zarzaur

66