
FILED
2023 Dec-19 AM 11:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| JANE DOE,<br>on behalf of herself and all<br>others similarly situated,<br><br>**Plaintiff,**<br><br>vs.<br><br>MG FREESITES, LTD, d/b/a<br>"PORNHUB", a foreign entity;<br>MG FREESITES II LTD, a foreign<br>entity; MINDGEEK, S.A.R.L., a<br>foreign entity; MINDGEEK USA,<br>INCORPORATED, a Delaware<br>corporation; MG CY HOLDINGS<br>LTD, a foreign entity; MINDGEEK<br>CONTENT RT LIMITED, a<br>foreign entity; 9219-1568 QUEBEC<br>INC. d/b/a MINDGEEK, a foreign<br>entity; MG BILLING LTD, a<br>foreign entity,<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 7:21-cv-00220-LSC |

## MEMORANDUM OF OPINION AND ORDER
## GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## I.    Introduction

The Court has for consideration Plaintiff Jane Doe's motion, filed on

September 13, 2023, to certify a class under Federal Rule of Civil Procedure 23.

(Doc. 95.) Plaintiff describes the class as follows:

All persons, who were under eighteen years of age at the time they were depicted in any video or image, (1) in any commercial sex act as defined under 18 U.S.C. §§ 1591 and 1595, or (2) in any child pornography as defined under 18 U.S.C. § 2252A, that has been made available for viewing on any website owned or operated by the Defendants.

(*Id.* at 2.) Defendants—MG Freesites, LTD, d/b/a "Pornhub"; MG Freesites II, LTD; Mindgeek S.A.R.L.; Mindgeek USA Incorporated; MG CY Holdings LTD; Mindgeek Content RT Limited; 9219-1568 Quebec, Inc., d/b/a Mindgeek; and MG Billing LTD—oppose class certification (doc. 102; *see also* docs. 132 & 137), and Plaintiff has replied in support of her motion. (Doc. 129; *see also* doc. 126).[1] For the following reasons, Plaintiff's motion will be granted.

## II.    Background

The Court assumes that the parties are familiar with Plaintiff's complaint allegations. This Court described them in detail in its Memorandum of Opinion and Order denying Defendants' Motion to Dismiss. (Doc. 42; *Doe #1 v. MG Freesites,*

---

[1]    The parties originally filed redacted motions and briefs and were then permitted to file unredacted versions under seal. This Court believes that this opinion should be in the public domain to the extent possible. Thus, some portions of this opinion are redacted, and an unredacted version will be filed under seal contemporaneously. Additionally, Doc. 126, which is Plaintiff's motion for a status conference to discuss an expedited ruling on the pending class certification motion, is hereby **DENIED as MOOT**.

*LTD*, 2022 WL 407147 (N.D. Ala. Feb. 9, 2022)). In short, the allegations—and evidence submitted by the parties in conjunction with this motion—show the following.

Plaintiff, an Alabama woman proceeding pseudonymously, is a victim of childhood sex trafficking, and she brings this putative class action against Defendants, who are a network of related companies that own or operate several of the most-visited pornographic websites in the world, including www.Pornhub.com. Pornhub is a tube site, meaning much of the site's content comes from individual users who create pornographic videos or images and upload them to Pornhub themselves, subject to Pornhub's terms and conditions. But the content is not publicly available until Defendants allow it to be so. Defendants actively review all content before it appears on their websites, create thumbnails, tags, and titles for that content, and determine which uploaded content will and will not appear on their websites. Defendants then offer the uploaders the opportunity to share in the advertising revenue from the content they upload, through, among other things, their Content Partner and ModelHub programs. Defendants also monetize the content on their sites by selling premium subscriptions and harvesting user data that they share with advertisers.

Plaintiff alleges that Defendants have constructed and continue to use a business model that enables them to profit from sex trafficking ventures involving tens of thousands of children, and in so doing have also received and distributed vast amounts of child sexual abuse material ("CSAM") on their pornography websites. Defendants' business model is predicated on maximizing views and traffic to their websites, and Plaintiff alleges that they edit the titles, tags, and keywords of content that violates or potentially violates their terms of service so that such content can remain live and publicly available. According to Plaintiff, this active role has not only allowed Defendants to profit from content with tags commonly associated with CSAM, such as "young," "teenager," and "tiny teen," it has also led to the proliferation of CSAM on their websites. For instance, Plaintiff's abuser—who has since been convicted of displaying obscene material depicting a minor and sexual abuse—filmed her engaging in sexual acts while she was still a minor and uploaded the videos to Pornhub. The videos, one of which contained the diminutive term "Lil" in the title, were publicly available for over two years, despite several take down requests, until law enforcement intervened.

Plaintiff brings this case on behalf of herself and all other victims whose CSAM appeared on Pornhub and Defendants' other sites as a result of Defendants' business practices. Her Amended Complaint contains two counts: one alleging that

Defendants knowingly benefitted from participation in what they knew or should have known was a sex trafficking venture, in violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591 and 1595 (Count I), and the other that Defendants received and distributed child pornography in violation of 18 U.S.C. §§ 2252 and 2252A (Count II). Plaintiff requests that the Court award damages and issue injunctive and equitable relief, including requiring Defendants to identify and remove CSAM and implement corporate-wide policies to prevent continued dissemination of CSAM on their platforms. Indeed, although Defendants describe a variety of technological tools that they now use that were developed in recent years that were designed to detect CSAM before it is viewable to the public, Plaintiff contends that these new moderation practices and tools remain ineffective in eliminating CSAM on Pornhub and the other sites.

## III.   Legal Standards

Class actions, in which representative litigants may bring claims on behalf of absent class members, are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). The class representative must be a part of the class and "possess the same interest and suffer the same injury" as the class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).

Federal Rule of Civil Procedure 23 governs class certification. *Id.* at 345. The class representative has the burden of proof. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). The class representative must do three things: 1) satisfy an implied ascertainability requirement, 2) show that the class meets each of the requirements specified in Rule 23(a), and 3) show that the class falls under at least one of Rule 23(b)'s categories of class actions. *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012).

Rule 23(a) "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores*, 564 U.S. at 349. The four requirements found in Rule 23(a) are that:

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;
>
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Courts and litigants refer to these requirements as numerosity, commonality, typicality, and adequacy of representation. *Valley Drug Co.*, 350 F.3d at 1188.

Plaintiff is moving for class certification pursuant to Rule 23(b)(2) and (3). A Rule 23(b)(3) class action must satisfy two additional requirements: (1) the "questions of law or fact common to class members [must] predominate over any questions affecting only individual members" and (2) a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). On the other hand, Rule 23(b)(2) allows class treatment where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule—that is, [she] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores*, 564 U.S. at 351. Accordingly, this Court may consider the merits of Plaintiffs' claims "to the extent [ ] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). This Court resolves any factual disputes by a preponderance of the evidence standard. *Wal-Mart Stores*, 564 U.S. at 350–51.

