IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| JANE DOE #1, and JANE DOE #2, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MG FREESITES, LTD, d/b/a "PORNHUB," et al.,<br><br>Defendants. | Civil Action No. 7:21-cv-00220-LSC<br><br>Honorable L. Scott Coogler |

## **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**

Defendants MG Freesites, Ltd; MG Freesites II Ltd; MindGeek S.A.R.L.; MindGeek USA Incorporated; MG CY Holdings Ltd; MindGeek Content RT Limited; 9219-1568 Quebec, and MH Biling Ltd (collectively, "MindGeek") hereby oppose Plaintiff Jane Doe #1's Motion to Compel the Production of Documents (ECF No. 175, "Mot."):

## **INTRODUCTION**

This Court should deny Plaintiff's motion to compel. Contrary Plaintiff's assertions, MindGeek has worked cooperatively with Plaintiff and has afforded her

1

substantial discovery, including the production of over ***600,000 pages*** of documents.  Plaintiff moves to compel documents which clearly fall outside the scope of permissible discovery, for example:  documents MindGeek has already produced; documents that are not responsive to her requests; and documents outside of MindGeek's possession, custody, or control (as Plaintiff is well aware).  Plaintiff fails to tie her relief sought to specific requests for production, instead demanding broad, amorphous categories of documents, such as all "Google Documents and Sheets."

Despite Plaintiff's unreasonable approach to discovery, MindGeek has made and continues to make substantial efforts to furnish Plaintiff with the information that she believes is relevant to her claims—even though she seeks duplicative discovery, not included in her requests for production, which is incredibly burdensome and disproportionate.  Given the substantial burdens associated with producing some of the information requested by Plaintiff, absent further narrowing during the meet and confer process, MindGeek may have no choice but to request cost shifting.  Nevertheless, MindGeek is continuing to meet and confer with Plaintiff and to evaluate the burdens associated with many of her requests, some of which Plaintiff narrowed two days ago, on April 23.  Most significantly, Plaintiff's motion to compel is not ripe, and MindGeek respectfully asks that the Court deny the motion and order the parties to continue to meet and confer to resolve their

discovery disputes – a process in which the parties continue to meaningfully engage.

## BACKGROUND

As Plaintiff acknowledges (Mot. 3), she served requests for production on December 22, 2021, and received MindGeek's response over two years ago, on January 21, 2022. MindGeek began producing documents on a rolling basis more than a year ago, on January 26, 2023. *Id.* Plaintiff failed to raise her concerns regarding MindGeek's productions until over a year after such productions began, on February 2, 2024. *See id.* at 4; Pl.'s Ex. 1.

In a 4-page letter, dated February 2, 2024, Plaintiff demanded for the first time that MindGeek produce five broad categories of documents and that MindGeek produce "[a]ll PII for CSAM" so that Plaintiff could "track and identify" potential class members. Pl.'s Ex. 1 at 1. For example, Plaintiff asserted in a summary fashion that MindGeek had supposedly "failed to produce discovery in this matter in the form of Google Docs and Sheets, Jira, Internal Wiki, Zendesk, Kayako, Google Analytics, and CMS Data Exports." *Id.* at 2.

On February 16, Plaintiff sent a follow-up demand, and MindGeek responded by explaining that it was "preparing a response which w[ould] go out in the next few days (given the [President's Day] holiday]." Pl.'s Ex. 3 at 1. MindGeek also explained that the parties "should make a plan to meet and confer."

3

*Id.* Rather than waiting for MindGeek's response or requesting to meet and confer, Plaintiff sent a letter on February 27 stating that it would move to compel (Pl.'s Ex. 4), and Plaintiff filed her motion to compel on March 5 (ECF No. 175).

## ARGUMENT

"The court has broad discretion to compel or deny discovery." *Pipkins v. City of Hoover*, 2022 WL 214756, at *2 (N.D. Ala. Jan. 7, 2022), *report and recommendation adopted*, 2022 WL 213862 (N.D. Ala. Jan. 24, 2022) (citing *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1306 (11th Cir. 2011)). Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, a party may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). But the scope of discovery is not unbounded. Even if information is relevant, the district court "limit the frequency or extent of discovery otherwise allowed … if it determines that … the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." *Id.* 26(b)(2)(C).