## IV.    Discussion[2]

### A.    The Implied Ascertainability Requirement

Plaintiff's first hurdle is to establish that the proposed class is "adequately defined and clearly ascertainable." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) ("Class representatives . . . must satisfy this requirement before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)."). The Eleventh Circuit has traditionally "collapsed class definition and ascertainability into one inquiry." *Id.* The proposed class cannot be defined "through vague or subjective criteria." *Id.* Instead, class membership must be capable of being determined through objective criteria so that the Court is able to ascertain who belongs in the class. *Id.* at 1303–04. Importantly, "membership can be capable of determination without being capable of *convenient* determination." *Id.*

---

[2]    "[A]nalysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). *See also Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1283 n. 20 (11th Cir. 2001) ("[T]he fact that this suit was brought as a class action does not alter [the proposed class representative's] obligation to show that [s]he individually satisfies the constitutional requirements of standing."). Defendants do not challenge Plaintiff's standing to pursue the present action as a general matter, although they do argue that she lacks standing to seek injunctive relief, an argument that is addressed *infra*. The Court, in independently reviewing the record, has not identified any standing problems or other "case or controversy" concerns (e.g., ripeness or mootness) that would prevent this case from proceeding as a class action.

This means that, at least in the Eleventh Circuit, "[a]dministrative feasibility is not an inherent aspect of ascertainablity." *Id.* Administrative feasibility refers to whether identifying class members is a "'a manageable process that does not require much, if any, individual factual inquiry.'" *Id.* at 1304 (quotation omitted).

As noted, Plaintiff defines the proposed class as follows:

> All persons, who were under eighteen years of age at the time they were depicted in any video or image, (1) in any commercial sex act as defined under 18 U.S.C. §§ 1591 and 1595, or (2) in any child pornography as defined under 18 U.S.C. § 2252A, that has been made available for viewing on any website owned or operated by the Defendants.

(Doc. 95 at 2.) From this definition, it appears that the following objective criteria can be used to ascertain who belongs in the class: 1) the age of class members at a specific point in time; 2) the type of media depicting the class members; 3) the specific acts or circumstances in which the class members are depicted; and 4) the availability of the videos or images on specific websites. Indeed, none of these criteria is subject to opinion or interpretation.

Defendants contend that Plaintiff's class definition is impermissibly vague for several reasons, but their arguments overcomplicate the ascertainably inquiry. First, they say that it will be difficult to determine the identities of class members from images or videos on Pornhub or Defendants' other sites, since faces depicted in pornographic videos are often obscured. They also say that it will be nearly

impossible to determine, by merely viewing the images or videos, whether class members were underage at the time the content depicting them was created, especially if they were post-pubescent minors at the time of creation.

However, Plaintiff has already established her minority at the time her CSAM was created through direct evidence, without anyone having to resort to attempting to determine her age from a video or photo. (Ex. 18 to Doc. 95 [Plaintiff's declaration in which she confirms her age at the time of the creation of her CSAM]; Ex. 20 to Doc. 95 [Defendants' records showing date of upload of CSAM depicting Plaintiff to Pornhub].) Class members can similarly self-identify.

In any event, Defendants' arguments pertain more to the administrative feasibility of the class, which the Eleventh Circuit has instructed courts not to consider as a part of the ascertainability analysis. *See Cherry*, 986 F.3d at 1304. *See also Morris v. Walmart Inc.*, 2022 WL 1590474, at *6 (N.D. Ala. Mar. 23, 2022) (finding ascertainability and explaining that a fact "may complicate the identification of class members and even necessitate some self-identification, but it does not make identification impossible"). Certainly, class members may be required to establish their minority during any future claims administration processes in order to qualify as members of the class and participate in any class monetary relief. But for class certification purposes, the CSAM content documented in Defendants' own records

shows who the class members are. They are the people in those CSAM images on Defendants' websites—20,000 of which Defendants have reported to the National Center for Missing and Exploited Children ("NCMEC") since 2020. (Exs. 1 & 22 to Doc. 95).

Defendants also say that Plaintiff's inclusion of references to 18 U.S.C. §§ 1591, 1595, and 2252A in the class definition makes it a prohibited "fail-safe" class. A fail-safe class is "a class whose membership can only be ascertained by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability." *Rodriguez v. Countrywide Home Loans, Inc.*, 695 F.3d 360, 369–70 (5th Cir. 2012) (citation omitted); *accord Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (defining a fail-safe class as "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim"). The Eleventh Circuit has suggested in dicta that fail-safe classes are disfavored, while not outright prohibiting them. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019).

However, even if the wording of Plaintiff's class definition runs the risk of making it a fail-safe class, the Court needn't deny class certification on this basis. Rather, this Court can redefine the class to more clearly describe the class of individuals affected by Defendants' conduct. *See Moody v. Circle K Stores, Inc.*, 2023

WL 404018, at *4 (N.D. Ala. Jan. 25, 2023) (the Court has discretion to "revise the class on its own, or permit the plaintiff to cure the flawed definition") (citing *Messner*, 669 F.3d at 825 ("the fail-safe problem is "more of an art than a science . . . and often should be resolved by redefining the class definition rather than flatly denying class certification on that basis.") (quotation omitted)); *Cox v. Community Loans of Am., Inc.*, 2014 WL 1216511, at *14 (M.D. Ga. Mar. 24, 2014) (explaining that the court may "redefine the class to bring it within the scope of Rule 23"); 5 James W. Moore et al., *Moore's Federal Practice* § 23.24[7] (3d ed. 2007).

Plaintiff has already suggested an alternative class definition, which is:

> All persons who were under the age of 18 when they appeared in a video or image that has been made available for viewing on any website owned or operated by [Defendants] anytime from February 12, 2011 through the present.

(Doc. 129 at 56 n.35.) The Court finds that this alternative definition adequately defines the class and avoids putting it in the fail-safe category and will thus use it going forward.

Finding that the class is ascertainable, the Court now turns to the four requirements found in Rule 23(a).

## B.    The Rule 23(a) Requirements

### 1.    Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is "generally [a] low hurdle," *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009), and a class of "more than forty" members is "generally" adequate, *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1153 (11th Cir. 1986). Here, Plaintiff contends that the proposed class numbers at least in the thousands. As noted, Defendants' own records indicate that they have made over 20,000 reports to NCMEC of apparent CSAM on their websites. (Exs. 1 & 22 to Doc. 95.) The Court finds that the numerosity requirement is met.

### 2.    Commonality

To satisfy the commonality requirement, a party seeking class certification must demonstrate "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The class members' claims must "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350. "For purposes of Rule 23(a)(2) even a single common question will do." *Id.* at 359. *See also Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) ("Commonality requires 'that there be at least one issue whose resolution will affect

all or a significant number of the putative class members.'") (quoting *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982)).