With respect to requests for production, "[i]t is elementary that a party can not be ordered to compel non-existent information." *Silver v. Tenet Health Care Corp.*, 2010 WL 11444064, at *7 (S.D. Fla. Aug. 6, 2010).  Thus, "where [a] defendant states in discovery responses that there are no responsive documents, the court has no basis to compel production." *Id.*  Additionally, "[s]peculation that there is more [evidence in a party's possession or control] will not suffice." *Maale v. Caicos Beach Club Charter, Ltd.*, 2010 WL 297808, at *1 (S.D. Fla. Jan. 19, 2010) (quoting *Hubbard v. Potter*, 247 F.R.D. 27, 29 (D.D.C. 2008)).  "[I]f the theoretical possibility that more documents exist sufficed …, discovery would never end." *Id.*

### I. THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR GOOGLE, JIRA, INTERNAL WIKI, ZENDESK, AND KAYAKO DOCUMENTS

Plaintiff has failed to establish that Defendants have not produced any Internal Wiki, Google, Jira, Zendesk, or Kayako documents that are relevant and responsive to her document requests.

#### A. Internal Wiki

Defendants have produced hundreds of pages of Internal Wiki documents, such as responsive Internal Wiki pages for their Trust & Safety Department. Nevertheless, Plaintiff now asserts that she believes she is entitled to "responsive Internal Wiki pages from the Defendants engineering department."  ECF No. 200

at 3-4.  Solely for the sake of compromise, Defendants have agreed to search the Internal Wiki for their Engineering Department and produce responsive portions.  Defendants' production of any such responsive Internal Wiki pages should resolve this issue.  *See id.*

### B.     Google Documents and Google Sheets

Plaintiff initially asserted (Mot. 8) that she "believes Defendants have Google Documents and Sheets that would be responsive to Requests for Production Numbers 29-34, and 38."  Plaintiff asserted (Mot. 6) that Braden Bulloch "testified that he used a Google Document for a banned word list."  And Plaintiff asserted (Mot. 7) that Andreas Ignatiou "testified that written training materials for content moderation were created, edited, and provided on Google Documents."  Defendants, however, have produced multiple versions of the banned word list and the written training materials used for content moderation.  As Defendants explained to Plaintiff, these documents were exported from the Google interface into Microsoft Word or Excel and then produced—because Defendants do not have the capability to easily search for and produce documents from the Google interface.

Realizing that Defendants produced the very documents about which she complained in her motion, Plaintiff changes her argument altogether and now claims she "believes she is entitled to historical versions and commentary on

6

responsive Google Documents and Google Sheets." Mot. at 3. Defendants have asked Plaintiff to identify which documents she believes have relevant "historical versions and commentary," and Plaintiff has identified three documents: the "Banned Words" list; a document referred to as the "Bullpen" document; and a document referred to as the "Tips for Age" document. Defendants are in the process of determining whether there are any historical versions and commentary that are available for these documents that has not been produced. If such information is available, Defendants will produce it. This should resolve Plaintiff's request for "historical versions and commentary on responsive Google Documents and Google Sheets."

C. **Jira System**

Jira provides software that allows users to report bugs and request help or changes, among other things.[1] Plaintiff does not identify any specific Jira-related documents that are relevant, responsive to her document requests or that Defendants have not already produced. *See* Mot. 8-9. Plaintiff asserts (Mot. 6) that Exhibit 7 to her motion "is a spreadsheet that contains references to Jira Tickets related to potential CSAM, CMS pages related to potential CSAM." Solely for the sake of compromise, Defendants produced the Jira tickets identified

---

[1] https://www.atlassian.com/software/jira/guides/getting-started/introduction#dig-into-specific-features.

in the spreadsheet. Plaintiff has not identified, based on that production, any specific Jira tickets that she believes are responsive to her discovery requests.

Nevertheless, Plaintiff now asserts that she believes she is entitled to "additional responsive JIRA tickets from the Defendants' engineering department." ECF No. 200 at 3. Plaintiff has clarified, during a meet and confer on April 23, that she wants ***all Jira tickets*** related to all of the CSAM detection tools that MindGeek employs on their websites. Defendants have explained to Plaintiff that collecting such Jira tickets would be incredibly burdensome and that the probative value of such engineering Jira tickets is slim to none, and would be akin to a fishing expedition. Specifically, Plaintiff appears to be operating on the unsupported theory that MindGeek has "toggled" settings on CSAM detection tools to make them less effective at detecting CSAM. Although Plaintiff has taken many depositions, including of MindGeek engineering personnel, Plaintiff has not identified any evidence in support of her theory.