Plaintiff seeks to certify a class based on the violations of the federal child pornography prohibitions and the TVPRA. To establish liability under the federal child pornography statutes, Plaintiff must prove that Defendants knowingly received or distributed child pornography in interstate or foreign commerce. 18 U.S.C. § 2252A(a)(2). To prevail under the TVPRA, Plaintiff must show that Defendants knowingly benefitted financially or by receiving anything of value from participation in a venture that Defendants knew or should have known has engaged in child sex trafficking. 18 U.S.C. § 1595(a). Plaintiff has identified the following common questions that she says will be relevant to her claims and that are susceptible to class-wide proof:

- Whether CSAM has appeared on Defendants' websites;

- How Defendants obtain content for their websites;

- How Defendants review and moderate content that appears on their websites;

- Whether Defendants' policies and practices allowed CSAM to appear on their websites or were inadequate to stop CSAM from appearing on their websites;

- How Defendants monetize content on their websites and whether they profited from CSAM appearing on their websites;

- Whether Defendants knew or should have known that CSAM has appeared on their websites;

- Whether Defendants knowingly benefitted from sex trafficking ventures;

- Whether Defendants' conduct constitutes sex trafficking, dissemination of videos depicting minors in commercial sex acts or child pornography, or child exploitation in violation of 18 U.S.C. §§ 1591, 1595, and 2252A.

(Doc. 95-1 at 14–15).

The Court agrees with Plaintiff that these questions and issues all relate to the same practices and policies that Defendants have used to operate their websites that have resulted in Plaintiff's and the putative class members' CSAM being distributed to the public in violation of federal sex trafficking and child pornography laws, and, therefore, all are susceptible of being resolved by class-wide proof. *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 916–17 (10th Cir. 2018) (commonality requirement satisfied where "all members of the TVPA [forced labor] class based their claims on the [same] Policy" of defendants). Defendants have failed to persuade the Court that there is not "at least one issue whose resolution will affect all or a significant number of the putative class members." *Mohawk*, 568 F.3d at 1355.[3] Thus, the commonality requirement is met.

---

[3]     Although Defendants vigorously argue that sex trafficking crimes are highly individualized in their circumstances and that making the determination as to

### 3.    Typicality

The third Rule 23(a) requirement, typicality, "measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322–23 (11th Cir. 2008) (quotation omitted). "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). "Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Id.* (citation omitted).

The court easily finds that a "sufficient nexus" exists between Plaintiff's claims and those of the putative class. *See id.* Plaintiff and the class contend that Defendants' websites hosted pornographic videos depicting them when they were minors. Plaintiff alleges that Defendants' policies and practices made dissemination of this CSAM, both of her and the putative class members, possible. In other words,

---

whether a particular individual was trafficked cannot be done on group basis, their arguments are better addressed when the Court discusses the predominance requirement found in Rule 23(b)(3), *infra.*

she alleges the same conduct of Defendants caused injuries common to all class members. *See Menocal*, 882 F.3d at 917 (typicality requirement satisfied where "the claims of all the class members—including the representatives—share the same theory: that GEO knowingly obtained class members' labor by means of the Sanitation Policy . . . . The class representatives allege that they—just like all other Aurora Facility detainees in the relevant period—performed 'mandatory, uncompensated work . . . under [GEO's] Housing Unit Sanitation policy.'").

Defendants argue that Plaintiff is not typical of the class because her claims may be subject to "unique defenses" that other class members may not have. (Doc. 102 at 43–44 (citing *Bryant v. Southland Tube*, 294 F.R.D. 633, 648 (N.D. Ala. 2013))). ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



███████████████████████████████████████████

███████████████████████████████████████████

██████

This argument ignores that each CSAM victim suffers a personal injury due to the very fact that CSAM of them exists, regardless of whether that injury manifests in emotional distress, physical symptoms, or in some other fashion. *See New York v. Ferber*, 458 U.S. 747, 758-59 (1982) ("[T]he use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. . . . and the harm to the child is exacerbated by their circulation."); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249 (2002) ("[A]s a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated. Like a defamatory statement, each new publication . . . would cause new injury to the child's reputation and emotional well-being."); *St. Louis v. Perlitz*, 176 F. Supp. 3d 97, 99 (D. Conn. 2016) ("Congress has recognized that distribution of child pornography on the Internet inflicts an injury on the minor victims depicted in the pornographic material."). As a result, Plaintiff and every other minor whose CSAM appeared on Defendants' websites suffered at least this same injury.

Further, the case on which Defendants rely is an employment discrimination case where the court found typicality lacking because each named class representative had different factual circumstances surrounding the defendant's failure to promote them: they were employed in different positions; they desired different training and promotions; some asked for a promotion while others never did; some had issues with their job performance or attendance that made them unlikely candidates for promotion or merit raises; yet others were promoted numerous times. *Bryant*, 294 F.R.D. at 648. Additionally, the defendant in *Bryant* stated that its reasons for awarding promotions were specific to the individual and not based on a policy of race discrimination. *Id.* This case bears no similarity to *Bryant*, or to any discrimination case, because Plaintiff's claims concern Defendants' common business practices and policies.

Finally, any differences in the emotional distress suffered by class members could be addressed during any future claims administration process as individuals participate in any monetary relief award, or even in separate actions brought by class members who might choose to opt out of this class action to pursue their own individual damages claims. *See In re Checking Account Overdraft Litig.*, 2022 WL 472057, at *5 (11th Cir. Feb. 16, 2022) (rejecting the argument that the named plaintiff "lacks the typicality needed for Rule 23(a)(3) because he has a unique

defense" and noting that even if the "defense would be dispositive as to most class members if they attempted to sue individually, there is still a 'sufficient nexus' . . . between [the plaintiff's] claims and the class's claims to render [the plaintiff] typical under Rule 23(a)(3)."). As such, the typicality requirement is satisfied.

### 4. Adequate Representation

"Adequacy of representation" is the final Rule 23(a) requirement. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The adequacy-of-representation requirement thus "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug*, 350 F.3d at 1189 (quotations omitted).

There is no evidence that Plaintiff or her counsel has any conflict of interest with other class members. Rather, Plaintiff's claims are consistent with those of the class members, who would all allege to have suffered the same type of injury because of Defendants' conduct. *See Amchem Prods., Inc.*, 521 U.S. at 625–26 (to satisfy the adequacy of representation requirement, the class representative "must be part of the same class and possess the same interest and suffer the same injury as the class

members") (quotation omitted); *Valley Drug*, 350 F.3d at 1189 (for the adequacy of representation requirement, conflicts of interest exist only "where some party members claim to have been harmed by the same conduct that benefitted other members of the class").

Further, Plaintiff has already demonstrated her commitment to prosecuting her claims by making a large discovery production, including being deposed, and she has declared her intention to see this litigation through to its conclusion. (Ex. 18 to Doc. 95.) The same is true of Plaintiff's counsel, who are qualified, experienced, and financially able to prosecute this case, and who have already invested significant resources into it. (Ex. 19 to Doc. 95 [Plaintiff's counsel's declaration discussing counsel's experience representing victims of sex trafficking, sexual abuse, and sexual exploitation, as well as extensive experience with complex litigation, including class actions and criminal cases involving sex crimes].)