Nonetheless, MindGeek is in the process of producing the Internal Wiki for the Engineering Department and has asked Plaintiff to reconsider her request for Jira tickets from the Engineering Department based on that production. MindGeek understands that Plaintiff is willing to do so. MindGeek is also in the process of determining the burden that would be associated with producing all Jira tickets relating to all CSAM detection tools. Accordingly, MindGeek believes that

Plaintiff's request for Engineering Jira tickets is not ripe at this time and that the parties should continue to meet and confer on this issue.

### D.     Zendesk and Kayako

MindGeek uses Zendesk to create tickets when content is flagged as potential CSAM, Ingatiou Tr. (Pl.'s Ex. 9) 147:3-16, and MindGeek previously used Kayako for this purpose. MindGeek exported into Excel spreadsheets data from its Zendesk and Kayako databases and produced those spreadsheets to Plaintiff, as Plaintiff acknowledges (Mot. at 10). Plaintiff, however, has requested that MindGeek produce the actual tickets.

MindGeek has explained to Plaintiff that it would be incredibly burdensome to produce the "actual tickets" for the over 3500 tickets that are reflected in the spreadsheets it has produced. Specially, MindGeek understands that an employee would need to manually print each individual ticket as a PDF for MindGeek to be able to produce (i.e., the actual tickets could not be exported as producible documents en masse). Additionally, PII would need to be redacted from any actual tickets produced to Plaintiff, a time-intensive and burdensome process.

Because of this, MindGeek proposed a reasonable compromise. MindGeek produced all tickets relating to content that Plaintiff's ex-boyfriend had posted on MindGeek's websites (which content did not depict Plaintiff). And MindGeek offered to produce specific tickets to the extent Plaintiff identifies ones in the

spreadsheets for which she has a need. Plaintiff has not identified any specific tickets for which she has a need, despite MindGeek's repeated offers to produce specific tickets identified by Plaintiff.

Instead, Plaintiff continues to demand that MindGeek produce all Zendesk and Kayako tickets identified in the spreadsheets that MindGeek has produced. MindGeek is in the process of evaluating the feasibility of this request and whether there are alternative methods that would allow it to produce actual tickets en masse. Accordingly, MindGeek believe that Plaintiff's request is not ripe at this time and that the parties should continue to meet and confer on this issue

### E.   Google Analytics

Plaintiff errs in arguing (Mot. 11-12) that MindGeek should be ordered to produce Google Analytics documents. Plaintiff suggests that such documents may be responsive to Request for Production No. 37. The identified request is unintelligible and states: "Please produce all generally reports, dashboards, and other documents containing data collected from or provided by the business intelligence tools during the period 2008 through the present in connection with Pornhub." Pl.'s Ex. 5 at 28. MindGeek did not agree to produce any documents in response to this request and offered, in January 2022, "to meet and confer with the Plaintiffs regarding the scope of th[e] Request." *Id*. Plaintiff never attempted to meet and confer regarding the request, so it is too late for her to now argue that

unidentified Google Analytics documents are responsive and should now be produced.

In any event, Plaintiff does not articulate why any Google Analytics documents are in any way related to any of the parties' claims or defenses or otherwise discoverable. Plaintiff asserts (Mot. 11) that "Google Analytics tracks the traffic on Defendants' sites." But data showing the location from which users are accessing MindGeek's sites is not relevant to any parties' claims or defenses. *See* Pl.'s Ex. 16 at '220 (discussing the impact on traffic resulting from a country's decision to block access to certain websites). Plaintiff also asserts (Mot. 11) that "Google Analytics can also track things like language setting and what brought the user to the site." But again, that information is not relevant to Plaintiff's claims or defenses. And finally, Plaintiff asserts (Mot. 11) that MindGeek "used Google Analytics traffic information when making decisions on whether to leave up the metadata from removed content." But Plaintiff already has the document in which this information is contained and discussed by MindGeek employees. *See* Pl.'s Ex. 17.

On April 23, Plaintiff clarified that she is seeking responsive Google Analytics documents that are kept by MindGeek's Business Intelligence division. Given this clarification, MindGeek is in the process of determining the extent to which its Business Intelligence division has responsive documents reflecting

information obtained from Google Analytics and the burden associated with producing those documents. Accordingly, Plaintiff's request for Google Analytics documents is not ripe and the Court should order the parties to continue to meet and confer.