Defendants argue that Plaintiff is not an adequate representative because, by suggesting that this Court could, in its discretion, certify a class for statutory liquidated damages only,[5] she has constructively abandoned pursuit of actual

---

[5]    Under 18 U.S.C. § 2255, a victim may choose to recover liquidated damages of $150,000, as an alternative to actual damages, for both a child pornography claim (*i.e.*, a violation of 18 U.S.C. § 2252A) and for a sex trafficking beneficiary liability claim (*i.e.*, a violation of 18 U.S.C. § 1591).

compensatory damages to the detriment of absent class members who may wish to seek them. To the contrary, the Court does not read Plaintiff's motion as abandoning any type of damages. Plaintiff clearly seeks all forms of damages on behalf of the class—statutory, compensatory, and punitive. (Doc. 95-1 at 40.) Accordingly, Plaintiff is an adequate representative of the class.

Finding that Plaintiff has met the four requirements for a class action under Rule 23(a), the Court now turns to the two categories of classes found in Rule 23(b) that Plaintiff requests be certified.

### C.     Categories of Class Actions Under Rule 23(b)

In addition to the Rule 23(a) requirements, Plaintiff must also establish one or more of the grounds for maintaining a class action under Rule 23(b). *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004) (every putative class must meet "at least one of the requirements set forth in Rule 23(b)"). Plaintiff seeks certification under Rule 23(b)(3) and 23(b)(2).

### 1.     Rule 23(b)(3) Common Questions Class

Rule 23(b)(3) allows certification when the court finds that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R.

Civ. P. 23(b)(3). The Court will address predominance and superiority in turn, finding that Plaintiff meets both requirements.

### i.    The Predominance Requirement

"Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Williams*, 568 F.3d at 1357 (quoting *Klay*, 382 F.3d at 1255). Assessing predominance requires "a pragmatic assessment of the entire action and all the issues involved." *Id*. (quoting 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.45[1] (3d ed. 2008)). "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Id.* (quoting *Klay*, 382 F.3d at 1255). Rule 23(b)(3)'s predominance inquiry is "far more demanding" than Rule 23(a)'s commonality requirement. *Id.* (quoting *Amchem Prods.*, 521 U.S. at 623–24).

In this circuit, the predominance inquiry involves three steps. *See Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234–35 (11th Cir. 2016). First, the court "must . . . identify the parties' claims and defenses and their elements." *Id.* at 1234 (citing *Klay*, 382 F.3d at 1254 & n.7). Second, the court "should . . . classify these

issues as common questions or individual questions by predicting how the parties will prove them at trial." *Id.* (citing *Klay*, 382 F.3d at 1255). "Common questions are ones where 'the same evidence will suffice for each member,' and individual questions are ones where the evidence will 'var[y] from member to member.'" *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). Third, "[a]fter identifying the common and individual questions, the district court should determine whether the common questions predominate over the individual ones." *Id.* at 1234–35. Predominance is a "qualitative assessment, too;" meaning that the "relative importance" of the common versus individual questions is also a consideration. *Id.* at 1235 (quotation omitted).

The Court will consider whether common questions of law or fact predominate as to each of Plaintiff's claims.

> **a.    Common Questions Predominate Over Individual Ones on Plaintiff's Sex Trafficking Beneficiary Liability Claim under 18 U.S.C. §§ 1591(a)(2) and 1595(a)**

Count I of Plaintiff's Amended Complaint alleges that Defendants knowingly benefitted from participation in what they knew or should have known was a sex

trafficking venture, in violation of the TVPRA, 18 U.S.C. §§ 1591(a)(2) & 1595(a).[6]

To prove "beneficiary liability" under the TVPRA, Plaintiff must prove that 1) Defendants knowingly participated in a venture, 2) they knowingly received a benefit from their participation in the venture, 3) the venture violated the TVPRA as to Plaintiff, and 4) Defendants knew or should have known that the venture violated the TVPRA as to Plaintiff. *See Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021) (TVPRA beneficiary liability claim against a hotel franchisor). *See also Doe v. Twitter*, 2021 WL 3675207, at *25 (N.D. Cal. Aug. 19, 2021) (defining the elements of a TVPRA beneficiary liability claim similarly, in a case against an electronic services provider).

Before turning to whether common questions predominate over individual ones as to each of these four elements, the Court notes that Plaintiff argued for the first time in her reply brief that she is also claiming that Defendants committed direct sex trafficking in violation of 18 U.S.C. § 1591(a)—every time they allowed CSAM of a victim to be viewed by the public. (*See* doc. 129 at 24–25.) Arguments raised for

---

[6]     Section 1591(a) defines the violations (both direct and beneficiary), 18 U.S.C. § 1591(a), and section 1595 permits a party to bring a civil claim against perpetrators of sex trafficking and against persons or entities who, although not the direct perpetrator, knowingly benefitted from participating in what they knew or should have known was a sex trafficking venture. *See* 18 U.S.C. § 1595(a).

the first time in a reply memorandum are ordinarily not considered. *See Herring v. Sec'y, Dep. of Corr.*, 397 F.3d 1338, 342 (11th Cir. 2005). The Court did allow Defendants to submit a sur-reply, in which they responded in opposition to this argument. (*See* doc. 137.) Nonetheless, Plaintiff never alleged a direct trafficking claim in her Amended Complaint, nor did she argue that theory in opposition to Defendants' motion to dismiss. A complaint may not be amended through responsive briefing. *See Huls v. Llabona*, 437 F. App'x 830, 832 n.5 (11th Cir. 2011) (finding that a claim is not properly raised where asserted for the first time in response to a motion to dismiss). Accordingly, the Court will not entertain Plaintiff's direct sex trafficking allegation at this time.

To prove section 1591(a)(2) beneficiary liability, Plaintiff must first prove that Defendants knowingly participated in a venture. The Eleventh Circuit has defined "participation in a venture" for purposes of TVPRA beneficiary liability as "taking part in a common undertaking or enterprise involving risk and potential profit." *Red Roof Inns*, 21 F.4th at 726. The beneficiary must be shown to have associated with Plaintiff's trafficker in order to serve the beneficiary's business objective. *Id.* (citing *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017)). Plaintiff may prove a "direct association" or a "continuous business relationship" between the beneficiary and

the plaintiff's trafficker. *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1235 (N.D. Ga. 2022).

Plaintiff can easily use evidence common to all class members to try to prove that Defendants participated in a venture with her sex trafficker and class members' sex traffickers. Plaintiff can show that Defendants obtained CSAM through their direct association and contractual relationships with sex traffickers. Defendants' own business records demonstrate that uploaders submit content to Defendants' websites pursuant to the same terms and conditions, that Defendants actively review all content before it appears on their websites, that they create thumbnails, tags, and titles for that content, and they determine what uploaded content will and will not appear on their websites. Defendants' entire business model is premised on their contractual relationship with individuals who submit pornographic content to be uploaded, some of whom sadly are sex traffickers as the TVPRA defines that term.