## II.   THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR CMS DATA EXPORTS

Plaintiff errs in arguing (Mot. 12) that MindGeek "has not produced records relating to the moderation team's review of TOS-8 content and Level 3 violations for CSAM." MindGeek has produced out of its content management system documentation relating to content that was designated TOS-8 or otherwise reported to NCMEC. MindGeek is also in the process of determining whether there is any other additional information that could be easily exported from the CMS database and provided to Plaintiff, given that Plaintiff has clarified, during the parties' meet and confers, her request for certain categories of CMS data. Accordingly, Defendants believe that Plaintiff's request is not ripe at this time and that the parties should continue to meet and confer on this issue.

## III.   THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR MODERATION EMPLOYMENT RECORDS

Plaintiff argued (Mot. 14) that MindGeek has "not produced any employment records documenting" the process by which moderators received

warnings and were placed on probation for compliance mistakes. MindGeek has produced employment records, and Plaintiff has not raised this issue in the parties' recent meet and confers. Accordingly, MindGeek believes this issue has been resolved.

## IV. THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR TOS-14 DATA

Plaintiff asserts (Mot. 17) that MindGeek "should produce redacted versions of any responsive TOS-14 documents." As Plaintiff recognizes, MindGeek would use the designation TOS-14 to designate content that could damage "Brand Safety." *Id.* And as shown below, there is ample evidence that content designated as TOS-14 is not relevant to any parties' claims or defenses.

As one MindGeek employee explained at his deposition, there is a process for designating content as apparent CSAM. When content is identified as obvious CSAM, it is designated as TOS-08. Ignatiou Tr. (Ex. A) 345:7-19. When content is not obvious CSAM, MindGeek launches an investigation that includes asking the uploader for documentation to the performer(s) age(s). *Id.* 335:11-23. If MindGeek does not receive documentation or if it cannot otherwise eliminate the possibility that content is CSAM, the content is designated as TOS-08. *Id.* 348:12-349:13. This ensures that any possible CSAM is sent to NCMEC. *Id.* 356:8-357:19.

In contrast, when an investigation is conducted, and the uploader provides convincing, valid documentation showing that the performer(s) are of age (and there is no other reason why the content is problematic) the content is considered compliant. *Id.* 348:12-349:13. At that point, the content could go live, but moderators also have other options. Moderators may still choose to classify the content as TOS-08, meaning the content would not go live and would instead be fingerprinted and reported to NCMEC, and MindGeek would ban the uploader.

Another option moderators have is to designate the content as TOS-14, "Brand Safety," which keeps the content off the site unless and until MindGeek can make a further determination based on new evidence. *Id.* 420:9-422:9. A moderator team may designate content as TOS-14 based on reasons unrelated that are unrelated to the original concern that the content was potentially CSAM. *Id.* 356:8-357:19. Thus, the TOS-14 designation allows moderators to err on the side of caution and to prevent public access to videos that are technically compliant but that may harm "Brand Safety." *Id.* 335:11-337:1, 422:5-9. It would be inappropriate to flag this content as TOS-8 and report it to NCMEC because compliant content, with appropriate documentation regarding the performer(s) age, should not be reported to NCMEC. *Id.* 356:8-19; 421:2-6.

This case concerns persons who, Plaintiff contends, were under the age of 18 when they appeared in a video or image on any of MindGeek's websites. ECF

14

No. 148 at 12. Plaintiff asserts that this occurred because MindGeek did not obtain proper identification to ensure that those depicted were over the age of 18. FAC (ECF No. 22) ¶¶ 50, 97, 142. But content that is designated TOS-14 is content for which MindGeek has received proper documentation showing that the performer(s) are over the age of 18.

In light of this, MindGeek would arguably benefit from producing documents relating to content designated as TOS-14. But the entire collection of TOS-14 documents are incredibly overbroad—because many TOS-14 designations relate to "Brand Safety" issues that have absolutely nothing to do with CSAM. Put simply, it is a black hole of content that moderators determined should not be live on MindGeek's websites due to various brand safety concerns. And there is no way for MindGeek to segregate the TOS-14 content where there were, at one point, age concerns. And even worse, production of TOS-14 content would implicate serious consumer privacy concerns if not redacted in compliance with the GDPR and other international laws—which would place a tremendous burden on MindGeek.

For these reasons, Plaintiff's request for TOS-14 content is not responsive, and the burdens of producing such documents far outweigh the benefits. This Court should deny Plaintiff's request for TOS-14 documents.