Plaintiff must next demonstrate that Defendants "knew [they were] receiving some value from participating in the alleged venture." *Red Roof Inns*, 21 F.4th at 724. Plaintiff can easily attempt to prove this element through generalized evidence common to all class members from Defendants' own business records of how Defendants profited from uploaded videos and images. CSAM is a commodity and a "thing of value" under the TVPRA. *United States v. Cook*, 782 F.3d 983, 989 (8th

Cir. 2015) (child pornography "photographs and videos" are "things of value"
within the meaning of "commercial sex act" under 18 U.S.C. § 1591). Evidence that
would be the same for all class members shows that advertisements appear next to
all videos on Defendants' websites; Defendants share in advertising revenue with
uploaders based on the advertisements that appear next to their content; uploaders,
like Plaintiff's trafficker, have uploaded CSAM onto Defendants' websites; and

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

    Third, Plaintiff must also prove that the venture violated the TVPRA as to
her—and as to the other class members. *See Northbrook Indus.*, 619 F. Supp. 3d at
1238 (citing *Red Roof Inns*, 21 F.4th at 725). With regard to herself, Plaintiff alleges
that she was trafficked in violation of 18 U.S.C. § 1591(a), which makes it a crime to
cause a person under 18 years old to "engage in a commercial sex act." 18 U.S.C. §
1591(a). Consequently, Plaintiff must [prove] that the venture in which [Defendants]
participated caused Plaintiff to engage in a commercial sex act." *Northbrook Indus.*,

619 F. Supp. 3d at 1238 (quoting 18 U.S.C. § 1591(a)). Under the TVPRA, the "term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Accordingly, the TVPRA makes it illegal to benefit from the dissemination of videos or images of minors engaging in sex acts for which anyone received something of value. In this case, the exposure, platform, and financial incentives provided to Defendants' uploaders and the profits Defendants' themselves reap from traffic on their websites constitute things of value. With regard to the absent class members, independent of how each class member was trafficked in the first place, Plaintiff can certainly attempt to demonstrate through the evidence that would be the same for all class members that Defendants violated the TVPRA as to Plaintiff and the class members by the fact that their CSAM has appeared on Defendants' websites, and someone received something of value from the CSAM.

Finally, Plaintiff must prove, at the least, that Defendants should have known that she—and the other class members—were victims of sex trafficking. Constructive knowledge has been defined as "that knowledge which 'one using reasonable care or diligence should have.'" *Red Roof Inns*, 21 F.4th at 725 (quoting Black's Law Dictionary (11th ed. 2019)). As to Plaintiff specifically, she has already submitted evidence showing that her trafficker uploaded her CSAM onto Pornhub,

where it remained publicly available for viewing for over two years and—despite several requests that were submitted to Defendants in February 2020 that it be taken down—it was not removed until law enforcement contacted Defendants in July 2020. (Exs. 21 & 15 to Doc. 95.) Plaintiff has sufficiently alleged that Defendants had constructive knowledge of *her* CSAM on Pornhub.

But Plaintiff must also prove that Defendants had constructive knowledge that the absent class members were sex trafficking victims. Defendants argue that Plaintiff will not be able to use common evidence to demonstrate this because each class member's circumstances are unique, and a general awareness of CSAM being present on Defendants' sites is not enough. However, Plaintiff has come forward with evidence regarding Defendants' policies and practices that could be used to meet this element of the TVPRA claim. ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Evidence such as this, which is common to all class members, can demonstrate that Defendants have participated in a venture that they knew or should have known violated the TVPRA as to the class members. This issue will obviously be vigorously litigated, but importantly, Rule 23(b)(3) requires a showing only that "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459.

The Court is also not persuaded by Defendants' argument that individual issues as to how each absent class member was trafficked will bog the Court down. Specifically, Defendants contend that the Court will have to determine whether each class member was a minor when the content was created; the specific manner in which they were trafficked as described in section 1591(a); whether their trafficker had knowledge or reckless disregard that they were a minor; and whether their trafficker intended to profit from the videos at the time they were made. Each contention is addressed in turn.

First, Defendants say that each class member will have to establish that he or she was a minor at the time the content was created, which is in most cases nearly impossible to do by just inspecting a video or image. However, as already discussed, class members may self-identify, as Plaintiff has done. Absent class members may have to establish that they were minors at the time their CSAM was created, which they can do as part of the claims administrative process to participate in any class monetary relief. At that time, Defendants may challenge these claims. And contrary to Defendants' suggestion, Defendants' due process right to ensure that each class member prove his or her claim to relief is not offended by the class certification process. *See In re Takata Airbag Prod. Liability Lit.*, -- F. Supp. 3d --, 2023 WL 4925368, at *12 (S.D. Fla. June 20, 2023) ("[S]o long as the defendant is given a fair opportunity to challenge the claim to class membership and to contest the amount owed each claimant during the claims administration process, its due process rights have been protected.") (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015)).

Second, Defendants argue that determining whether a class member was recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited—taking the language from 18 U.S.C. § 1591(a)(1) that describes the different ways a victim may be sex trafficked—will differ

from class member to class member, will require investigation, and would not be information that is even available to Defendants. But regardless of how the person who uploaded the CSAM to Defendants' websites or committed sexual abuse committed the direct sex trafficking, the fact remains that the CSAM somehow made its way onto Defendants' websites. The very fact that Plaintiff's CSAM and thousands of other CSAM videos have appeared on Defendants' websites demonstrates that the people who uploaded the videos "obtained," "maintained," or "provided" minors for "commercial sex acts" within the meaning of 18 U.S.C. § 1591(a).

Third, Defendants assert that proving whether the trafficker "knew or recklessly disregarded" the age of a person is an individualized inquiry that is not susceptible to a common method of proof.[7] But regardless of the state of mind of the perhaps thousands of third-party direct sex traffickers, this case is about what Defendants knew or should have known, and as discussed, Plaintiff can show that

---

[7] Plaintiff makes another argument for the first time in her reply brief, which is that she need not prove the *mens rea* of either the uploader or of Defendants because she can utilize section 1591(c) of the TVPRA, which removes that requirement as long as the defendant "had a reasonable opportunity to observe the [minor]." 18 U.S.C. § 1591(c). The Court is not considering this argument because it was raised for the first time in Plaintiff's reply brief. *See Herring*, 397 F.3d at 342. In any event, the Court is not convinced that this section of the TVPRA applies to in this case factually or legally.

CSAM was prevalent on Defendants' sites, Defendants allowed titles and tags associated with CSAM on uploaded content, they knew uploaders were posting significant amounts of CSAM to their websites and, despite that knowledge, Defendants did not implement sufficient policies and practices to prevent that from occurring over and over again. Defendants' policies certainly show their constructive knowledge.

Finally, Defendants argue that each class member would have to prove that their uploader intended to make money from the videos at the time they were made, and the circumstances and motives behind the creation of each video vary considerably. However, there is no such requirement in the TVPRA. Section 1591(a) does not require evidence of such intent but only requires that the sex trafficker have "knowledge" or "reckless disregard of the fact" that the victim "will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). "The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person." *Id.* § 1591(e)(3). And Defendants' own business records and entire business model shows that they certainly monetize all of the content on their websites through advertisements and have contractual relationships with uploaders in which Defendants place a monetary value of the content each uploader provides.