## V. THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR ICQ MESSAGES

Plaintiff asserts (Mot. 17) that MindGeek "should produce any ICQ messages that are responsive to Plaintiff's Requests for Production." MindGeek has never had an ICQ account. Some moderators used ICQ to communicate before MindGeek began using Microsoft Teams. But MindGeek does not have access to those ICQ messages. Accordingly, the Court should deny Plaintiff's request for an order compelling production of ICQ messages.

## VI. PLAINTIFF HAS NOT SHOWN GOOD CAUSE FOR THE PRODUCTION OF NONPARTY PII

This Court has addressed the issue of nonparty PII. The Court ordered, in its August 17, 2023 order, that "Defendants shall produce redacted nonparty PII responsive to Plaintiff's discovery requests but maintain unredacted copies." ECF No. 92 at 19. The Court further explained, "should Plaintiff wish to receive unredacted versions of the material Defendants produce, [she] will submit such a request to Defendants identifying the specific purpose for which Plaintiff desires to view it." *Id.* at 17. And "[t]he Court will review such a request(s) if intervention is needed." *Id.* at 17-18. "Many factors may influence the decision about whether such unredacted materials should be produced, such as whether the PII is of

potential witnesses or of potential class members; and whether such individuals are represented by counsel or other agencies." *Id.* at 18.

Here, Plaintiff has not identified a specific document containing PII and requested the PII in that document. Nor does Plaintiff argue that any PII is relevant to ***her*** claims. Rather, Plaintiff makes a blanket demand, asserting that "[a]ll PII for the CSAM is needed for Plaintiffs [sic] to be able to track and identify all additional victims." B. Kent Feb. 2, 2024 Letter (Pl.'s Ex. 1) at 1. Plaintiff further asserts that lack of such PII "inhibits Plaintiffs [sic] ability to properly [sic] and effectively expand notice to class members, as well as understand the breadth of the failures of MG's internal policies, or abide by the law to report and eliminate CSAM on its sites." *Id.*

Given the significant privacy interests at stake, Plaintiff has failed to establish good cause for obtaining "[a]ll PII" in every document that MindGeek has produced. As this Court previously recognized, sharing PII regarding nonparties threatens to unnecessarily "invade the privacy of those individuals." May 24, 2023 Tr. 14:18-15:7. And Plaintiff's request for "[a]ll PII" implicates international laws concerning the discovery of PII, an issue that Plaintiff has not addressed. For example, Plaintiff made clear, at a meet and confer on April 23, that she wants all PII for any person who flagged or reported content as potential CSAM—regardless whether the person reporting or flagging the content appears to

17

have any relationship with the person(s) depicted in the content. Providing such PII raises grave privacy concerns and could have a drastic chilling effect on users' willing to report potential CSAM on MindGeek's platforms.

Given these concerns, Defendants offered to work with Plaintiff to craft a narrowed approach for producing PII, consistent with governing privacy laws. The parties are in the process of meeting and conferring on this issue. MindGeek is also in the process of attempting to determine the percentage of content removal requests that are "firsthand" requests—e.g., requests made by the person in the content or family members of the person in the content—as opposed to requests made by random members of the public. MindGeek believes this analysis may inform whether the determination of whether there is good cause for Plaintiff to obtain "[a]ll PII" related to CSAM. Accordingly, Defendants believe that Plaintiff's request is not ripe at this time and that the parties should continue to meet and confer on this issue.

## **CONCLUSION**

This Court should deny Plaintiff's motion to compel and order the parties to continue to meet and confer.

Dated:  April 24, 2024

        /s/ Sara M. Turner
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
smturner@bakerdonelson.com
1901 Sixth Avenue North Suite 2600
Birmingham, AL 35203
Phone: (205) 250-8316

/s/ Diane Cafferata
QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael T. Zeller (*pro hac vice*)
michaelzeller@quinnemanuel.com
Michael E. Williams (*pro hac vice*)
michaelwilliams@quinnemanuel.com
Diane Cafferata (*pro hac vice*)
dianecafferata@quinnemanuel.com
Robert Becher (*pro hac vice*)
robertbecher@quinnemanuel.com
Thomas Nolan (*pro hac vice*)
thomasnolan@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I certify that on this day, April 24, 2024, I served a true and correct copy of the foregoing to all counsel of record for Plaintiff via electronic mail.

Dated:    April 24, 2024                                                 */s/ Sara M. Turner*
                                                                                        Sara M. Turner