In sum, Plaintiff is not required to establish that every single element of her claims is susceptible to class-wide proof. Rather, "[t]he predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks and citation omitted). To "require a plaintiff to show that no individual issues exist . . . would be an impossibly high standard." *Doe 1 v. JPMorgan Chase Bank N.A.*, 2023 WL 3945773, at *8 (S.D.N.Y. Jun. 12, 2023). Here, the Court will not need to consider the individual actions and circumstances of every class member or every underlying sex trafficker to resolve the question of Defendants' liability on Plaintiff's sex trafficking claims on a class wide basis. The focus of Plaintiff's claims is what Defendants did with the class members' CSAM, their failure to prevent CSAM from appearing on their sites, and that can be proven from Defendant's own business records regardless of how each piece of CSAM was created and uploaded. Failure to prevent the CSAM affects every class member the same, and it predominates over every other issue.

Further, while the TVPRA cases against hotel franchisors may be instructive in espousing the elements of a beneficiary liability claim, they are factually distinguishable from this case. In *Red Roof Inns*, relied upon by Defendants, the

plaintiffs alleged that they were trafficked in Atlanta-area hotels and that the defendant hotel franchisors were liable as TVPRA beneficiaries by knowingly allowing criminals to use their hotels for prostitution and profiting from renting rooms to them. 21 F.4th at 719–20, 726. In support, they alleged that the defendants sent inspectors to the hotels who "would have seen signs of sex trafficking" and that they had "received [online] reviews mentioning sex work occurring at the hotels." *Id.* at 727. The Eleventh Circuit found no liability, explaining that the TVPRA requires proof the defendant "participated in a common undertaking . . . that violated the TVPRA—i.e., the alleged sex trafficking ventures" and that even if the defendants knew of and profited from the trafficking, "observing something is not the same as participating in it." *Id.* at 726-27.

However, the evidence discussed above demonstrates that Plaintiff can attempt to show that Defendants have done much more in this case than simply "observ[e] something." *See id.* Indeed, Defendants are more like the hotel franchisees (who owned and operated the local hotels at issue) upon which liability was established based on the hotel franchisees' direct "ongoing business relationship with known pimps and prostitutes in which they rented rooms to be used for commercial sex." *See Does 1–4 v. Red Roof Inns, Inc.*, 2023 WL 5444261, at *3 (N.D. Ga. Aug. 10, 2023). In light of that direct relationship between the hotel franchisee

and the traffickers who rented its rooms, evidence that the hotel franchisee regularly observed the traffickers and the victims (including some who appeared "young or underage"), had received complaints about prostitution, and booked the traffickers into remote rooms that were less visible to others, presented genuine issues of material fact regarding whether the hotel franchisee "knowingly participated in a sex trafficking venture." *Id.* Similarly, Defendants here permitted traffickers to have space on their platforms, were able to regularly observe both the traffickers and victims through the upload and review process, and participated in and facilitated the trafficking by creating thumbnails, tagging, titling, otherwise altering, disseminating, and then monetizing the CSAM.

In sum, the Court finds that common questions predominate on Plaintiff's TVPRA claim.

> **b.    Common Questions Predominate Over Individual Ones on Plaintiff's Receipt or Distribution of Child Pornography Claim under 18 U.S.C. § 2252A**

Plaintiff's Amended Complaint also alleges that Defendants received and distributed child pornography in violation of 18 U.S.C. §§ 2252 and 2252A. The elements Plaintiff must prove under 18 U.S.C. § 2252A are that: (1) the defendant "receive[d] or distribute[d]" child pornography"; (2) in interstate or foreign commerce "by any means, including by computer"; and (3) the defendant did so

"knowingly."  18 U.S.C. § 2252A(a)(2). "Any person aggrieved by reason of the conduct prohibited under subsection [2252A(a)(2)] may commence a civil action." 18 U.S.C. § 2252A(f)(1).

Plaintiff can use evidence common to all class members to attempt to prove all of the elements of the child pornography claims in this case. As to the first element, receipt or distribution of child pornography, evidence of Defendants' own practices and business operations demonstrates that when Defendants receive content from third parties, that content sometimes constitutes CSAM, and Defendants have distributed CSAM on their websites. Indeed, since 2020, Defendants have reported to NCMEC over 20,000 instances of CSAM that had been on their websites. (Ex. 1 to Doc. 95.) As to the second element, "in interstate or foreign commerce," 18 U.S.C. § 2252A(a)(2), Plaintiff can show that Defendants operate some of the largest commercial pornography websites in the world, and those websites are available throughout the United States and worldwide.

With regard to the knowledge element, a person "knowingly receives" child pornography when he "intentionally views, acquires, or accepts child pornography on a computer from an outside source." *United States v. Pruitt*, 638 F.3d 763, 766 (11th Cir. 2011). A person "knowingly possesse[s]" child pornography when he "knew the [videos] in question contained a visual depiction of minors engaging in

sexually explicit conduct." *United States v. Dixon*, 589 F. App'x 427, 428 (11th Cir. 2014) (citing *United States v. Alfaro–Moncada*, 607 F.3d 720, 733 (11th Cir. 2010)). Circumstantial evidence can be used to prove that a defendant knowingly received or distributed CSAM. *See id.*; *see also Alfaro-Moncada*, 607 F.3d at 733 (explaining that "the jury was free to reject [the defendant's] testimony" that "he had bought the DVDs without knowing that they contained child pornography" because the "the covers of the DVD cases" showed "young girls [of unstated ages] engaging in sex acts" and the defendant admitted that "he watched a 'little bit' of the DVDs inside" those cases). Here, circumstantial evidence that would be common to all class members from Defendants' business records can be used to demonstrate their knowledge that they received and possessed CSAM on their sites. Indeed, Defendants have internal procedures for reviewing and identifying CSAM and reporting it to NCMEC. They have documentation of all CSAM on their websites including date of upload and documentation of when it was reported. There is also evidence that almost half of all CSAM identified on Defendants' sites was removed after it had already been made publicly available. (Ex. 16 to Doc. 95.) Defendants' own actions in reporting and removing apparent CSAM is common evidence that all class members can use to prove that Defendants had knowledge that content on their websites constituted CSAM.

Finally, though each class member may have to demonstrate that they qualify to participate in any class monetary judgment at the claims administration stage by confirming their age when their CSAM was created, this is not an individual issue that predominates over the many issues common to the class on Plaintiff's child pornography claim.

### c.     Plaintiff's Request for Damages Does not Defeat Predominance

Defendants also argue that Plaintiff's demand for actual and punitive damages defeats predominance and make class treatment unmanageable. The Court sees no impediment to class certification based on the issue of damages.

As an initial matter, the availability of statutory liquidated damages for sex trafficking and child pornography victims means that damages are a common, rather than an individualized, issue. As noted previously, 18 U.S.C. § 2255 provides persons who were victims of violations of 18 U.S.C. §§ 1591 and 2252A while a minor with civil causes of action for which the victims can recover their actual damages or liquidated damages of $150,000. Accordingly, statutory damages are available in this case as an alternative remedy on both of Plaintiff's claims, meaning that individualized proof of personal injury or actual damages is not necessary for Plaintiff or the class to prevail. As the Sixth Circuit aptly explained:

> The point of [18 U.S.C. § 2255's] minimum-damages requirement is to allow victims of child pornography to recover *without* having to endure potentially damaging damages hearings. Were it otherwise, a fresh damages hearing might inflict fresh wounds, *increasing* the child's suffering *and* increasing the compensatory damages to which she is entitled. . . . Once a child has shown she was the victim of a sex crime, there is little point in forcing her to prove an amount of damages, only to have the court disregard that figure and award the statutory minimum.

*Doe v. Boland*, 698 F.3d 877, 882–83 (6th Cir. 2012). Of course, the Court cannot predict what any class member would do, but it is certainly possible that class members would accept liquidated damages in lieu of enduring a damages hearing in which they may be forced to relive past trauma and reveal sensitive personal information.

Even if some class members choose to pursue their actual damages under the TVPRA and the child pornography statute pursuant to 18 U.S.C. §§ 1595 and 2255(a) rather than accept liquidated damages, this does not mean that individual issues predominate. *See Brown*, 817 F.3d at 1239 (the "presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"); *see also JPMorgan Chase Bank N.A.*, 2023 WL 3945773, at *10 (it "is commonplace in class actions certified under Rule 23(b)(3)" that damages may "have to be resolved on an individualized basis"). Individualized damages issues only predominate if "computing them will be so complex, fact-specific, and difficult

that the burden on the court system would be simply intolerable" or if "significant individualized questions go[ ] to liability." *Green-Cooper v. Brinker International, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023) (quoting *Brown*, 817 F.3d at 1240). In contrast, "[i]ndividualized damages issues are of course least likely to defeat predominance where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods." *Id.* (quoting *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010)). Given the option of liquidated damages for class members on both of Plaintiff's claims, the Court simply does not foresee that there will be thousands of mini-trials on damages. In fact computing damages could be based upon a formula that calculates the number of instances of CSAM, the length of time the CSAM was publicly available, and the number of views, among other things.

Nor is the Court concerned by the fact that punitive damages are available for Plaintiff's TVPRA and child pornography claims. *See Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 206 (5th Cir. 2017) (punitive damages available for TVPRA claims); 18 U.S.C. § 2252A(f)(2)(B). The "focus [of punitive damages] is on the character of the [defendant's] conduct." *Hoever v. Marks*, 993 F.3d 1353, 1359 (11th Cir. 2021). Accordingly, a punitive damages award could be a common, rather than individualized, issue.

Additionally, this Court has various tools at its disposal "to effectively and efficiently deal with individualized damages issues that may arise in a class action." *Herman v. Seaworld Parks & Entertainment, Inc.*, 320 F.R.D. 271, 299 (M.D. Fla. 2017). Such tools include: "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *Brown*, 817 F.3d at 1239 (quotation omitted); 2 Newberg and Rubenstein on Class Actions § 4:54 (6th ed. June 2023 Update) ("a class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings"). The Court need not weed through these options at this juncture, but their availability further persuades the Court that should any manageability issues arise with regard to damages, the Court will be well-equipped to address them.

In sum, given that Plaintiff can attempt to prove Defendants' liability in this case through evidence common to all class members from Defendants' business practices and operations, and the fact that statutory liquidated damages are available, the Court finds that the issue of individual damages does not predominate.

### ii.    The Superiority Requirement

The second requirement of a Rule 23(b)(3) common issues class is that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Four criteria for consideration are offered:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The superiority inquiry requires the Court to "consider the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269. The outcome of the Court's predominance analysis "has a tremendous impact on the superiority analysis" because "the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Id.*

Here, the four factors weigh in favor of finding that a class action is superior to alternative forms of litigation. As to the first factor, class members would probably not have a great interest in individually suing Defendants for several reasons.

Discovery would be intrusive and bring to light highly sensitive material and likely cause CSAM victims to relive past traumas. Defendants have substantial resources, and their legal team is aggressively defending this case. Thus, CSAM victims, who may have limited resources themselves, would have a strong interest in joining the class, not only to avail themselves of Plaintiff's similarly strong legal representation and resources but also to take advantage of the fact that Plaintiff is offering to endure the stressors of litigation on their behalf. Certifying a class also helps more vulnerable CSAM victims come forward with their claims and potentially receive relief than might otherwise come forward individually.

The second factor is "intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1780 at 568–70 (2d ed. 1986) (footnotes omitted). This factor appears to be concerned with the existence of multiple individual, as opposed to class, actions. *See id.* ("If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate . . . Moreover, the existence of litigation indicates that some of the interested parties have decided that individual actions are an acceptable way to proceed, and even may consider them preferable to a class action."). The Court is

aware of another pending class action against Defendants asserting the same claims and two individual lawsuits.[8] The existence of two individual actions certainly does not persuade the Court that CSAM victims would prefer individual actions to class treatment.

Turning to the third factor, this forum certainly seems desirable because Plaintiff is an Alabama resident, the actions giving rise to the claims occurred in this state, and at least some Plaintiff's lawyers are local. Perhaps most importantly, this Court has already approved of a discovery protocol whereby the Alabama Attorney General's office has agreed to serve as a repository for potentially illegal imagery and videos that may be produced in discovery or may be needed to prove or administer the class members' claims.   (Doc. 92.) The parties, as well as this Court, have invested substantial time and resources into crafting this solution to the problem of how CSAM may be discovered in a civil proceeding, and the Court is not aware of a similar protocol in any of these other cases.

---

[8]    The U.S. District Court for the Central District of California recently certified a class in *Doe v. MindGeek USA Inc., et al.*, No. 8:21-cv-00338-CJC-ADS (C.D. Cal)), in which a plaintiff brings identical sex trafficking and child pornography claims against Defendants, among other state law claims. Individual plaintiffs are also asserting similar claims only on their own behalf against Defendants in two cases, *Fleites v. MindGeek S.A.R.L.*, No. 21-cv-04920 (C.D. Cal.) and *Mother v. Franklin et al.*, No. 2:22-cv-00605-ECM-KFP (M.D. Ala.)).

Finally, the fourth manageability factor is a comparative inquiry that "focuses on whether a class action 'will create relatively more management problems than any of the alternatives.'" *Cherry*, 986 F.3d at 1304 (quoting *Klay*, 382 F.3d at 1273). Here, the difficulties in managing this class action do not outweigh the benefit of maintaining a class instead of separate lawsuits. Indeed, if this class is not certified, the individual lawsuits could number in the tens of thousands. *See Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 660 (7th Cir. 2004) (explaining that class actions with large number of class members generally satisfy superiority because the "more claimants there are, the more likely a class action is to yield substantial economies in litigation" regardless of any individual issues). Class manageability issues, such as identifying class members or calculating individual damages, still appear to be more manageable than thousands of individual lawsuits across the country brought against the same network of companies. "[A]dministrative difficulties—whether in class-member identification or otherwise—do not alone doom a motion for certification. Indeed . . . manageability problems will 'rarely, if ever, be in [themselves] sufficient to prevent certification.'" *Cherry*, 986 F.3d at 1304 (quoting *Klay*, 382 F.3d at 1272); *see also Klay*, 382 F.3d at 1273 ("[Where a court has already made a finding that common issues predominate over

individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

In sum, the Court finds not only that common questions predominate over individual questions on both of Plaintiff's claims, but also that all of the relevant factors support the conclusion that a class action is superior to other available methods for adjudication of the claims in dispute here. A Rule 23(b)(3) class will thus be certified. The Court now turns to Plaintiff's additional request for an injunctive relief class.

### 2.    Rule 23(b)(2) Injunctive Relief Class

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(1). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal–Mart Stores*, 564 U.S. at 360–61. Rule 23(b)(2) "requires common behavior by the defendant towards the class." *Casa Orlando Apartments Ltd. v. Federal Nat. Mortg. Ass'n*, 624 F.3d 185, 198 (5th Cir. 2010).

The Court has no trouble concluding that, should it award declaratory or injunctive relief, such relief would be the same for all class members. Simply put, Plaintiff seeks an injunction to change Defendants' practices and policies to effectively eliminate CSAM on their websites. This injunction would benefit the class as a whole, in the same way.

Defendants advance three arguments against certification under Rule 23(b)(2). First, they assert that Plaintiff lacks standing because she is unable to show a threat of "actual or imminent" future harm, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), because the videos about which she is suing were removed from Defendants' sites in July 2020, fingerprinted, and reported to NCMEC to protect against re-uploading. According to Defendants, any fear Plaintiff may harbor about the videos being re-uploaded is "conjectural [and] hypothetical," *see id.*, or an insufficient expression of future harm that does not confer Article III standing.

The Court could not disagree more with Defendants' position. Plaintiff has standing to represent the Rule 23(b)(2) class because her videos appeared on Defendants' websites. As a result, and like every other potential class member would, Plaintiff has a justifiable fear that her CSAM lives forever on the Internet and could reappear at any moment on Defendants' websites or elsewhere. Indeed, once content is posted to public websites like Pornhub, where it can be copied or recorded,

there is no way to ensure it will never reappear again. This is especially true considering that the effectiveness of identifying an image by "fingerprinting" or "hash valuing" can easily be undone by make the slightest alternation to it. (*See* Ex. 6 to Doc. 129 at 8-9 [transcript of this Court's previous hearing relating to discovery of CSAM].) Defendants cite several products liability cases where victims of past harms did not have standing as class representatives for a Rule 23(b)(3) injunctive relief class because they had no intention of purchasing the product in the future. *See, e.g., See Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1255 (11th Cir. 2023). Plaintiff is vastly different from those consumers because she has no control over whether her CSAM will reappear on Defendants' sites. As she testified, she lives in fear of this happening. (Ex. 4 to Doc. 129 at 257.)

Second, Defendants argue that Plaintiff has not identified an injunction that would provide relief to the class because Defendants have already taken steps to address much of the challenged conduct. Inherent in this contention is Defendants' assertion that they are currently employing the best content moderation tools in the pornography industry and that their content moderators disable any content that could potentially be CSAM before it is publicly available. On the other hand, Plaintiff submitted the declaration of Timothy Weaver, a forensic examiner, in which he suggests certain practices that Defendants could implement to more effectively

eliminate CSAM on their sites, essentially requiring the best state-of-the-art verification for all persons in all videos or images. (Ex. 15 to Doc. 95.) Defendants disparage Weaver's suggestions and seek to have his declaration excluded on grounds that he does not qualify as an expert under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. 120.) The motion to exclude is **DENIED** at this stage of this proceeding. This Court did not rely upon Weaver's declaration in deciding Plaintiff's motion for class certification. Defendants' policies and practices have obviously not been successful in completely eradicating CSAM from their websites, as tens of thousands of items of CSAM have been reported over the years. It does not take an expert to reach that conclusion. The issue of which methodology and tools would be best to eliminate CSAM on Defendants' sites seems to be more appropriately resolved at summary judgment or trial. Indeed, Weaver's opinion merely offers practices that Defendants' *could* implement. At this stage, the Court is merely concerned with whether Plaintiff has established that Defendants have policies that affect everyone in the class in the same way, not whether Plaintiff's specific requested form of injunctive relief is appropriate. Thus, while the Court denies Defendants' motion to exclude, Defendants may re-file should Plaintiff use Weaver's opinions at a future stage of this proceeding.

Third, Defendants argue that Plaintiff cannot be granted certification of a Rule 23(b)(2) class because she is also seeking damages separately in a Rule 23(b)(3) class. To the contrary, it is permissible to certify both types of classes. *Wal-Mart Stores*, relied upon by Defendants, holds only that a class cannot be certified under Rule (b)(2) *alone* when a plaintiff seeks damages that are more than just "incidental" to her request for injunctive relief. 564 U.S. at 360. *Wal-Mart Stores* did not address and does not bar requests, like Plaintiff's here, for certification of both a Rule (b)(2) injunctive relief class and a separate Rule (b)(3) damages class. *See* 2 Newberg and Rubenstein on Class Actions § 4:38 (this approach "insulates the (b)(2) class piece from the money damage portion of the case, hence complying with *Wal-Mart*'s admonition against adjudicating individual damage claims in a (b)(2) class action").

Accordingly, the requirements for class certification for injunctive relief are satisfied, and a Rule 23(b)(2) class will be certified.

## V.   Class Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). "In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's

knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(a).

Since filing this case, counsel has successfully defended against a motion to dismiss, conducted extensive discovery, mediated this dispute, and facilitated handling of potential CSAM by the Alabama Attorney General's Office. Further, Plaintiff's counsel has substantial experience handling cases involving child sexual abuse and child sex trafficking, as well as complex litigation including class actions. Accordingly, Plaintiff's counsel meets Rule 23(a)(4)'s adequacy requirement and are thus appointed class counsel.

## VI.    Conclusion

Given the foregoing, Plaintiff's Motion for Class Certification (doc. 95) is hereby **GRANTED**. The Court hereby **CERTIFIES** the following class under Rule 23(b)(2) and 23(b)(3):

> All persons who were under the age of 18 when they appeared in a video or image that has been made available for viewing on any website owned or operated by Defendants anytime from February 12, 2011, through the present.

Within twenty-one (21) days of this Order's entry, the parties are **DIRECTED** to meet, confer, and file a written plan for how the class-related portion of this case will proceed.

**DONE** and **ORDERED** on December 19, 2023.

L. Scott Coogler
United States District Judge

160704